# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - -X
STEVEN J. EDELSTEIN
            Plaintiff,

 v.                                  3:16-cv-01353 (WWE)

LUCAS BRAND EQUITY, LLC,
HYD USA, LLC, AND JAY LUCAS          February 23, 2017
            Defendants

- - - - - - - - - - - - - - -X
                                Richard C. Lee
                                United States Courthouse
                                141 Church Street
                                New Haven, Connecticut




            PREJUDGMENT REMEDY HEARING




  Held Before:
       The Honorable Joan G. Margolis




            FALZARANO COURT REPORTERS, LLC
                 4 Somerset Lane
               Simsbury, CT  06070
                   860.651.0258
            www.falzaranocourtreporters.com

APPEARANCES:


    For the Plaintiff:

        MADSEN, PRIESTLEY & PARENTEAU, LLC
        402 Asylum Street
        Hartford, CT  06103
        860.246.2466
        wmadsen@mppjustice.com
        By:  WILLIAM G. MADSEN, ESQ.


    For the Defendants:

        THE LEHMAN LAW GROUP
        47-39 Vernon Boulevard
        Long Island City, NY  11101
        724.453.4626
        brian@lehmanlawgroup.com
        By:  BRIAN LEHMAN, ESQ.

```
1                    (Commenced:  9:41 a.m.)

2

3              THE COURT:  Thank you.  As you know, we

4         are here on Edelstein v. Lucas Brand Equity,

5         LLC, 3:16-cv-01353, a case assigned to Judge

6         Eginton.  Will counsel please identify

7         themselves for the record?

8              MR. MADSEN:  Yes, your Honor.  Good

9         morning.  Will Madsen representing the

10        plaintiff, Steven Edelstein.

11             MR. LEHMAN:  Brian Lehman representing

12        the three defendants, Lucas Brand Equity, Jay

13        Lucas, and HYD USA, LLC.

14             THE COURT:  As you know, we are here for

15        the evidentiary hearing on plaintiff's motion

16        for prejudgment remedy, filed on December

17        20th of last year, Entry No. 21, and referred

18        to me by Judge Eginton one week later; and

19        that is Entry No. 22.  Are we ready to

20        proceed?

21             MR. MADSEN:  Yes, we are, your Honor.

22             THE COURT:  Will the plaintiff please

23        call his first witness?

24             MR. MADSEN:  Yes.  Your Honor, I would

25        like to call Steven Edelstein to the witness
```

```
 1                    stand.

 2

 3   STEVEN J. EDELSTEIN, Witness, being first duly sworn by the

 4   Notary Public, was examined and testified, on his oath, as

 5   follows:

 6

 7                         DIRECT EXAMINATION

 8

 9                    THE CLERK:  Please state your name for

10             the record.

11                    THE WITNESS:  Steven J. Edelstein.

12                    THE CLERK:  Spell your last name.

13                    THE WITNESS:  E-d-e-l-s-t-e-i-n.

14                    THE CLERK:  And provide us your town of

15             residence.

16                    THE WITNESS:  I'm sorry?

17                    THE CLERK:  Your town of residence.

18                    THE WITNESS:  New Haven, Connecticut.

19                    THE CLERK:  Thank you.

20

21

22

23

24

25
```

```
1                        DIRECT EXAMINATION

2

3    BY MR. MADSEN:

4         Q      Good morning, Mr. Edelstein.  Are you the Mr.

5    Edelstein who is the plaintiff in the lawsuit captioned

6    Steven J. Edelstein v. Lucas Brand Equity, et al?

7         A      I am.

8         Q      In the lawsuit, you claim that you were hired,

9    worked for Lucas Brand Equity and HYD USA and then lost

10   your position; is that correct?

11        A      That is correct.

12        Q      Okay.  I'd like to go back to the beginning.

13   When were you first hired by Lucas Brand Equity and HYD

14   USA?

15        A      My start date was September 1, 2015.

16        Q      And how did you come about to become employed

17   at that time?

18        A      I was offered the position after an

19   acquisition of HYD for Men, LLC as an employee of both

20   Lucas Brand Equity and HYD for Men, LLC, which name then

21   changed to HYD USA, LLC.

22        Q      And prior to commencing your employment on

23   September 1, 2015, did you have conversations with a Mr.

24   Jay Lucas about the position?

25        A      I did.  Absolutely.
```

```
1        Q     Did you have more than one conversation?

2        A     Yes, I did.

3        Q     And what sort of things did you discuss in

4   advance of the commencement of your employment with LBE,

5   which is shorthand for Lucas Brand Equity, and HYD USA?

6        A     A variety of things, most notably, employment

7   as originally CEO of the entity as well as chief operating

8   officer, which then I ended up maintaining in that

9   position through the tenure of my position.

10               MR. LEHMAN:  Can he clarify which

11          entity?

12               MR. MADSEN:  We'll get to that.  And

13          actually, what I think, what I will do is, I

14          will introduce my first exhibit, which is

15          Exhibit 1.  I'm going to ask if you have any

16          objection to that.

17               MR. LEHMAN:  No.  That's fine.

18               MR. MADSEN:  Okay.  Your Honor, may I

19          approach the witness?

20               THE COURT:  Yes, please.

21               MR. MADSEN:  I do have an extra copy of

22          this.

23               THE COURT:  Thank you.

24               MR. MADSEN:  But I don't have extra

25          copies of all.  I apologize.
```

```
 1                    THE COURT:  Thank you.
 2                    MR. MADSEN:  Mr. Edelstein, I just
 3              handed you Exhibit 1, and your Honor, I will
 4              just let the record reflect that the
 5              defendants have no objection to this exhibit;
 6              so I move for its admission as a full
 7              exhibit.
 8                    THE COURT:  Exhibit 1 may be marked as a
 9              full exhibit.
10   BY MR. MADSEN:
11        Q     Can you identify Exhibit 1, Mr. Edelstein?
12        A     I certainly can, yes.
13        Q     And please identify it for me.
14        A     This is a letter of employment by Lucas Brand
15   Equity and HYD for Men to be employed as chief operating
16   officer at a salary of $120,000 per year plus benefits,
17   healthcare benefits, and any expenses paid on my behalf
18   approved by the company.
19        Q     Okay.  And next, do you see halfway down the
20   page where it says, there's a "re" line, r-e?  What does
21   it say next to that?
22        A     "Employment status."
23        Q     Okay.  And can you please read the first
24   sentence of this email from Mr. Lucas to you?
25        A     "Hi, Steve.  This letter is to confirm your
```

1    employment as chief operating officer for HYD for Men, a

2    portfolio company of Lucas Brand Equity, LLC."

3         Q    Okay.  And then it says after that that your

4    compensation was $120,000 per year.  Is that something you

5    discussed with Mr. Lucas prior to accepting this position?

6         A    Yes, I did.

7         Q    All right.  And was that a salary proposal

8    that you had requested of Mr. Lucas to fulfill the

9    services in this position?

10        A    Yes, I did.

11        Q    And he agreed to provide that?

12        A    Yes, he did.

13        Q    And how is it that this email from Mr. Lucas

14   to you was composed?  Did you ask for this?

15        A    I did.

16        Q    Why did you ask for it?

17        A    It was for verification of employment.

18        Q    Okay.  I would like to introduce the next

19   exhibit.

20             MR. LEHMAN:  That's fine.  Can I keep

21        it, though?  I need a copy.

22             MR. MADSEN:  Yeah, that's fine.

23             MR. LEHMAN:  Thanks.

24             MR. MADSEN:  Your Honor, may I approach

25        the witness?

```
 1                    THE COURT:  Yes, please.
 2                    MR. MADSEN:  Unfortunately, I don't have
 3             an extra copy of this one, your Honor.
 4   BY MR. MADSEN:
 5        Q     Mr. Edelstein, I've just handed you Exhibit 2.
 6   First of all, can you read the date on this document?
 7        A     February 1, 2016.
 8        Q     And what is this document?  Can you identify
 9   it?
10        A     Yes.  It's a verification of employment again.
11   That was requested of our accounting manager at the time.
12        Q     Okay.  And who was the accounting manager?
13        A     Michael Lanzaro.
14        Q     Why was this letter provided to you, if you
15   know?
16        A     I needed verification for a lease for a car.
17                    MR. LEHMAN:  Your Honor, I do have one
18             objection.  I think it's hearsay, because
19             it's an out-of-court statement being
20             presented for the truth therein; but it's a
21             statement by Michael Lanzaro, who is not
22             here.
23                    MR. MADSEN:  I can fix that, your Honor.
24             Mr. -- and I thought you said you agreed to
25             this exhibit as a full exhibit.  Are you
```

```
 1                   withdrawing that?
 2                        MR. LEHMAN:  Okay.  So I withdraw that.
 3                        MR. MADSEN:  Okay.  That's fine.
 4      BY MR. MADSEN:
 5           Q      Mr. Edelstein, this document, Exhibit 2, is
 6      authored by Michael Lanzaro; correct?
 7           A      That is correct.
 8           Q      Okay.  And Mr. Lanzaro held what position in
 9      relation to Lucas Brand Equity, dash, HYD USA?
10           A      He was responsible for accounting, both
11      accounts receivable and payable, for both my salary as
12      well as expenses that were paid on behalf of the
13      corporation.
14                        MR. LEHMAN:  I guess I would object.  I
15              don't know the basis for how you know that.
16                        THE WITNESS:  I worked with him.
17      BY MR. MADSEN:
18           Q      Okay.  Can you explain how you know?
19           A      How do I know that?
20           Q      Yes.
21           A      I worked directly with Michael Lanzaro.  It
22      was instructed to me through both Jay Lucas and Karen
23      Ballou that Michael would be responsible for that
24      accounting practice.
25                        MR. LEHMAN:  Are you saying that both of
```

1              them instructed that?

2                   THE WITNESS:  Both of them at times

3              instructed that Michael Lanzaro was

4              responsible for all payments to both myself

5              and expenses on behalf of the company.

6                   MR. LEHMAN:  So the basis of your

7              knowledge is their statements, so I would

8              object.  That's hearsay.

9    BY MR. MADSEN:

10        Q     Did you, Mr. Edelstein, have multiple

11   opportunities to work with Mr. Lanzaro during your

12   employment?

13        A     I certainly did.

14        Q     Okay.  And Mr. Lanzaro was commonly referred

15   to as the accountant, the company accountant?

16        A     That is correct.

17        Q     And did he have agency and authority for HYD

18   USA?

19        A     Rephrase that because I'm not quite sure what

20   you're referring to.

21        Q     What was Mr. Lanzaro's role with respect to

22   HYD USA?

23        A     He was responsible for all accounting of that

24   particular portfolio holding.

25                   MR. MADSEN:  Okay.  Your Honor, I

1            believe the testimony has established that

2            Mr. Lanzaro was an agent.  He was a company

3            accountant, and this is a document provided

4            to Mr. Edelstein in response to a request for

5            verification of employment.  I believe that

6            it falls under the exemption for the hearsay

7            rule.

8                  MR. LEHMAN:  And I would object.  I

9            don't believe that the witness has a basis

10           for knowing Mr. Lanzaro's position here, so I

11           don't know how we can verify that without --

12                 THE COURT:  I would ask plaintiff's

13           counsel to continue on to expand upon this

14           plaintiff's interaction with Mr. Lanzaro.

15                 MR. MADSEN:  Okay.

16                 THE COURT:  How often he saw him, where

17           his office was located, etc.

18  BY MR. MADSEN:

19        Q     Mr. Edelstein, how often did you interact with

20   Mr. Lanzaro?

21        A     Several times a week.

22        Q     Okay.  And did you communicate with him by

23   telephone?

24        A     Yes, sir.

25        Q     Did you communicate with him by email?

```
 1          A       Yes, sir.

 2          Q       Okay.  Was he ever present in meetings that

 3    you had with Jay Lucas?

 4          A       No.  Unfortunately, he was not.

 5          Q       Okay.  And did Mr. Lanzaro have -- and you

 6    were chief operating officer of HYD USA during this time

 7    period?

 8          A       Correct.

 9          Q       As chief operating officer, was it your

10    responsibility to know who the agents and officers were

11    for HYD USA who had the authority to ask on their behalf?

12          A       Yes.

13          Q       Okay.  And based on that knowledge, did you

14    understand that Mr. Lanzaro was the company accountant who

15    was duly authorized to act on behalf of HYD USA?

16          A       Yes.

17                  MR. LEHMAN:  Your Honor, my objection

18                  would be that he just testified that he was

19                  the accountant for HYD; but this is being

20                  submitted as an exception to the hearsay rule

21                  because he's the accountant for Lucas Brand

22                  Equity, which he didn't mention in any of the

23                  testimony.

24                  THE COURT:  If you can ask the questions

25                  again with respect to Lucas Brands.
```

```
 1   BY MR. MADSEN:
 2           Q      Okay.  Did Mr. Lanzaro -- withdraw that.
 3           Were you also employed by Lucas Brand Equity in
 4   addition to HYD USA?
 5           A      Yes.
 6           Q      And during the course of your employment with
 7   Lucas Brand Equity, slash, HYD USA, did you receive
 8   compensation checks from both of those entities?
 9           A      Yes, I did.
10           Q      Did you have an understanding that Mr. Lanzaro
11   has agency authority with respect to Lucas Brand Equity?
12           A      Yes.
13                  MR. LEHMAN:  What is the basis of your
14                  understanding?  Or objection.  I don't know
15                  the basis of your understanding.
16                  THE WITNESS:  The basis -- explain to me
17                  what you're referring to.
18                  THE COURT:  How did you come to that
19                  conclusion?
20                  THE WITNESS:  First of all, I dealt
21                  directly with Mr. Lanzaro in terms of these
22                  different expenses that were paid on a daily
23                  basis.  He was communicated as the accounting
24                  manager and responsible for those payments,
25                  and it was verified.
```

```
 1                      MR. LEHMAN:  Who communicated this?
 2                      THE WITNESS:  Karen Ballou specifically.
 3                      MR. LEHMAN:  She's not here, and I would
 4              object because it's an out-of-court statement
 5              being presented for the truth therein.
 6   BY MR. MADSEN:
 7         Q      Who is Karen Ballou?
 8         A      Karen Ballou is the co-CEO or senior partner
 9      in Lucas Brand Equity.
10         Q      Does she have management authority?
11                      MR. LEHMAN:  Objection.  What's your
12              basis for that?  How do you know that that's
13              true?
14                      MR. MADSEN:  Your Honor, this is
15              irregular.
16                      THE COURT:  Please ask him about his
17              interactions with Ms. Ballou.
18   BY MR. MADSEN:
19         Q      Just so we're on the same page, could you
20      repeat what you said Karen's role was in Lucas Brand
21      Equity, LLC?
22         A      Co-CEO of Lucas Brand Equity, also senior
23      partner in Lucas Brand Equity.
24         Q      So she was an officer for Lucas Brand Equity?
25         A      Correct.
```

1        Q      Okay.  And you know that from your

2   interactions with her?

3        A      Correct.

4        Q      You know that from your interactions with Mr.

5   Lucas?

6        A      Correct.

7        Q      And you knew that in your capacity as chief

8   operating officer for Lucas Brand Equity, dash, HYD USA?

9        A      Correct.

10               MR. LEHMAN:  Your Honor, the first

11               exhibit says that this letter is confirming

12               employment of the chief operating officer of

13               HYD.  It doesn't mention Lucas Brand Equity.

14               The second letter, which I'm going to object

15               -- and I didn't object to that.  The second

16               letter, which I am objecting to, is being

17               submitted for the truth that he is the chief

18               operating officer of Lucas Brand Equity.

19               This witness is not here, the person who

20               stated it, so I'll just reiterate my

21               objection.

22               MR. MADSEN:  Your Honor, that's not what

23               the document says.  The document states, this

24               is Exhibit 2 for identification, "Steven J.

25               Edelstein has been chief operating officer

```
1                for Lucas Brand Equity, dash, HYD USA since

2                September 1, 2015."

3                     MR. LEHMAN:  And so those are different

4                descriptions, and they had plenty of time to

5                have this witness be here.

6                     MR. MADSEN:  But these are from agents

7                and managers of the defendants, and so I

8                believe that they fall within the exception

9                to the hearsay rule.

10                    MR. LEHMAN:  I've never seen this

11               document before.  I don't believe it's been

12               produced in discovery.

13                    MR. MADSEN:  Sir, you haven't served

14               discovery on us yet.

15                    MR. LEHMAN:  I'm asking -- you could

16               have produced this.  I'm saying you just

17               brought this in here today.  I'm asking --

18               you're saying this is from an agent --

19                    MR. MADSEN:  This has not been produced

20               in discovery because you have not served --

21                    MR. LEHMAN:  That's fine, but you're

22               saying that this has been produced by an

23               agent.  I don't know that that's true.  I've

24               never seen this.

25                    THE COURT:  Why don't we ask, when did
```

```
 1                    he receive the letter?
 2    BY MR. MADSEN:
 3            Q      Mr. Edelstein, when did you receive Exhibit 2?
 4            A      In February of 2016.
 5            Q      Were you employed as chief operating officer
 6       for HYD USA, dash, Lucas Brand Equity at that time?
 7            A      Yes.
 8                        MR. LEHMAN:  Objection.  You just
 9                   switched the names around.
10    BY MR. MADSEN:
11            Q      Were you employed by Lucas Brand Equity at
12       that time?
13            A      Yes.
14            Q      Were you employed by HYD USA at that time?
15            A      Yes.
16                        MR. LEHMAN:  So if we have his testimony
17                   saying that, I don't know why we're fighting
18                   over this.  That's his testimony.  But I do
19                   object that this is an out-of-court statement
20                   with a witness who is not here, and they had
21                   plenty of time to bring them.
22                        THE COURT:  Insofar as the document
23                   appears to be a business record, the
24                   objection is overruled; and it can be marked
25                   as a full exhibit.
```

```
1                    MR. LEHMAN:  A business record of HYD
2             USA.
3                    THE COURT:  Whoever is the company --
4                    MR. LEHMAN:  It's on HYD USA letterhead.
5                    THE COURT:  That's fine.
6   BY MR. MADSEN:
7         Q     And can you read the entire letter, Exhibit 2?
8         A     "Re:  Verification of employment.  To Whom it
9   May Concern:  Steven J. Edelstein has been chief operating
10  officer for Lucas Brand Equity, hyphen, HYD USA since
11  September 1, 2015.  His compensation is $120,000 per year,
12  which is paid in bimonthly installments.  This position
13  works an average of 40 hours per week.  Sincerely, Michael
14  Lanzaro, Stellar Accounting Services, accountant for Lucas
15  Brand Equity, hyphen, HYD USA."
16                   MR. LEHMAN:  I do have an objection.
17            The heading wasn't included, the logo wasn't
18            included, the date wasn't included, nor was
19            the bottom included.  Moving forward, though,
20            he doesn't have to read this.  It speaks for
21            itself.  If it's been submitted as an
22            exhibit, it says what it says.
23                   MR. MADSEN:  I have no further questions
24            on this exhibit, your Honor.
25                   THE COURT:  Thank you.
```

```
 1   BY MR. MADSEN:
 2        Q      I'm going to back up a little bit, Mr.
 3   Edelstein.  What is Lucas Brand Equity?  Can you explain
 4   what that entity is?
 5        A      Yes.  It is a private equity, limited fund
 6   portfolio holding company that acquires emerging brands,
 7   primarily in the health, beauty, wellness, and personal
 8   care industries.
 9        Q      Thank you.  And so Lucas Brand Equity is a
10   private equity firm?  Is that correct?
11        A      Correct.
12        Q      And this Lucas Brand Equity had a portfolio of
13   companies.  Is that correct?
14        A      That is correct.
15        Q      And one of those companies was HYD USA?
16        A      Correct.
17        Q      And you were hired to run HYD USA; is that
18   correct?
19        A      Correct.
20        Q      And your title initially was chief executive
21   officer?
22        A      Correct.
23        Q      But it was later changed to chief operating
24   officer?
25        A      Correct.
```

1          Q       And was this company, HYD USA, a portfolio

2     company of Lucas Brand Equity, was it in start-up mode

3     when you were hired to run this company?

4          A       It was post-startup in terms of business

5     structure.

6          Q       Was it a profitable company when you were

7     hired to run it?

8          A       No, it was not.

9          Q       And does HYD USA sell products?

10         A       Yes, they do.

11         Q       Okay.  Can you give examples of some products

12    that it sells?

13         A       Yes.  Primarily in the personal care and

14    grooming space, moisturizers, conditioners, shampoos,

15    razor extenders, emollients -- a variety of skin care

16    products.

17         Q       What trade name were those products marketed

18    under?

19         A       HYD.

20         Q       Did HYD USA actually manufacture the products?

21         A       It was on an outsource basis but was overseen.

22         Q       So did HYD USA contract with manufacturers to

23    produce this -- manufacture these personal care products

24    that were sold --

25         A       Yes.

```
1          Q       -- under the HYD name?

2          A       Yes.

3          Q       And were you responsible for entering into

4    agreements or arrangements with third parties to

5    manufacture these line of goods?

6          A       Yes.

7          Q       Were you responsible for the marketing of HYD

8    USA goods?

9          A       Yes, but as part of a team.

10         Q       Okay.  What were your principal job activities

11   as chief operating officer for HYD USA?

12         A        I was responsible for all of the manufacturing

13   of the products; I was responsible for all of the

14   distribution of the products; I was responsible for all of

15   the vendor relationships, both front and back-end systems;

16   I was responsible for overseeing all of the development

17   and growth of the business to some extent; I was also

18   responsible for both resurrecting, growing, and enhancing

19   the retail relationships.

20         Q       Who was responsible for overseeing the

21   performance of HYD USA?

22         A       Hard question to answer because --

23         Q       Let me withdraw that.

24         A       Technically, it would be Jay Lucas.

25         Q       All right.  So as a portfolio company of Lucas
```

1    Brand Equity, did members of management within Lucas Brand

2    Equity oversee the performance of HYD USA and specifically

3    the work that you were doing in conjunction with HYD USA?

4         A      Very sporadically.

5                MR. LEHMAN:  Your Honor, I do object.

6                These are pretty leading questions.  He's

7                putting forth his testimony and just asking

8                the witness to say yes or no.

9                MR. MADSEN:  I'll try to correct that,

10               your Honor.

11               THE COURT:  Thank you.

12   BY MR. MADSEN:

13        Q      You mentioned Karen Ballou earlier.  Who was

14   Karen Ballou employed by?

15        A      Lucas Brand Equity.

16        Q      And how do you know that?

17               MR. LEHMAN:  Objection.  His basis for

18               knowing that?

19   BY MR. MADSEN:

20        Q      How do you know that?

21        A      Based on relationship with the corporation.

22        Q      And did you see documents that identified her

23   as a member of Lucas Brand Equity?

24        A      I did not.

25        Q      Did she tell you she was a member of Lucas

```
1     Brand Equity?

2          A     Yes, she did.

3          Q     Did she tell you she was a senior partner for

4     Lucas Brand Equity?

5          A     Yes, she did.

6          Q     Did Jay Lucas confirm that she was a partner

7     with Lucas Brand Equity?

8          A     No, he did not.

9                MR. LEHMAN:  Objection, your Honor.  The

10               last three questions have all been hearsay.

11               They're out-of-court statements being

12               submitted for the truth therein.  He's

13               testifying on behalf of Jay, testifying on

14               behalf of Karen.

15               THE COURT:  Why don't we ask the witness

16               as to his understanding?

17    BY MR. MADSEN:

18         Q     Okay.  So if you can just testify as to your

19    understanding as to what Karen Ballou was.

20         A     I'm sorry.  Say that again.  I apologize.

21         Q     Karen Ballou's role.

22               THE COURT:  What was your understanding

23               about her role?

24               THE WITNESS:  Sure.  As a senior partner

25               of Lucas Brand Equity and co-CEO of Lucas
```

```
 1                    Brand Equity.
 2    BY MR. MADSEN:
 3         Q      Did you have executive authority for the
 4    affairs of HYD USA?
 5         A      I did.
 6         Q      With regard to the areas of responsibility
 7    that you just testified to?
 8         A      That is correct.
 9         Q      Okay.  Is it the case that you did or did not
10    have to get approval from anyone at Lucas Brand Equity in
11    order to carry out your daily activities?
12         A      In terms of tasks and operations, no.
13         Q      What about in financial matters?  Did you have
14    to get approval or authority from any members of Lucas
15    Brand Equity in order to carry out your job duties and
16    responsibilities as chief operating officer for HYD USA?
17         A      Yes, I did.
18         Q      Did you have purchasing authority for HYD USA?
19         A      Only based on approval.
20         Q      Okay.  Who would you typically get that
21    approval from?
22         A      Karen Ballou.
23         Q      Did you also get approval from Jay Lucas with
24    respect to any financial matters or dealings of HYD USA?
25         A      I did not.
```

1    Q    Okay.  So you worked principally through Karen

2    Ballou with respect to financial matters for HYD USA.  Is

3    that correct?

4    A    Correct.

5    Q    And was it explained to you that in the course

6    of carrying out your job duties and responsibilities that

7    you would need to go to Karen Ballou in order to get that

8    authority so that you could consummate some of these

9    business transactions?

10    A    Never communicated.

11    Q    How did you come to understand that that was

12    the case?

13    A    Respect and understanding of the business.

14    Q    Okay.  And so did, in fact, Karen Ballou give

15    you approval and authority with respect to various

16    financial matters of HYD USA during the course of your

17    employment there?

18    A    Yes, when expenses needed to be paid.

19         MR. LEHMAN:  Your Honor, I do object.

20         He's saying the word "approval," but he just

21         testified he didn't need approval; it's based

22         on respect and understanding.

23         THE WITNESS:  No, that's not what I

24         said.

25    BY MR. MADSEN:

1       Q       Did you need approval in order to get certain
2   payments made to vendors of HYD USA?
3       A       I did.
4       Q       And did you have the authority to make those
5   payments on behalf of HYD USA?
6       A       I did not because I needed that approval.
7       Q       Okay.  Thank you.  Was the HYD USA business
8   ever profitable during your employment there?
9       A       It was not.
10      Q       How did the company receive its funding?
11      A       The funding was based on an agreement that was
12  signed between Lucas Brand Equity and a company called
13  ABJP, LLC, owned by Adam Berk.  It was an agreement of a
14  capital investment of a million-five, based on initial
15  tranches of money, approximately $40,000 per month to
16  $150,000 per quarter.  That was the agreement that was
17  made.
18      Q       Okay.  Now, during the time that you served as
19  chief operating officer for HYD USA, did HYD USA ever
20  experience insufficient funding?
21      A       On a consistent basis.
22      Q       Okay.  And how was the insufficient funding
23  addressed?
24      A       Verbally.
25      Q       Can you explain?

1       A       Sure.  It was addressed in three different

2    ways:  one, by communication between myself, Adam Berk,

3    and Lucas Brand Equity to no resolve; it was based on

4    expenses and vendor expenses or vendor payments that were

5    due that were never paid; and then through Michael

6    Lanzaro, who is the accounting manager.

7       Q       Now, turning back to Exhibit 2, which is

8    before you, it states here that the position works an

9    average of 40 hours per week.  Do you see that?

10      A       I do.

11      Q       Was this a full-time job for you?

12      A       It certainly was.

13      Q       Did you have any other job or employment

14   during the time that you served as chief operating officer

15   for HYD USA?

16      A       No.

17      Q       Were you running a business on the side at the

18   time you served as chief operating officer of HYD USA?

19      A       No.

20      Q       Was this your only job?

21      A       Yes.

22              MR. MADSEN:  I would like to introduce

23              Exhibit 3, which consists of defendants'

24              responses to plaintiff's first set of

25              interrogatories.

```
 1                    MR. LEHMAN:  No objections, if these are
 2              the ones that were given.
 3                    MR. MADSEN:  Thank you.
 4                    MR. LEHMAN:  Yes no objection.
 5                    THE COURT:  Accordingly, Exhibit 3 may
 6              now be marked as a full exhibit.
 7    BY MR. MADSEN:
 8         Q     Mr. Edelstein, I'm handing you Exhibit 3.  I
 9    would ask you to look at that document and tell me if you
10    can identify it.
11         A     Yes, I can.
12         Q     What is it?
13         A     I'm sorry?
14         Q     What is this document?
15         A     This is the response to our first set.
16         Q     Okay.  Thank you.  And I'd like you to turn to
17    Page 4 of Exhibit 3.
18                    MR. LEHMAN:  Your Honor, I do object.
19              This is, I guess, duplicative.  The
20              interrogatories speak for themselves.  We
21              don't need the witness to read them out loud
22              to verify that, whatever, Mr. Lucas was the
23              primary person who was interviewed.  What we
24              said is what we said.
25                    MR. MADSEN:  I'm not sure I understand
```

1                   the objection, your Honor.

2                        MR. LEHMAN:  Taking up a lot of time for

3                   something that it says what it says.  We

4                   don't need him to read it out loud.

5                        MR. MADSEN:  I'm going to ask him to

6                   read.  It's part of -- it's a full exhibit,

7                   and full exhibits can be used for any

8                   purpose.  I promise to be brief on this.  May

9                   I proceed, your Honor?

10                       THE COURT:  Yes, please.

11   BY MR. MADSEN:

12        Q     If you turn to Page 4, Interrogatory 8 --

13   actually, withdraw that.  I would like to first look at

14   Page 1, which asks the defendants to identify all persons

15   who answered the interrogatories and production requests.

16   Do you see the response given to Interrogatory No. 1?

17        A     Yes.

18        Q     What is the response?

19        A     "Jay Lucas, Lucas Brand Equity, 880 Third

20   Avenue, 18th Floor, New York, NY, 10022."

21        Q     Okay.  And then I would like you to turn to

22   the last page of Exhibit 3, which says, "Certification of

23   response of the Defendants' responses to Plaintiff's first

24   set of the interrogatories."  Do you see that?

25        A     I do.

1      Q      Okay.  And who signed this verification?

2      A      Brian Lehman.

3      Q      Did Mr. -- to your knowledge, did Mr. Lucas

4    sign a verification attesting to the veracity of these

5    interrogatories?

6      A      Not to my knowledge.

7      Q      Thank you.  I would like you to turn to Page

8    4, and Interrogatory 8 states, "Please state fully and

9    specifically the complete factual basis for Defendant's

10   contention that Plaintiff was never an employee of the

11   Defendants as described in Paragraph 34 of your answer,

12   dated October 11, 2016."  Do you see that?

13     A      I do.

14     Q      Okay.  And it's a fairly lengthy response, but

15   it's important.  I'd ask you to read that response for the

16   Court.

17     A      Defendant HYD USA, LLC entered into a

18   consultant agreement with Logical Step, LLC, a company

19   that Plaintiff promotes as a, quote, brand management

20   marketing operations, parentheses, fulfillment, slash,

21   logistics, comma, customer care, end parentheses.  Firm

22   dedicated to the enhanced revenue and growth of business,

23   utilizing direct customer, direct response, quote, end

24   quote, methodology, including financial modeling, tactful

25   marketing, intuitive implementation, and operations

1    expertise, end quote.  Http, colon, forward slash, forward

2    slash, www.linkedin.com, forward slash, in, forward slash,

3    stevenjedelstein J. Edelstein, parentheses, last viewed,

4    January 25, 2017, end parentheses.

5         "The other defendants did not have a contractual

6    relationship with A Logical Step, LLC.  Defendants further

7    state that they have not yet decided yet which additional

8    facts, documents, law, or other information it will rely

9    upon in its defense.  When Defendants have made such a

10   decision, they will provide a response to the extent that

11   such a production is not protected by attorney work

12   product privilege."

13        Q    Thank you.  Now, you just read defendants'

14   interrogatory response, which states that defendant HYD

15   never had a -- never had a contractual -- withdraw that --

16   which states that defendant HYD entered into a consulting

17   arrangement with Logical Step, LLC."  Do you see that?

18        A    I do.

19        Q    What is Logical Step, LLC?

20        A    Logical Step was a company that I ran many

21   years ago, which was a management, consulting, management

22   -- campaign management firm.

23        Q    When did you run that company?

24        A    From 2006 from 2011.

25        Q    Okay.  And did Logical Step, LLC have an

```
 1    employee identification, employer identification number?

 2         A    It did.

 3         Q    And did you, in fact, have consulting

 4    arrangements through Logical Step in the 2006 to 2011 time

 5    period?

 6         A    I did.

 7         Q    And when you provided those services, did you

 8    invoice your client or customers?

 9         A    I did.

10         Q    And did they make checks payable to Logical

11    Step, LLC?

12         A    They did.

13         Q    Did they issue Forms 1099 reflecting Logical

14    Step's LLC employer identification number?

15         A    They did.

16         Q    Okay.  And when was the last time you received

17    a check made out to Logical Step, LLC?

18         A    2011.

19         Q    Did HYD USA or Lucas Brand Equity ever receive

20    an invoice from Logical Step, LLC?

21         A    Ever?

22         Q    Well --

23         A    Explain it to me.

24         Q    Well, did HYD -- did Lucas Brand -- during the

25    time that you were chief operating officer for Lucas Brand
```

1    Equity and HYD USA --

2         A    Right.

3         Q    -- did Logical Step ever submit invoices to

4    Lucas Brand Equity or HYD USA?

5         A    Never.

6         Q    Did Lucas Brand Equity or HYD USA ever issue

7    payment to Logical Step, LLC?

8         A    Never.

9         Q    Okay.  Did Mr. -- did Mr. Lucas ever --

10   withdraw that.  When was the first time you heard this

11   statement here that Defendant HYD USA, entered into a

12   consulting agreement with Logical Step, LLC?  When was

13   first time you heard that contention?

14        A    When this document was filed.

15        Q    In your conversations with Jay Lucas regarding

16   your role as chief operating officer and during your

17   employment as chief operating officer, did the two of you

18   ever discuss Logical Step as being the business entity

19   that was providing the services?

20        A    No.

21        Q    Did it ever come up in conversation?

22        A    No.

23             MR. MADSEN:  I would like to introduce

24             Exhibit 4.  I'm not quite sure what it is,

25             but --

```
 1                    MR. LEHMAN:  Do you want to establish
 2             what it is?
 3                    MR. MADSEN:  Yes, I will.
 4                    MR. LEHMAN:  I don't have objection to
 5             you establishing what it is.
 6  BY MR. MADSEN:
 7        Q     Mr. Edelstein, I'd like to hand you Exhibit 4
 8     for identification.  Without reading from the document,
 9     can you identify what it is?
10        A     Yes, I can.
11        Q     What is it?
12        A     It is a tax document reflecting payment by
13     both Lucas Brand Equity and HYD USA.
14        Q     Who issued this document to you?
15        A     Michael Lanzaro.
16        Q     Okay.
17                    MR. MADSEN:  Your Honor, I offer this
18             document.
19                    MR. LEHMAN:  I mean, I do object because
20             it's an out-of-court statement being
21             submitted for the truth therein and that I
22             don't know -- I mean, one, Lucas Brand Equity
23             LP is strangely typed up here.  I just --
24             I've never seen this before.  It wasn't
25             produced.  Again, it's -- we haven't made a
```

1          document request, but I don't know where this

2          came from.  The reason why it's a hearsay

3          objection, he could have easily typed this up

4          at home and said this is the document.

5  BY MR. MADSEN:

6      Q    Mr. Edelstein, did you type out this document?

7      A    I did not.

8              MR. LEHMAN:  Or any other person could

9          have typed it up.

10 BY MR. MADSEN:

11     Q    Mr. Edelstein, who provided this document to

12 you?

13     A    It was provided by the corporation.

14             MR. LEHMAN:  Which corporation?

15             THE WITNESS:  It was provided under the

16         guidance or the authority of Michael Lanzaro

17         acting as the accounting manager for Lucas

18         Brand Equity and HYD USA.

19             MR. LEHMAN:  You just said one single

20         corporation; is that correct?

21             THE WITNESS:  It's from both companies.

22             MR. MADSEN:  Your Honor, I offer this.

23             MR. LEHMAN:  I do object that the person

24         who offered it it is not here.  It is

25         hearsay.

```
 1                    MR. MADSEN:  Your Honor, it's -- was
 2            this document produced in the ordinary course
 3            of business?
 4                    THE WITNESS:  Yes, it was.
 5                    MR. MADSEN:  Your Honor, I --
 6                    MR. LEHMAN:  Could you explain your
 7            basis for the ordinary course of business
 8            that this was produced?
 9                    THE WITNESS:  At the end of the year,
10            January 31st, of the tax year, you're
11            required to produce these types of documents
12            for tax return purposes.
13                    THE COURT:  To the best of your
14            knowledge, did other employees receive
15            similar documents?
16                    THE WITNESS:  To the best of my
17            knowledge, correct.
18                    MR. MADSEN:  Your Honor, I offer it as a
19            full exhibit.
20                    THE COURT:  Accordingly, exhibit 4 may
21            be marked as a full exhibit.
22                    MR. MADSEN:  Your Honor, I do have an
23            extra copy of this document.
24                    THE COURT:  Thank you.
25   BY MR. MADSEN:
```

1        Q        Okay.  Mr. Edelstein, at the top of Exhibit 4,

2    do you see that the top left box where it indicates, it

3    says "payers name," and in between those two lines, it

4    says something.  Can you read that?

5        A        "Lucas Brand Equity, LP."

6        Q        Okay.  And then it gives an address; correct?

7        A        Correct.

8        Q        Okay.  Does this -- is this a 1099

9    miscellaneous form that you received from Lucas Brand

10   Equity that reflects income that Lucas Brand Equity paid

11   to you in 2015?

12       A        That's correct.

13               MR. LEHMAN:  Your Honor, I object.

14               That's incorrect.  This is from Lucas Brand

15               Equity, LP, which is a Delaware limited

16               partnership, to my knowledge.  The defendant

17               in this case is not this entity.

18               MR. MADSEN:  Your Honor -- withdraw

19               that.

20   MR. MADSEN:

21       Q        Mr. Edelstein, in 2015, did you receive

22   $15,000 from Lucas Brand Equity by deposit?

23               MR. LEHMAN:  Objection.  I would ask him

24               not to say "Lucas Brand Equity" when there

25               are clearly different entities.  There is a

```
1                    limited partnership, and there is an LLC.
2    BY MR. MADSEN:
3         Q    Okay.  Do you know the difference between --
4    were you aware that there was a difference between an LP
5    and an LLC with respect to Lucas Brand Equity?
6         A    No.
7                    MR. LEHMAN:  He's the chief operating
8                    officer of the company that does private
9                    equity, according to him.  But regardless,
10                   this is an LP.  I'm not even sure -- I do
11                   object.  It's irrelevant to this hearing if
12                   it's from an LP, which is a different entity.
13                   MR. MADSEN:  Your Honor, it's not
14                   irrelevant because it shows that Mr.
15                   Edelstein was in fact paid by two corporate
16                   entities and received tax documents from two
17                   separate corporate entities, the first of
18                   which was called Lucas Brand Equity, LP, and
19                   the second one was called HYD USA, LLC.  And
20                   so your Honor, this is compensation that my
21                   client received in 2015 from these two
22                   entities in connection with his services
23                   performed as chief operating officer.
24                   THE COURT:  Why don't we get a
25                   foundation for how it is he said he received
```

```
1                    his payment, and does he know from what

2                    entity the payment came?

3                         MR. MADSEN:  Yes.

4    BY MR. MADSEN:

5         Q     Mr. Edelstein, how did you receive payment in

6    exchange for your services as chief operating officer?

7         A     Via wire payment.

8         Q     And did the wire transfers indicate the

9    originating source of the payment?

10        A     Yes, they did.

11        Q     And in 2015, did you receive wire payments

12   from Lucas Brand Equity?

13        A     Yes, I did.

14                    MR. LEHMAN:  Your Honor, I do object.

15                There is no such thing as Lucas Brand Equity.

16                There is an LLC --

17                    THE COURT:  Why don't we follow up on

18                that issue.

19   BY MR. MADSEN:

20        Q     All right.  What was your understanding as to

21   the entity from which you received the $15,000 in 2015?

22        A     In respect to Lucas Brand Equity, that was the

23   entity.

24                    MR. LEHMAN:  Your Honor, I object to the

25                relevancy of his understanding of where he
```

```
 1                      received the payment from.  He could have

 2                      understood it came from Mars, it doesn't

 3                      matter.  He received it from where he

 4                      received it.  It was from an LP, according to

 5                      this document, which is not a defendant in

 6                      this case.

 7   BY MR. MADSEN:

 8        Q     Mr. Edelstein, did the wire transfers -- did

 9    you receive notices of the wire transfers?

10                      MR. LEHMAN:  Your Honor, I object to the

11                      leading -- I'm not sure that's leading, but I

12                      do object to the extent that these are

13                      becoming leading questions where he's

14                      testifying and he asks for a yes or no.

15   BY MR. MADSEN:

16        Q     Did you receive -- did you receive money from

17    Lucas Brand Equity in 2015?

18        A     I did.

19        Q     And how do you know that?

20        A     I have the documentation, the -- what do you

21    call it? -- the wire transfer -- the transaction.

22                      MR. LEHMAN:  Your Honor, I object to the

23                      relevancy.  He's remembering now what

24                      documents he has.  It's not relevant.  The

25                      documents themselves should be submitted as
```

```
 1                evidence.
 2                     MR. MADSEN:  Your Honor, he's testifying
 3                from his knowledge, his recollection.  I
 4                believe that that's sufficient to --
 5                     THE COURT:  Let me ask, did you pay
 6                attention to the entity that was wiring the
 7                money to you?
 8                     THE WITNESS:  I did.
 9                     THE COURT:  What was the name of that
10                entity?
11                     THE WITNESS:  Lucas Brand Equity and HYD
12                USA, LLC, two different -- two different
13                accounts, depending on the payment cycle, was
14                paid out of either account.  There was no
15                rhyme or reason to it.
16                     MR. LEHMAN:  Your Honor, there is, as
17                far as I know, no such entity called "Lucas
18                Brand Equity," so it's confusing.
19                     MR. MADSEN:  He can get into that on
20                cross-examination, your Honor.
21                     MR. LEHMAN:  Okay.
22                     MR. MADSEN:  So just for the record, has
23                Exhibit 4 been entered as a full exhibit?
24                     THE COURT:  Yes.
25                     MR. MADSEN:  Okay.
```

```
1    BY MR. MADSEN:

2         Q      And if you look at the bottom half of Exhibit

3    4, does it reflect payment to you in the amount of $25,000

4    from HYD USA, LLC?

5         A      Yes.

6         Q      Now, you started, I believe you testified, on

7    September 1, 2015; is that correct?

8         A      Correct.

9         Q      And your compensation arrangement was $120,000

10   per year?

11        A      Correct.

12        Q      How was that paid?

13        A      It was paid in bimonthly installments, $5,000

14   on the 8th and the 22nd of each month.

15        Q      And those payments were wired to your account?

16        A      Yes, they were.

17        Q      Okay.  All right.  Now, when did you first

18   become -- withdraw that.

19                   MR. LEHMAN:  Your Honor, can I, when

20              it's convenient, can I go to the bathroom,

21              please?

22                   THE COURT:  Do you want to take a recess

23              now?

24                   MR. LEHMAN:  Yes.

25                   THE COURT:  Court stands in recess.
```

```
 1
 2                    (Recess:  10:26 to 10:32)
 3
 4                    THE COURT:  Thank you.  You may be
 5         seated.
 6                    MR. MADSEN:  May I resume, your Honor?
 7                    THE COURT:  Yes, please.
 8  BY MR. MADSEN:
 9         Q     Mr. Edelstein, you testified that you were
10  normally paid on the 8th and the 22nd of each month from
11  your employment as chief operating officer; is that
12  correct?
13         A     That's correct.
14         Q     And you received $10,000 per month?
15         A     That is correct.
16         Q     Now, you testified that you started on
17  September 1, 2015.  Did you work for the defendants
18  through the end of -- withdraw that.
19         You started working on September 1, 2015.  Did you
20  continue working as chief operating officer for HYD USA
21  through the end of 2015?
22         A     That's correct.
23                    MR. LEHMAN:  I do object to the leading
24              questions, your Honor.
25                    MR. MADSEN:  I don't think that was
```

```
1                    leading, but I will attempt --  I did say,

2                    did he work until the end of December.  I

3                    wasn't saying, didn't he work.  I'll try to

4                    --

5                         MR. LEHMAN:  When did you end your --

6                         THE COURT:  Were you still employed as

7                    of December 31st by the defendants.

8    BY MR. MADSEN:

9         Q    Were you still employed as of December 31,

10   2015?

11        A    Yes.

12        Q    How many months did you work in 2015 as chief

13   operating officer for HYD USA?

14        A    Four months.

15        Q    Four months.  Okay.  And so at $120,000 per

16   year, what was your compensation over the course of those

17   four months?

18        A    Forty thousand dollars.

19        Q    And if you look at Exhibit 4, does the

20   cumulative total of the payments you received from Lucas

21   Brand Equity, LP and HYD USA, LLC amount of $40,000?

22        A    Yes, it does.

23        Q    So these two documents accurately reflect the

24   compensation you received as chief operating officer in

25   2015?
```

1          A       Yes, they did.

2          Q       Thank you.  Now, at some point, you became

3     aware that you were being -- that your income was being

4     reported under a 1099 miscellaneous.  Is that correct?

5          A       That is correct.

6          Q       And your -- well, when did you become aware

7     that you were being treated as a 1099 employee?

8          A       It was several months into my employment.

9          Q       Okay.  And did you have any concerns about the

10    fact that you were being paid as a 1099 employee?

11         A       Many.

12         Q       And did you raise any concerns with Mr. Lucas

13    or Ms. Ballou?

14         A       I did, but primarily those concerns were

15    administrated by Michael Lanzaro because he is responsible

16    for all accounting of the business -- businesses.

17                 MR. LEHMAN:  Your Honor, two objections.

18                 One, it's leading.  He could have just said,

19                 Who did you raise these concerns with?  But

20                 in addition, it's a compound question that

21                 puts them both, Jay and Karen, at the same

22                 time.  He should just ask one at a time to

23                 make it the record clearer.

24                 THE COURT:  One at that time, please.

25                 MR. MADSEN:  Thank you.

1   BY MR. MADSEN:

2        Q      Did you raise any concerns that the defendants

3   were not withholding taxes from your pay?

4        A      I did.

5        Q      And who did you raise those concerns with?

6        A      To Michael Lanzaro.

7        Q      And did Mr. Lanzaro provide an explanation for

8   why taxes were not being withheld from your paychecks?

9        A      He did.

10       Q      What did he say?

11       A      His comment was that the accounting system

12  that was being put in place was not set up properly, and

13  they did not have a payroll service.

14       Q      Thank you.  Mr. Edelstein, bearing in mind

15  your testimony that you were normally paid on the 8th and

16  the 22nd of each month, were there ever times when you

17  were not paid in a timely fashion?

18       A      Many.

19              MR. LEHMAN:  Your Honor, I do object to

20              the characterization of his testimony which

21              would speak for itself.  It's already been

22              recorded.  He doesn't need to characterize it

23              and ask the question.

24              THE COURT:  I will allow the witness to

25              answer the times he was not paid on the 8th

1                    or the 22nd of the month.

2    BY MR. MADSEN:

3         Q     Were there ever times when you were not paid

4    on 8th and the 22nd of each month?

5         A     Yes.

6         Q     And is it or is it not the case that there

7    were times when the defendants fell behind in making their

8    payments to you?

9         A     Yes.

10        Q     Okay.  Did you ever ask why?

11        A     Many times.

12        Q     Who did you ask?

13        A     Michael Lanzaro, Jay Lucas, Karen Ballou.

14        Q     Did anyone provide an explanation to you as to

15   why you were not paid on time with respect to those

16   instances?

17        A     There were a few explanations.  Most notably,

18   payment would be guaranteed, they are behind on their

19   investments, money is being raised -- there were a variety

20   of different excuses.

21             MR. LEHMAN:  Your Honor, I do object to

22             assuming a fact that hasn't been proven when

23             he said that the defendants were falling

24             behind.  It hasn't been proven the defendants

25             owed him anything as all defendants.  Maybe

```
1              HYD, maybe Lucas, maybe Lucas Brand Equity,
2              but to assume that right now is improper.
3   BY MR. MADSEN:
4       Q    You worked as chief operating officer at the
5   rate of $10,000 per month; correct?
6       A    Correct.
7       Q    You were supposed to get paid on the 8th and
8   the 22nd of each month; correct?
9       A    That is correct.
10      Q    They, the defendants -- well, did the payments
11  sometimes come late?
12      A    They did.
13      Q    Okay.  And did you raise concerns?
14      A    I did.
15      Q    What was the response given to you as to why
16  payment was not made to you?
17      A    Investment money is being generated, they
18  don't have the money, monies would be paid -- again, a
19  variety of excuses.
20              MR. LEHMAN:  Your Honor, I object.  The
21              question was vague because he didn't say --
22              we're not specifying anyone here.  We're not
23              saying who did you raise objections to.
24              You're saying who -- there was no subject to
25              your verb and object.
```

```
1              THE COURT:  I'll allow the witness to
2          answer to whom he raised the concerns and who
3          specifically gave him the following
4          responses.
5   BY MR. MADSEN:
6          Q    Okay.  You testified as to whom you raised the
7   concerns.  My question is, who gave you the response that
8   you just testified to?
9          A    Jay Lucas, Karen Ballou, Michael Lanzaro.
10         Q    Okay.  Let's start with Mr. Lucas.  What did
11  Mr. Lucas say to you with regard to the fact that you were
12  late in receiving payment?
13         A    That monies were being generated, investments
14  were being waited on, monies would be guaranteed, quote
15  unquote, we will make you whole and up to date on what is
16  owed to you.
17         Q    Okay.  What did Ms. Ballou say to you in
18  regards to the same inquiry?
19              MR. LEHMAN:  Your Honor, I would object.
20          It's hearsay.  Ms. Ballou is not a defendant
21          in this case, so there's no even exception to
22          the hearsay that he would be asking to --
23              THE COURT:  I'll allow the witness to
24          say what explanation was given to him not for
25          the truth of the content, but this is the
```

```
1                    explanation that he was given.  Not of the
2                    fact that it was true, but this was the
3                    response they gave him.  So it's not for a
4                    hearsay purpose.
5                         MR. LEHMAN:  Then I would object as to
6                    relevance.  What's the relevancy to answer
7                    that question, if it is not for the truth?
8                         THE COURT:  I'm overruling that.  Please
9                    answer.
10                        THE WITNESS:  I'm sorry.  Can you
11                   rephrase the question?  I apologize.
12                        THE COURT:  What were the responses that
13                   were given to you?
14                        THE WITNESS:  Sure.  Monies were being
15                   raised; they were behind in their payment
16                   schedules; money owed was guaranteed to be
17                   paid, quote, unquote.  Again, we will make
18                   you whole and up to date on what is due.
19   BY MR. MADSEN:
20        Q    Were there ever times in 2016 where payments
21   were late, where your compensation payments were late?
22        A    They were.
23        Q    Okay.  And did you receive the assurances that
24   you described in 2015?
25                        MR. LEHMAN:  Your Honor, I object.  It's
```

1                    vague.  Assurances from who?

2    BY MR. MADSEN:

3         Q      Did you receive the assurances from Jay Lucas

4    that your compensation was guaranteed and would be paid?

5         A      I did.

6         Q      That was in 2015?

7         A      That is correct.

8         Q      In fact, in 2015, did you in fact receive the

9    payments that were late?

10        A      I did.

11        Q      Now, in 2016, did you go for a period of time

12   without receiving any pay whatsoever?

13        A      I did.

14        Q      When did that start?

15        A      Last payment received in terms of pay period

16   was the end of May of 2016.

17        Q      Okay.  And what, if anything, did you do about

18   that?

19        A      Multiple, multiple phone calls.  Some were

20   never returned, most were never returned, text messages,

21   phone calls, text messages, phone calls repeatedly.

22        Q      To whom in particular?

23        A      To Jay Lucas, Karen Ballou, Michael Lanzaro.

24        Q      And did any of those three individuals give

25   you a response as to why payments, your compensation

1    payments, were late in 2016?

2          A     Very rarely from Jay Lucas, sporadically by

3    Karen Ballou, consistently by Michael Lanzaro, but he was

4    always waiting on the quote, unquote, list of who was to

5    be paid and who was not.

6          Q     Thank you.  Did Mr. Lucas at any time offer an

7    opinion as to whether or not he would make good on making

8    sure that you received your compensation?

9          A     He did.

10         Q     What did he say specifically?

11         A     Above and beyond explaining the situation, we

12   will guarantee that payment will be made, that you will be

13   made whole and paid up to date.

14         Q     Okay.  And based on -- withdraw that.

15          Did you continue working as chief operating officer

16   of HYD USA notwithstanding the fact that you were not

17   getting paid?

18         A     I did.

19         Q     Why did you continue working there?

20         A     Because I was assured that payment would be

21   made, that things would be brought up to speed, and I'm a

22   very loyal and diligent person, if that means anything.

23         Q     Now, did you work for Lucas Brand Equity in --

24   for the -- I'm sorry.  Did you work as chief operating

25   officer for HYD USA for the entire month of May, 2016?

1          A      I did.

2          Q      Did you work for the entire months of June,

3    July, and August of 2016?

4          A      I did.

5          Q      Did you ever receive payment for your services

6    as chief operating officer for HYD USA?

7          A      I did not.

8          Q      And was it during that time that Mr. Lucas

9    made these promises to you, assurances, that you would

10   receive payment?

11         A      That is correct.

12         Q      Okay.  Did Mr. -- during the period of May

13   through August, 2016, did Mr. Lucas ever tell you that you

14   were no longer employed as chief operating officer for HYD

15   USA?

16         A      Absolutely not.

17         Q      Did anyone at -- did Karen Ballou make such a

18   statement?

19         A      No.

20         Q      Did anyone associated with HYD USA or Lucas

21   Brand Equity make the statement to you that you were no

22   longer an employee, you were no longer employed as chief

23   operating officer for HYD USA?

24         A      No.

25         Q      Now, at a certain point, Mr. Edelstein, you

1        decided to take legal action; is that correct?

2              A      That is correct.

3                     MR. LEHMAN:  No objection.

4                     MR. MADSEN:  Your Honor, may I approach?

5              Mr. Edelstein, I just handed you Exhibit 5.

6              And your Honor, the defendant has --

7              defendants have stated that they do not

8              object to Exhibit 5.  I offer it as a full

9              exhibit.

10                    THE COURT:  Just identify what it is for

11             the record.

12                    MR. MADSEN:  August 9, 2016 complaint

13             filed in U.S. District Court for the District

14             of Connecticut by Steven J. Edelstein v.

15             Lucas Brand Equity, LLC and HYD USA, LLC and

16             Jay Lucas.

17                    THE COURT:  Accordingly, Exhibit 5 may

18             now be marked as a full exhibit.

19                    MR. LEHMAN:  Your Honor, I do object.

20             Except for the date filed, this document is

21             no longer relevant; there was an amended

22             complaint.  Legally speaking, this has no

23             legal relevance now.

24                    THE COURT:  Except to indicate the date

25             on which it was filed.

```
 1                    MR. LEHMAN:  Yes.

 2                    MR. MADSEN:  Thank you.

 3   BY MR. MADSEN:

 4        Q      Why did you decide to take legal action?

 5        A      Primarily because it was my last resort in

 6   trying to get paid for the services and for the job that I

 7   was performing.

 8        Q      Okay.  Were you still working there at the

 9   time you filed this complaint?

10        A      I was.

11        Q      All right.  And after filing this complaint on

12   August 9, 2016, did you continue to have interactions with

13   Karen Ballou?

14        A      I did.

15        Q      Did you continue to have interactions with Mr.

16   Lanzaro?

17        A      I did.

18        Q      Did you continue to, on a full-time basis,

19   provide services as chief operating officer for HYD USA?

20        A      I did.

21        Q      Mr. Edelstein, did there come a time when you

22   learned that you were no longer an employee of Lucas Brand

23   Equity or, I'm sorry, you were no longer employed as chief

24   operating officer for HYD USA?

25        A      Rephrase that because --
```

1          Q      Did there come a time, a point in time, when

2     you learned that you were no longer employed as chief

3     operating officer for HYD USA?

4          A      Only through counsel.

5          Q      Okay.  I would like to -- who was the lawyer

6     representing the defendants when this case was first

7     filed, to your knowledge?

8          A      Larry Peikes.

9          Q      Did you understand that Mr. Peikes was having

10    communications with me regarding your employment status?

11         A      I did.

12         Q      As chief operating officer for HYD USA?

13         A      I did.

14         Q      Okay.  Thank you.

15               MR. LEHMAN:  Objection.  It's vague.  I

16           don't know what time frame he's referring to.

17               MR. MADSEN:  Okay.  Well, I can --

18    BY MR. MADSEN:

19         Q      Was this during the first couple of months of

20    the lawsuit pending?

21         A      Yes.

22               MR. MADSEN:  Thank you.  Your Honor --

23           well, do you have an objection to this

24           document?

25               MR. LEHMAN:  Yes.  It's hearsay.  It's

```
 1                    Lawrence Peikes' statements, and he's not
 2                    here.
 3                         MR. MADSEN:  Okay.  Your Honor, I would
 4                    like to present this exhibit to the witness
 5                    for identification.
 6   BY MR. MADSEN:
 7        Q     Mr. Edelstein --
 8                         MR. LEHMAN:  Can I have a copy?
 9   BY MR. MADSEN:
10        Q     Mr. Edelstein, did you -- were you aware that
11    Mr. Peikes was representing the defendants in this action
12    as of September of 2016?
13        A     Yes.
14                         MR. MADSEN:  And your Honor, I'll let
15                    the record reflect that in the docket entry,
16                    Mr. Peikes has entered an appearance on
17                    September 7, 2016, on behalf of the
18                    defendants.
19                         MR. LEHMAN:  Your Honor, I object.  Mr.
20                    Madsen is submitting an email he was sent
21                    from the attorney for the defendants to him,
22                    and now he's making himself a witness, which
23                    would lead to automatic disqualification.
24                         MR. MADSEN:  Your Honor, these are
25                    communications regarding the plaintiff's
```

1                    employment status between two representatives

2                    for the clients.  It is not hearsay.  It

3                    falls within the exception to hearsay.

4                         MR. LEHMAN:  Your Honor, this email was

5                    sent to the attorney who is now representing

6                    him in court.  It makes him a witness.  He is

7                    now disqualified if he submits this exhibit.

8                         MR. MADSEN:  No.  Your Honor, I disagree

9                    with that.

10                        THE COURT:  Only if the issues are

11                   contentious.

12                        MR. MADSEN:  Correct.

13                        THE COURT:  I'll have the witness

14                   answer.

15                        MR. MADSEN:  Okay.

16   BY MR. MADSEN:

17        Q     So did you learn on or about September 12,

18   2016, that you were no longer employed as chief operating

19   officer for HYD USA?

20        A     Only through counsel.

21        Q     Okay.  Given the fact that you continued not

22   to be paid --

23                        MR. LEHMAN:  Your Honor, I object to the

24                   last question.  Mr. Madsen just made himself

25                   a witness.  The question was, "Did you learn

1              on or about September 12th that you were no

2              longer employed by HYD?"  The answer is yes,

3              through counsel.  In order to verify that, he

4              would have to be on the stand.

5    BY MR. MADSEN:

6         Q    Did you receive a copy of the email that Mr.

7    Peikes sent to me on or about September 12, 2016?

8              MR. LEHMAN:  And it would be the same

9              objection.  Who did you receive it from?  If

10             you received it from his attorney, he's now

11             made himself a witness.

12             MR. MADSEN:  Your Honor, this is an

13             email from Mr. Peikes to me, stating that Mr.

14             Edelstein is no longer an employee as chief

15             operating officer for HYD USA.  This is

16             extraordinarily relevant that this was when

17             it was communicated through counsel that he

18             was no longer employed; so I don't see how

19             this document could possibly be kept out of

20             evidence.

21             MR. LEHMAN:  It's not that that I'm

22             objecting to.  I'm objecting to him now

23             representing this witness.  It will be a

24             contested issue when he was fired, when he

25             found out.  And now Counsel is saying that

1          the way in which he found out was through

2          counsel.  In order to talk about that, Mr.

3          Madsen will have to be on the stand at some

4          point.

5                    THE COURT:  Not necessarily today.

6                    MR. LEHMAN:  Not necessarily today.

7                    MR. MADSEN:  Correct.  Your Honor, I

8          offer it as a full exhibit.

9                    MR. LEHMAN:  I don't object to that.  I

10         do object -- I do move for him to be

11         disqualified.

12                   THE COURT:  If there comes a time in the

13         future that that is at issue, then obviously,

14         defendants are free to file a motion to

15         disqualify plaintiff's counsel.

16                   MR. LEHMAN:  Particularly also, it's an

17         issue on this PJA, which would be the only

18         relevant reason to submit it right now.

19                   MR. MADSEN:  Again, your Honor, I'm not

20         sure how to respond to that.

21                   THE COURT:  But you started to ask about

22         when he was paid for that month, so why don't

23         we ask that?

24                   MR. MADSEN:  So can the record reflect

25         that Exhibit 6 is now a full exhibit?

```
 1                    THE COURT:  Full exhibit, yes.
 2                    MR. MADSEN:  Your Honor, I have an extra
 3             copy.
 4                    MR. LEHMAN:  Your Honor, among other
 5             things, I think he is waiving attorney-client
 6             privilege because in order to talk to him
 7             about this, I have to find out what
 8             conversations he had with Mr. Edelstein.  The
 9             testimony here is that the first time he
10             found out was through counsel.  In order to
11             delve into that, there will be a deposition
12             notice that goes to Mr. Madsen.  If he wants
13             to go down that road, that's fine, but that
14             will happen.
15                    THE COURT:  We will reach that in the
16             future.  We'll have that to look forward to.
17   BY MR. MADSEN:
18        Q    If you go to the bottom of Exhibit 6, the
19   first pages of Exhibit 6, do you see that there's an email
20   from me, your attorney, to Mr. Peikes?
21        A    I do.
22        Q    Okay.  And can you please read that email?
23        A    "Larry, comma, can we speak with your clients
24   and advise me by 5 p.m. on Monday, May 12th," should be
25   September 12, 2016, "whether Steven J. Edelstein is still
```

1    employed by HYD USA and/or Lucas Brand Equity?"

2         Q      And then can you read the next email in the

3    chain?

4                MR. LEHMAN:  Your Honor, the email does

5                speak for itself.  It doesn't need to be read

6                out loud.  If there's something he wants to

7                highlight, that's fine; but listening to him

8                read an email is tedious.

9    BY MR. MADSEN:

10        Q      Was it clarified that the expected response

11   time for Mr. Peikes was September 12, 2016?

12        A      Correct.

13        Q      Thank you.  And then do you see that there's

14   an email from Mr. Peikes to me on September 12, 2016?

15        A      I do.

16        Q      Okay.  Now, I'd like you to read it, please.

17        A      "Will, I'm still looking into this matter and

18   therefore am working off incomplete information at this

19   juncture.  But here's what I do understand at this point,"

20   parentheses, "subject to further investigation," end

21   parentheses.  "Mr. Edelstein was retained on behalf of HYD

22   as a consultant to build the business.  He was compensated

23   at the rate of $10,000 per month, paid biweekly, on a 1099

24   basis.  HYD discounted [sic] payments to Mr. Edelstein

25   back in May due to the fact that he was not providing the

```
1     services he was retained to provide."
2               MR. LEHMAN:  Your Honor, I object.  He's
3          not reading it correctly.  He just said
4          "discounted" instead of "discontinued," which
5          is why the document speaks for itself.  We
6          don't need a witness reading it out loud.
7             THE WITNESS:  Do you want me to
8          continue?
9             THE COURT:  Yes, please, please.
10            THE WITNESS:  I'll rephrase that.  "HYD
11         discontinued payments to Mr. Edelstein back
12         in May due to the fact that he was not
13         providing the services he was retained to
14         provide."
15            MR. LEHMAN:  "These services."
16            THE WITNESS:  "For example," comma,
17         "there was no sales activity or product
18         development.  HYD was also lacking funds due
19         to the absence of revenue.  While Mr.
20         Edelstein apparently continued to circulate
21         occasional emails despite being told HYD
22         lacked funds to pay him, he has not provided
23         any tangible services."  Excuse me.  It would
24         therefore behoove Mr. Edelstein to
25         discontinue the activities he claims to have
```

```
 1                    been engaged in on HYD's behalf," period.
 2      BY MR. MADSEN:
 3           Q     Is it true that in May of 2016 that you
 4      stopped providing services as chief operating officer for
 5      HYD USA?
 6           A     That is not true.
 7           Q     Did you in fact continue to work on a
 8      full-time basis as chief operating officer for HYD USA up
 9      until September 12, 2016?
10           A     I did.
11           Q     When you received notice of this communication
12      from Mr. Peikes did you stop working at HYD?
13           A     I did.
14           Q     Thank you.  Now, from May until September of
15      2016, did you have ongoing interactions with Karen Ballou
16      in regard to the services you were providing as COO of HYD
17      USA?
18           A     I did.
19           Q     Did you have communications with Jay Lucas
20      during that period?
21           A     Very sporadically, if any.
22           Q     Did you have telephone conversations with Ms.
23      Ballou about your work as chief operating officer during
24      the May to September, 2016 time frame?
25           A     I did.
```

1        Q      And did you have email communications with Ms.

2    Ballou during that period of time?

3        A      I did.

4        Q      You did.  Okay.

5                MR. LEHMAN:  I have no objection.

6                MR. MADSEN:  Your Honor, defense counsel

7            has --

8                MR. LEHMAN:  Actually, I apologize since

9            I said I don't.  I do object again.  The

10           first part I don't of this email, whenever

11           Mr. Edelstein is saying whatever he said

12           because he's here, but Samantha Kafedzic is

13           talking on this.  I don't even know who she

14           is, but she's not here, and they had an

15           opportunity to bring her here.  So I object;

16           all that is hearsay.  And Karina Cabrera is

17           not here, so I object again to that being

18           hearsay.

19               MR. MADSEN:  So you do not stipulate to

20           this being a full exhibit?

21               MR. LEHMAN:  No.  Just the first part,

22           just the first -- anything from -- well, it's

23           -- okay.  I'll go -- I will not object to

24           this.  When we go individually through it, I

25           may object because you may have different

```
 1                    reasons for bringing it in, so that's fine.
 2                    MR. MADSEN:  Your Honor, Plaintiff's
 3              Exhibit 7 is a full exhibit?  Is that
 4              correct?
 5                    THE COURT:  Not yet.
 6                    MR. LEHMAN:  So -- well, I do object
 7              because I don't know the basis for where this
 8              document came from.  If you could establish
 9              that, then we could go to that level, and as
10              you ask questions on it, I may have
11              objections to, for example, using Samantha's
12              email.  The reason would be because someone
13              could easily change it as it goes back and
14              forth.  Just the fact that he sent this
15              doesn't mean that that's an accurate
16              reflection of what Samantha originally sent.
17              People can change it.
18  BY MR. MADSEN:
19        Q     Mr. Edelstein, I've just handed you Exhibit 7
20     for identification.  Without disclosing the contents of
21     this document, can you tell us what it is?
22        A     It is a communication to handle a past-due
23     balance with a vendor of the company.
24        Q     Okay.  Did you have email -- does this
25     document reflect email communications between you and --
```

1    well, who is Samantha Kafedzic?

2        A     She is the vice president of accounting for

3    the fulfillment vendor, J.M. Field.

4        Q     At the top of Exhibit 7, do you attempt to

5    raise a concern, an issue, to Jay Lucas and Karen in

6    regards to a matter concerning --

7                    MR. LEHMAN:  Your Honor, I object to the

8                    leading question as characterization of the

9                    email.  He could have said, What were you

10                   doing?  He doesn't need to say, "Did you

11                   attempt to raise a concern," and have the

12                   witness say yes or no.

13                   MR. MADSEN:  I can even do better.

14   BY MR. MADSEN:

15       Q     What were you trying to do in your email,

16   dated June 2nd, sent to Jay Lucas and Karen?

17                   THE COURT:  2016, I presume?

18                   MR. MADSEN:  Yup.  June 2, 2016.

19                   THE WITNESS:  Attempting to get them to

20                   pay the past-due balance.

21   BY MR. MADSEN:

22       Q     And did you -- were these emails generated in

23   the ordinary course of business?

24       A     They were.

25                   MR. MADSEN:  Your Honor, I offer this as

1          a full exhibit.

2               MR. LEHMAN:  I don't object for the

3          basis of the exhibit, but again, the hearsay

4          aspects.  I mean, so --

5               THE COURT:  So --

6               MR. LEHMAN:  It's a lot of just

7          different emails.  I don't object to the

8          first part, but I object to everything after

9          Page 1 because those are statements made by

10         people, unless you want to tell me what

11         reasons why you're submitting it.  Is it for

12         the truth of what's in here?

13              MR. MADSEN:  No.  It's not for the truth

14         of the matter asserted.

15              MR. LEHMAN:  So when Samantha says,

16         "We're going to have to suspend services if

17         we don't receive payment," you're not

18         submitting that to say that's a true

19         statement; you're saying it's for notice of

20         something else?

21              MR. MADSEN:  I'm presenting this

22         document as evidence that Mr. Edelstein

23         continued to perform services as chief

24         operating officer in June of 2016, and he

25         interacted with Mr. Lucas and Ms. Ballou

```
 1                   during that period.
 2                        THE COURT:  Goes to truth of his
 3                   communications with Ms. Ballou and Mr. Lucas
 4                   and the fact he had communications with
 5                   outside vendors thereafter, but not
 6                   necessarily for the truth.  Is that correct?
 7                        MR. LEHMAN:  So then here's the
 8                   objection.  I don't know, I just don't know
 9                   whether or not Mr. Lucas blocked them, so I
10                   don't know if there's interaction between him
11                   and Mr. Lucas.  I don't know if he wasn't
12                   receiving anything back as he was
13                   repetitively doing that.  That's a
14                   possibility.  So if that's --
15                        MR. MADSEN:  I don't think that that
16                   matters, whether or not Mr. Lucas -- this was
17                   an email that Mr. Edelstein sent to Jay Lucas
18                   and Karen Ballou.
19      BY MR. MADSEN:
20           Q    Actually, I do have a question.  It says here
21      Karen Knowles.  Who is that?
22           A    That's her maiden name.
23           Q    Okay.  Thank you.  But that's Karen Ballou?
24                        MR. LEHMAN:  Do you know that?
25                        THE WITNESS:  I do know that.
```

```
 1                  MR. LEHMAN:  So he wants to submit it
 2             for the fact that he tried, that's fine; but
 3             to claim interaction with anyone without
 4             those people being able to testify that they
 5             received it, I do object to it.
 6                  MR. MADSEN:  I offer it.
 7                  THE COURT:  I'm allowing it to be
 8             admitted in full but for a limited purpose,
 9             that he sent emails to Ms. Ballou and Mr.
10             Lucas and had email communications with
11             people outside the business on those days,
12             not necessarily for the truth of those
13             contents.
14                  MR. LEHMAN:  Thank you, your Honor.
15             Just to clarify, there were other people,
16             John Owens and four or five other names, just
17             so the record shows that.
18   BY MR. MADSEN:
19        Q    Okay.  So Mr. Edelstein, can you just read the
20   top two lines of your email to Jay Lucas and Karen
21   Knowles?
22        A    "Hi, Jay and Karen.  I've sent you a text
23   message regarding the J.M. Field accounting situation."
24        Q    Did you ever have any follow-up conversations
25   with Ms. Ballou with regard to this matter?
```

```
1          A     Many.

2          Q     Okay.  Did she confirm to you verbally that

3    she had received this email from you?

4          A     Yes, she did.

5          Q     Do you know whether Mr. Lucas received this

6    email?

7          A     I do not.

8          Q     Okay.  Did Ms. Ballou state to you after

9    receiving this email, did she ask you why you were still

10   performing services as chief operating officer for HYD

11   USA?

12         A     No.

13         Q     Okay.  So is this an example of interactions,

14   business interactions, that you had with Karen Ballou in

15   your capacity as chief operating officer for HYD USA in

16   June of 2016 when the defendant claims that you were no

17   longer providing services?

18                    MR. LEHMAN:  Your Honor, I object to --

19                    THE WITNESS:  That's correct.

20                    MR. LEHMAN: -- Counsel characterizing

21               whenever this email is and then asking the

22               witness to say yes or no to his

23               characterization.  It is what it is.  He

24               doesn't need to say, Does this give evidence

25               of an interaction between you and Karen --
```

```
 1                    THE COURT:  I'll allow the witness to
 2            answer what his impression was after having
 3            received these communications.
 4                    MR. MADSEN:  I'm sorry.
 5                    THE COURT:  What was your impression
 6            after having had this communication with Ms.
 7            Ballou as to his standing with the
 8            defendants?
 9                    MR. MADSEN:  Okay.
10    BY MR. MADSEN:
11            Q     What were your impressions as to your standing
12       as chief operating officer at HYD USA after communicating
13       with Ms. Ballou regarding the subject matter in Exhibit 7?
14            A     I was the chief operating officer of the
15       company.
16                    MR. LEHMAN:  Your Honor, I'm going to
17            have the same objection as I did last time;
18            however, I think that Counsel is submitting
19            this for the same reason he submitted the
20            other one, in which case, I'm willing to
21            stipulate so we don't have to go through this
22            over and over again, which is, he was trying
23            to contact people.  We don't know whether
24            those people were contacted with these
25            emails, but he was trying with these emails
```

1           by sending them to these addresses; and

2           therefore, we don't need to go through the

3           reading and trying to -- this is more

4           evidence that he wants to submit.

5                MR. MADSEN:  Your Honor, with all due

6           respect, I'd like to put on my case as I see

7           fit.  There are statements to Ms. Ballou

8           here, too.

9                MR. LEHMAN:  Mr. Ballou is not a

10          defendant.  She's not a defendant in this

11          case.  She is not a defendant in this case,

12          and therefore, you cannot use this as a

13          statement against her.

14               MR. MADSEN:  She is a party opponent

15          because she is a senior official.

16               MR. LEHMAN:  I am rather sure that has

17          not been proven, and certainly not by the

18          witness.

19               THE COURT:  Well, why don't we proceed?

20               MR. MADSEN:  Thank you.  So what is --

21          may I inquire as to the status of Exhibit 8?

22               THE COURT:  Just for identification

23          purposes at this point.

24               MR. MADSEN:  Thank you.  Okay.

25               THE COURT:  Again, it's a series of

```
 1                    emails.  I obviously have not seen it.
 2      BY MR. MADSEN:
 3           Q     Did you have the occasion to have --
 4      communicate with Karen Ballou in July of 2016 with regard
 5      to business matters in your capacity as chief operating
 6      officer of HYD USA?
 7           A     I did.
 8           Q     Okay.  And I'm going to hand you Exhibit 8 for
 9      identification.  Do those email exchanges reflect your
10      communications with Ms. Ballou about business matters
11      concerning HYD USA?
12           A     Yes.
13           Q     Okay.  Does Ms. Ballou -- in fact, did Ms.
14      Ballou write you a response anywhere on Exhibit 8?
15                      MR. LEHMAN:  I object.  We don't know
16                 who wrote this email.  If he wants to say,
17                 Did it come from this address, I don't have
18                 an objection to that.  But was it his
19                 impression that Mr. -- Ms. Ballou sent it
20                 because the address was the same, that's
21                 fine; but we don't know that Ms. Ballou wrote
22                 it.
23      BY MR. MADSEN:
24           Q     Mr. Edelstein, did Karen Ballou have an email
25      address at Lucas Brand Equity?
```

```
 1          A      She did.

 2          Q      Okay.  And what was that email address?

 3          A      Kballou@lbequity.com.

 4          Q      During the course of your employment as chief

 5    operating officer of HYD USA, did you receive emails from

 6    Ms. Ballou from that email address?

 7          A      I did.

 8          Q      Do you receive any email from Ms. Ballou from

 9    that email address on Exhibit 8 for identification?

10          A      I do.

11                 MR. MADSEN:  I offer this as an exhibit,

12             your Honor.

13                 MR. LEHMAN:  I don't object if it's

14             submitted for the limited purpose of what Mr.

15             Edelstein wrote to other people and what he

16             -- and what was attached to this one email.

17             But again, people can change emails when they

18             go back and forth, so this is why there's a

19             hearsay objection because he gets emails, he

20             then goes through and changes it.  And I'm

21             not saying he did that, but that's why I have

22             an evidentiary objection to that.  He then

23             responds back, and then we end up in

24             litigation, and we go four pages back, and

25             we're like, Is that really what was said?  We
```

1               need the person there who wrote it to testify

2               whether or not that's what they wrote.

3                    MR. MADSEN:  Your Honor, I offer this

4               exhibit.

5                    THE COURT:  I will allow the exhibit to

6               come in in full for the limited purpose of

7               indicating the communications that the

8               plaintiff had to Ms. Ballou and the fact that

9               she communicates back to him.  So not

10              necessarily of the truth of the contents at

11              this point.

12                   MR. MADSEN:  Thank you.

13    BY MR. MADSEN:

14         Q    At the bottom of the first page of Exhibit 8,

15    did you send an email to Karen Ballou?

16         A    I did.

17         Q    Okay.  And what did you say?

18         A    "FYI" -- I assume you're referring to the

19    bottom page?  Page 1?

20         Q    Yes.

21         A    "FYI:  This is why it's critical to have all

22    logistics up to date financially.  Not a big expense, but

23    it affects credibility, etc."

24         Q    Is that an email communication you sent to Ms.

25    Ballou?

1        A        That is correct.

2        Q        Did she respond to that email communication?

3        A        She did.

4        Q        And what was the date of her response?

5        A        July 13, 2016.

6        Q        And what did she say in that email?

7        A        "What is the balance?"

8        Q        Did you respond to Ms. Ballou?

9        A        I did.

10                 MR. MADSEN:  Thank you.

11                 MR. LEHMAN:  Objection.  We're going to

12               have the same type of objections before, so I

13               would ask that Exhibit 9 be admitted only for

14               the limited purposes the other two exhibits

15               were admitted for.

16                 MR. MADSEN:  That's fine, your Honor.

17                 MR. LEHMAN:  But again, to the extent

18               that it helps move us along, I do agree that

19               Mr. Edelstein was trying to contact people,

20               and that he sent these emails to these

21               addresses.

22                 THE COURT:  Accordingly, Exhibit 9 will

23               be marked in full for the same limited

24               purpose as in Exhibit 7 and 8.

25                 MR. MADSEN:  Thank you.

```
 1   BY MR. MADSEN:
 2          Q     Mr. Edelstein, I just handed you Exhibit 9.
 3                MR. LEHMAN:  And it may help the
 4          objections, you can ask, Do you remember what
 5          she said, and does this document refresh your
 6          recollection; and then he would be
 7          remembering it.  It wouldn't be based on the
 8          document.
 9   BY MR. MADSEN:
10          Q     Mr. Edelstein, did you receive an email from
11   Karen Ballou on July 15, 2016?
12          A     Yes.
13          Q     Okay.  And what did that email -- what was
14   that email about?
15          A     Regarding purchase order reconciliation, AP
16   and AR reports.
17          Q     Were you having problems with that?
18          A     Yes.
19          Q     Okay.  Describe those problems.
20          A     Accounting system was never set up properly,
21   lack of reconciliation, no accurate accounting of purchase
22   orders being entered, payments being made -- a variety of
23   a functional issues with the accounting practice.
24          Q     Okay.  Did you attempt to raise these concerns
25   with Ms. Ballou?
```

1          A       Many times.

2          Q       Okay.  And can you please read the response

3     that Ms. Ballou gave to you at the bottom of Exhibit 9 --

4          A       Mm-hmm.

5          Q       -- on the first page?

6          A       Mm-hmm.  "Steve, Jean [phonetic] nor Mike are

7     no longer working on accounting, so if you could leave

8     them off, it would be best.  You can send the accounting

9     AP and AR bills and invoices to accounting@hydusa.com.

10    The woman's name is Jessica.  No need to include Jay or

11    myself on these emails because you and Ian as I know you

12    guys are working on details that neither Jay or I need to

13    be part of.  We know you guys will work it out.  We just

14    want to see sales."

15         Q       You can stop there.

16         A       Okay.

17         Q       And did you send back a confirming response to

18    Ms. Ballou?

19         A       I did.

20         Q       Okay.  When she said there, "We know you guys

21    will work it out.  We just want to see sales," did Ms.

22    Ballou have communications with you during the summer of

23    2016 in which she encouraged or encouraged you to increase

24    sales for HYD USA?

25         A       Mm-hmm.

```
 1          Q      That's a yes?

 2          A      Yes.  I'm sorry.

 3          Q      Thank you.

 4                 MR. LEHMAN:  Your Honor, for Exhibit No.

 5              10, it will be the same objection; so I won't

 6              object to the extent that it's being

 7              submitted for the limited purpose as the

 8              other, I guess, four exhibits were submitted.

 9                 THE COURT:  Accordingly, Exhibit 10 will

10              be marked in full for the limited purposes as

11              indicated in 7, 8, and 9.

12  BY MR. MADSEN:

13          Q      Mr. Edelstein, I just handed you Exhibit 10.

14          A      Mm-hmm.

15          Q      What is Exhibit 10?  Can you identify it?

16          A      The Exhibit 10 has to do with a relationship

17      with Walgreens.com.

18          Q      Was that one of your retailers of HYD USA

19      products?

20          A      That is correct.

21          Q      And why did you get in touch -- did you get in

22      touch with Ms. Ballou in regards to Walgreen's?

23          A      I'm sorry.  Say that again.

24          Q      Did you get in touch with Ms. Ballou in

25      regards to the Walgreen's account?
```

```
1            A      I did.

2            Q      All right.  And if you look at the bottom of

3       the first page --

4                   MR. LEHMAN:  Objection, your Honor,

5                   because we don't know that he actually got in

6                   touch with Ms. Ballou; and in fact, in a

7                   previous email, she said stop including

8                   myself on emails, so she might very well just

9                   started ignoring them.

10                  MR. MADSEN:  Well, that will be

11                  clarified because in fact, there is a

12                  communication from Ms. Ballou in this

13                  document.

14                  MR. LEHMAN:  So that's what should be

15                  discussed, not this one.

16                  THE COURT:  Why don't we do the

17                  foundation question.

18                  MR. MADSEN:  Thank you.

19      BY MR. MADSEN:

20           Q      Did Ms. Ballou ask you to provide information

21      to her in regards to the Walgreen's account?

22           A      She did.

23           Q      Okay.  And did you provide her that

24      information?

25           A      I did.
```

```
 1          Q      Okay.  And what was -- what did she ask you at
 2     the bottom of Page 1?
 3          A      "Are we not able to go over to Walgreens.com?"
 4          Q      And you provided a response to that; correct?
 5          A      I did.
 6                 MR. LEHMAN:  So your Honor, I still have
 7                 the same objection, which is the question was
 8                 whether or not this top email was received by
 9                 Ms. Ballou.  We don't have an email back from
10                 her saying, I got this, or anything like
11                 that.  I do believe it's possible that Ms.
12                 Ballou was ignoring certain emails from Mr.
13                 Edelstein because --
14                 THE COURT:  Why don't we ask, Did you
15                 send this email?
16     BY MR. MADSEN:
17          Q      Did you send that email to Ms. Ballou?
18          A      Yes.
19          Q      Did she acknowledge verbally to have received
20     the email?
21          A      Yes.
22          Q      You were a personal witness to that
23     acknowledgment; correct?
24          A      I was.
25                 MR. MADSEN:  Okay.  I would like to
```

```
 1              submit 11.
 2                   MR. LEHMAN:  No objection.
 3                   MR. MADSEN:  Thank you.
 4                   THE COURT:  Accordingly, Exhibit 11 can
 5              be marked in full.
 6   BY MR. MADSEN:
 7         Q     Mr. Edelstein, you've just been handed Exhibit
 8     11?
 9         A     Mm-hmm.
10         Q     Can you identify that document?
11         A     Yes.  It is a document reflecting the request
12     to discuss a certain client relationship.
13         Q     Thank you.  What is the date of this?
14                   THE COURT:  Email or letter?
15                   THE WITNESS:  It's an email.
16   BY MR. MADSEN:
17         Q     What is the date of this email?
18         A     Monday, August 22nd.
19         Q     Okay.  And incidentally, this is after you
20     filed the lawsuit --
21         A     That is correct.
22         Q     -- against the defendants?  Thank you.  And in
23     sending this email to Ms. Ballou, were you communicating
24     aspects of your job duties and responsibilities as chief
25     operating officer of HYD USA?
```

```
 1            A       I was.

 2            Q       Did Ms. Ballou ever acknowledge verbally to

 3      ever having received this email?

 4            A       Yes.

 5            Q       Incidentally, during the summer of 2016, did

 6      you have --

 7                    MR. LEHMAN:  Your Honor, I object.  That

 8                 is hearsay.  He's asking Mr. Edelstein, the

 9                 witness, whether or not Ms. Ballou ever said,

10                 I received this email, presumably for the

11                 truth that she received this email.

12                    THE COURT:  We're not there yet.

13                    MR. LEHMAN:  Okay.

14                    THE COURT:  I don't know what the next

15                 question is going to be.  You may have

16                 another objection, but we don't know yet.

17                    MR. LEHMAN:  Okay.

18      BY MR. MADSEN:

19            Q       In sending this email to Ms. Ballou, were you

20      communicating aspects of your job performance and

21      responsibilities as chief operating officer for HYD USA?

22            A       I was.

23                    MR. LEHMAN:  Your Honor, I object.  He's

24                 asking leading questions, characterizing the

25                 email of what he did instead of, What were
```

1                    you trying to do with this email?  But a

2                    lawyer trying to prove his case by then

3                    giving more legalese than asking the witness

4                    to say yes or no is a leading question.

5                         THE COURT:  Well, let me ask, is this a

6                    personal email or a business email?

7                         THE WITNESS:  A business email.

8    BY MR. MADSEN:

9         Q     Thank you.  This was sent in the ordinary

10   course of business?

11        A     It was.

12                    MR. MADSEN:  It's already in as a full

13                    exhibit, so --

14                    MR. LEHMAN:  I object to the way in

15                    which you characterize it and then ask the

16                    witness to say yes or no.  You're an

17                    attorney.  You know how to say things in the

18                    way that fits the evidence instead of just

19                    asking him what was the purpose of sending

20                    this email.  Then he would give his testimony

21                    as to what he thinks the purpose is.

22   BY MR. MADSEN:

23        Q     What was your purpose in sending this email?

24        A     This email was written in order to not only

25   communicate the state of the business relative to issues

1    that were taking place, but also, most importantly, to

2    make sure that a conference call, some type of meeting

3    took place between Jay Lucas, Karen Ballou, Adam Berk to

4    discuss the state of the product because of their nascent

5    involvement in funding the business properly.

6         Q      And incidentally, what was your email address?

7         A      I would have to look at the email again.  I

8    forgot.  Steve@hydusa.com.

9         Q      At the bottom of this email that has been

10   marked as Exhibit 11, is your title listed?

11        A      Correct.  Yes, it is.

12        Q      Okay.  And I believe you testified that Ms.

13   Ballou acknowledged receiving this email?

14        A      That's correct.

15        Q      And did she have follow-up conversations with

16   you about the subject matter of this email?

17        A      Single conversation, emails, trying to

18   coordinate this very important meeting.

19        Q      Thank you.

20               MR. LEHMAN:  So your Honor, we just have

21               the same objection that it only be admitted

22               for the limited purpose of, I think 7, 8, 9,

23               and 10.  I didn't object to 11 because that

24               was Mr. Edelstein alone and didn't have other

25               emails attached to it, but this one does.

```
 1                    THE COURT:  Accordingly, Exhibit 12 will
 2              be marked in full, but for the limited
 3              purpose as in Exhibit 7, 8, 9, and 10.
 4   BY MR. MADSEN:
 5         Q     Can you identify Exhibit 12, Mr. Edelstein?
 6         A     I can.
 7         Q     What is it?
 8         A     It is yet again trying to confirm a conference
 9   call and/or meeting to discuss the state of the business.
10         Q     Okay.  And what is the date of this email?
11         A     August 29th, Monday.
12         Q     Who did you send it to?
13         A     Karen Ballou, Jay Lucas, Adam Berk.
14         Q     If you turn on the second page of the
15   document, did Ms. Ballou send you an email?
16         A     She did.
17         Q     What did she say in her email?
18         A     We do -- I want to make sure --
19              MR. LEHMAN:  Your Honor, I do object.
20              We don't know what Ms. Ballou said.  We do
21              know that Mr. Edelstein sent an email back to
22              her, and that this was attached.  That's all
23              we know based on this document.  If Ms.
24              Ballou was here, we could ask her, Did you
25              send this?  But she's not.
```

```
 1   BY MR. MADSEN:
 2        Q     Mr. Edelstein, was this document produced in
 3      the ordinary course of business?
 4        A     Yes, it was.
 5             MR. MADSEN:  I offer it as a full
 6          exhibit.
 7             MR. LEHMAN:  The problem here is that
 8          Mr. Edelstein could have changed the
 9          underlying documents that are being attached.
10          That's the problem.  That's why it's hearsay.
11          That's part of it.
12             MR. MADSEN:  Your Honor, I --
13             MR. LEHMAN:  Or someone else could have.
14             MR. MADSEN:  I renew -- Mr. Edelstein,
15          is this a true and accurate copy of the email
16          communication to the best of your knowledge?
17             THE WITNESS:  Yes, it is.
18             MR. LEHMAN:  It's a true and accurate
19          copy of the email that he sent.
20             THE COURT:  Mr. Edelstein, did you alter
21          in any way the chain of emails when you
22          printed up these emails?
23   BY MR. MADSEN:
24        Q     Yes.  Did you alter in any way the chain of
25      emails when you printed this off?
```

```
 1          A      No.

 2                        THE COURT:  The objection is overruled.

 3                        MR. MADSEN:  Thank you.

 4   BY MR. MADSEN:

 5          Q      And what did -- at the top of Page 2 of

 6   Exhibit 12, what did Mr. Ballou state to you?

 7          A      "We don't know how long the meeting will go so

 8   hard to plan this morning.  Will be in touch about

 9   timing."

10          Q      And this is meeting you were going to have

11   with whom?

12          A      With Jay Lucas, Karen Ballou, and Adam Berk.

13          Q      Did you end up having that meeting?

14          A      We did not.

15          Q      Okay.  And the date of that email again is?

16          A      Monday, August 29, 2016.

17                        MR. LEHMAN:  Your Honor, I don't have

18                  any objection.  Can I have a copy?

19                        MR. MADSEN:  Of course.  Your Honor,

20                  this is Exhibit 13.  Defendants have

21                  consented to this being a full exhibit, and

22                  it is a two-page email dated August 29, 2016.

23                        MR. LEHMAN:  Oh.

24                        THE COURT:  Accordingly, exhibit 13 is

25                  now marked in full.
```

1              MR. LEHMAN:  I'm sorry.  I did not see

2         this when I reviewed it before.  I can take

3         more time.  I'm just trying to help everyone

4         get through this.  There is, again, an

5         attachment at the bottom of this email that's

6         from Karen Ballou.  It's also in a different

7         formatting from the other emails, as in no

8         title, no anything.  And there's other items

9         that are missing, such as a mail attachment.

10        It looks like it was included but not; so

11        it's not even the full document.  So I don't

12        -- I object -- I agree to the submission so

13        long as it is for the limited purpose of this

14        is what Mr. Edelstein sent back to Karen

15        Ballou, including the underlying documents.

16            MR. MADSEN:  It's not offered for the

17        proof of the matter asserted, only the fact

18        that Mr. Edelstein continued to work as the

19        chief operating officer as of August 29,

20        2016, and that he had communications with

21        Karen Ballou regarding his job duties and

22        responsibilities.

23            THE COURT:  That will be marked for

24        limited purposes, same as Exhibit 7, 8, 9,

25        10, and 12.

1          MR. LEHMAN:  And again, I do stipulate

2     whenever counsel wants that he was trying to

3     contact people and was doing whatever these

4     emails said, if he wants to just batch the

5     documents and give them to us.

6          MR. MADSEN:  Well, would you be willing

7     to stipulate that not only was he contacting,

8     but that he was having ongoing, regular

9     communications with both Karen Ballou and Jay

10    Lucas during the entire summer of 2016

11    regarding his job duties and responsibilities

12    and that he was performing his job duties and

13    responsibilities in the summer of 2016?  Are

14    you willing to stipulate to that?  Because

15    then I will completely dispense --

16         MR. LEHMAN:  If you want to go through

17    it, there are parts to that that I would

18    stipulate to.  So for example, I don't know

19    enough based on the evidence here whether or

20    not it's a regular communication, but you --

21    anything that you want to give, I will

22    stipulate that that was a communication given

23    by Mr. Edelstein to other people, or at least

24    he tried, and you can ask him what his

25    impressions were; but there was something

```
 1                    else at the end of that very long soliloquy

 2                    that I didn't catch.

 3                         THE COURT:  That he was performing all

 4                    his duties.

 5                         MR. LEHMAN:  Oh, yeah.  No.  Of course

 6                    we won't stipulate to that because there's no

 7                    evidence here what his duties were.  That he

 8                    was performing all of them?  There's nothing

 9                    here today that would make me be able to know

10                    that.  So the first part, yes.  That's a fair

11                    part.  But not the rest.

12                         MR. MADSEN:  Okay.  I move for its

13                    admission.

14                         THE COURT:  Is this 14 or --

15                         MR. MADSEN:  We're still on 13.

16                         THE COURT:  13 is already in in full for

17                    a limited purpose.

18                         MR. MADSEN:  Thank you.

19                         THE COURT:  14?

20                         MR. MADSEN:  That's 13 again.

21   BY MR. MADSEN:

22         Q     Mr. Edelstein, if you look at the top of page

23   -- the second page of Exhibit 13, does Ms. Ballou ask you

24   a question?

25         A     Yes.
```

```
1          Q      What is the question?

2          A      "What company is this for?"

3          Q      And what was your response?

4          A      Amazon.

5          Q      Okay.  And then did Ms. Ballou provide

6     follow-up communications to you?

7          A      She did.

8          Q      On August 29, 2016?

9          A      She did.

10         Q      What was her response?

11         A      "Please make sure that you put into the

12    subject the account name.  It will be easier to search

13    when looking for info on that account.  Thanks."

14         Q      And did you respond to Ms. Ballou in that

15    regard?

16         A      I did.

17              MR. MADSEN:  Thank you.  No further

18              questions on that document.  There's only

19              three more exhibits.

20              MR. LEHMAN:  So your Honor, I agree to

21              the submission so long as it's for the

22              limited purposes of the other exhibits that I

23              made the same objection to.

24              MR. MADSEN:  Thank you.

25              THE COURT:  What is the date of those
```

1          emails?

2               MR. MADSEN:  So this is September 6,

3          2016, your Honor.

4               THE COURT:  Fourteen comes in full but

5          for the limited purpose as set forth in

6          Exhibit 7, 8, 9, 10, and 12 and 13.

7     BY MR. MADSEN:

8          Q     Mr. Edelstein, on September 6, 2016, did you

9     have communications with Karen Ballou regarding business

10    matters falling within your areas of responsibility as

11    chief operating officer?

12         A     I did.

13         Q     And if you can, do you see at the bottom of --

14    withdraw that.

15           On the second page, do you see the email at 1:02

16    p.m. from Karen Ballou to you?

17         A     Yes.

18         Q     Okay.  What does she ask you in that question?

19         A     "How do we get --"

20               MR. LEHMAN:  Your Honor, I object.  We

21          don't know that Karen said this.  I don't --

22          this is an email that he sent back on Outlook

23          or something and could have changed this.  We

24          need Karen here, Ms. Ballou, to testify as to

25          whether or not she said this.

```
 1                    MR. MADSEN:  It's sufficient that it
 2              comes from her email address.  May I ask a
 3              foundational question?
 4                    THE COURT:  Go ahead, please.
 5  BY MR. MADSEN:
 6        Q     Mr. Edelstein, did you have verbal
 7     communications with Ms. Ballou regarding the emails that
 8     have been marked as Exhibit 14?
 9        A     Yes.
10        Q     Did she acknowledge that these were her email
11     communications?
12        A     Yes.
13                    MR. LEHMAN:  Your Honor, I object.  This
14              is vague.  We don't know when.
15  BY MR. MADSEN:
16        Q     Were those communications shortly after
17     September 6th or on or about September 6th, 2016?
18        A     Yes.
19        Q     Okay.
20                    MR. LEHMAN:  So I do object.  They're
21              submitting this, they're trying to submit it
22              for trying to show what Karen said, but
23              they're doing it by having an email from
24              Steven with attachments on it.  Not -- they
25              haven't subpoenaed Karen.  She would have
```

```
 1                turned over the documents, and we wouldn't
 2                have this problem.  It's an end run around.
 3                     THE COURT:  For limited purposes.  It's
 4                not for the truth of what Karen said, but
 5                just the fact that she did respond?
 6                     MR. MADSEN:  Correct.
 7                     MR. LEHMAN:  Honestly, your Honor, I
 8                don't even know that that's true unless it's
 9                done properly.  You subpoena Ms. Ballou, she
10                turns over the documents, and now we don't
11                have a problem.
12                     THE COURT:  Again, ask the plaintiff
13                whether he altered in any way the email
14                chain.
15   BY MR. MADSEN:
16        Q    Did you alter in any way the email chain?
17        A    No.
18                     MR. LEHMAN:  So for example, I object
19                because there are images, they're clearly
20                indicated on this email they're not included
21                in this email that is now being submitted,
22                Image 003.jpg and 004.png.
23                     MR. MADSEN:  I can ask Mr. Edelstein if
24                he knows what those are, but it's so far
25                afield, and this is so extraneous to the
```

```
1                 communication going on here.

2                      THE WITNESS:  Mm-hmm.

3    BY MR. MADSEN:

4         Q     I just ask, Mr. Edelstein, was this document

5    generated in the ordinary course of business?

6         A     It was.

7                      MR. LEHMAN:  That doesn't address my

8                objection.  You could have subpoenaed Ms.

9                Ballou.  She would have turned over the

10               documents she had in response, and then we

11               would not have this problem; but there is a

12               very large problem that Mr. Edelstein is the

13               one who is turning over these documents.  I

14               don't object that that's what he said at the

15               top.  I do object to everything underneath

16               that's being tried to show that that's how

17               those people communicated back.  I just don't

18               know that.  And it would not be unusual for

19               that to be different.  We have already shown

20               images are missing.  We're already showing

21               there are parts that inadvertently being cut

22               off.

23                     MR. MADSEN:  The witness has testified

24               that he had conversations with Ms. Ballou in

25               which he confirmed these were her email
```

1              communications, and this is a business record

2              as well.  It comes from her email address,

3              and he's testified he hasn't altered it; so I

4              move for a full admission, please.

5                   MR. LEHMAN:  Your Honor, the specific

6              objection would be that he would have to say,

7              Did you have a specific conversation where

8              you asked Ms. Ballou, Hey, did you send me

9              that email?  How do we get paid on these

10             orders?  And she said yes.  Not, Did you send

11             emails back?

12                  THE COURT:  Why don't we hear it from

13             the witness as he recalls what the

14             attachments were.

15  BY MR. MADSEN:

16        Q     What were the attachments to this document?

17        A     The attachments were from the fulfillment

18   vendor.  The images that you see in the email are

19   reflective of Facebook, Instagram, Twitter.  Those are the

20   images.  They are graphic images.

21        Q     And in this Exhibit 14, did Ms. Ballou ask you

22   to provide -- withdraw that.

23        Did she ask you any questions?

24        A     Not outside of what was presented in the

25   email.

1      Q      Okay.  And you provided information to her?

2      A      That is correct.

3      Q      Okay.  And do you see the email from Ms.

4  Ballou, September 6th, 1:24 p.m., to you?

5      A      Mm-hmm.

6      Q      Can you read that email?

7      A      "I haven't received any and don't see them in

8  the bank account."

9                  MR. LEHMAN:  Your Honor, I object to the

10                 relevancy of this.

11                 MR. MADSEN:  Your Honor, it shows that

12                 Ms. Ballou was, as an agent representative of

13                 Lucas Brand Equity, was having communications

14                 with Mr. Edelstein, was asking him for

15                 information, and he was in turn supplying

16                 information, which in turn shows that

17                 contrary to their statement that he stopped

18                 performing services in May of 2016, in fact,

19                 he continued to work; and they continued to

20                 ask information from him in his capacity as

21                 chief operating officer.  So it shows he was

22                 gainfully employed during the period of time

23                 where we are claiming they wrongfully

24                 withheld compensation from him.

25                 MR. LEHMAN:  Your Honor, there was a lot

1          there.  In fact, I got lost on the third or

2          the fourth part, I think.  I -- what -- are

3          you able to tell me -- I object.  I don't

4          understand the relevancy of this unless it's

5          being submitted for, or trying to be

6          submitted for the truth of what it says.

7               THE COURT:  As I indicated, it's just to

8          indicate that there were communications back

9          and forth, not necessarily for the truth.

10              MR. MADSEN:  That is correct, your

11         Honor.

12              MR. LEHMAN:  We don't need to read it

13         out loud, just that there's communication

14         going back and forth.  We don't need the

15         specifics of it.  The only reason for that

16         specific is he wants to prove what was said

17         in there as the truth.

18              THE COURT:  Communications about a

19         vendor.  Let's move on, please.

20              MR. MADSEN:  Okay.  Thank you.

21    BY MR. MADSEN:

22         Q    Did you provide the information to Ms. Ballou

23    that she requested?

24         A    I did.

25         Q    Thank you.  That date was September 6, 2016;

1    correct?

2         A      That is correct.

3         Q      That was six days before you learned that you

4    no longer were employed?

5         A      That is correct.

6              MR. LEHMAN:  Your Honor, I do object to

7              counsel's characterization of the email from

8              Lawrence Peikes to him.  I don't think

9              there's anything in that email that said that

10             you were no longer employed.  He said at the

11             end, "Therefore, it would behoove Mr.

12             Edelstein to discontinue activities he claims

13             to be engaging in on HYD's behalf."  Is there

14             anything -- I don't see anywhere he

15             characterized that as him being terminated or

16             fired on that day.  I don't see anything.  So

17             I object to him characterizing this evidence.

18             THE COURT:  Why don't we say six days

19             before that email, and just leave it at that.

20             MR. MADSEN:  Excuse me?

21             THE COURT:  It was six days before the

22             email between counsel.

23             MR. MADSEN:  Correct.  Do you have an

24             objection to this document?

25             MR. LEHMAN:  Can I have a copy, please?

```
1                   Thank you.
2    BY MR. MADSEN:
3         Q     Mr. Edelstein, I'm handing you Exhibit 15, and
4    this has been entered as a full exhibit.  And this is the
5    notice of appearance of Larry Peikes.  Did you become
6    aware on or about September 7th that Mr. Peikes was
7    representing the defendants in this matter?
8         A     Yes.
9                   MR. MADSEN:  Thank you.
10                  THE COURT:  Accordingly, Exhibit 15 may
11              be marked in full.
12   BY MR. MADSEN:
13        Q     Now, in your -- going back to Exhibit 5, which
14   is the complaint, did you make claims against the
15   defendants for violation of the Fair Labor Standards Act?
16        A     Yes.
17        Q     Okay.  Just to ease, you know, the process
18   here, did you make claims against the defendants for
19   violation of the Fair Labor Standards Act of Counts 3 and
20   4?
21        A     Yes.
22        Q     Thank you.  Now, after receiving a copy of the
23   email from Mr. Peikes, you testified that you stopped
24   performing services; correct?
25        A     Correct.
```

```
1                    MR. LEHMAN:  I object that he's saying

2               that he received an email from Mr. Peikes.

3               Mr. Peikes sent it to counsel.

4                    THE COURT:  After he became aware of

5               Exhibit 6.

6                    MR. MADSEN:  I'm sorry?

7                    THE COURT:  Why don't we phrase it

8               "after he became aware of Exhibit 6."

9    BY MR. MADSEN:

10        Q    After you became aware of Exhibit 6, did you

11   stop providing services?

12        A    I did.

13        Q    And did you understand that you were no longer

14   employed by the defendants at that point in time?

15        A    I did.

16        Q    Okay.  And did you subsequently amend your

17   complaint to allege wrongful termination of employment?

18        A    I did.

19                   MR. MADSEN:  Your Honor, I'm just

20              handing the client Exhibit 16.  Defendant's

21              have stipulated to this as a full exhibit.

22              And for the record, it is the September 27,

23              2016 first amended complaint.

24                   THE COURT:  Accordingly, Exhibit 16 may

25              now be marked in full.
```

1    BY MR. MADSEN:

2        Q      Mr. Edelstein, if you turn to Page 6 of the

3    first amended complaint, did you allege wrongful

4    termination of employment in retaliation for making claims

5    under the Fair Labor Standards Act?

6        A      I did.

7        Q      Thank you.  Now, Mr. Edelstein, are you

8    currently employed?

9        A      I am not.

10       Q      Okay.  And how long have you been unemployed?

11       A      Since September 12th.

12       Q      Okay.  Are you looking for work?

13       A      I am.

14       Q      Did you apply for unemployment compensation?

15       A      I did.

16       Q      Okay.  Is it your understanding that

17   independent contractors are eligible for unemployment

18   compensation?

19       A      Rephrase that.

20       Q      Well, is it your understanding that you have

21   to be deemed an employee of a company in order to be

22   eligible for unemployment compensation?

23       A      Yes.  That is correct.

24       Q      Did the Department of Labor look into whether

25   or not you were an employee for the purposes of

1    unemployment?

2         A      They certainly did.

3         Q      And did they -- what was their determination?

4         A      They deemed me an employee, and I was approved

5    to collect benefits.

6         Q      I'm sorry?

7         A      They deemed me an employee, and approved me

8    for benefits.

9         Q      And are you continuing to receive unemployment

10   compensation benefits?

11        A      I am.

12              MR. LEHMAN:  Your Honor, I do object.

13          That's just his impression, but other than

14          that...

15              THE COURT:  That's fine.

16              MR. MADSEN:  I would like to mark this.

17              MR. LEHMAN:  Can I have a copy of this?

18          You gave it to me to look at, but you didn't

19          give me a copy.

20              MR. MADSEN:  This is Exhibit 17 for

21          identification.

22   BY MR. MADSEN:

23        Q      Mr. Edelstein, I'm handing you Plaintiff's

24   Exhibit 17 for identification.  And without reading the

25   contents, can you tell me what that document consists of?

1        A       Consists of all the wire payments that were

2     made -- let me just take a peek at this.  Excuse me -- in

3     two thousand -- from January to May of 2016.

4                        MR. LEHMAN:  Your Honor, I would just

5               ask that counsel establish how we got there,

6               the foundation?

7     BY MR. MADSEN:

8        Q       How did you get these documents?

9        A       These are my records from the transactions

10    that were made.

11       Q       Okay.  And do these reflect wire transfers

12    that you received as compensation --

13                       MR. LEHMAN:  That doesn't answer how he

14              got it.  Did you go to your computer?  Did

15              you print it up?  How did you get this

16              document?

17                       THE WITNESS:  That's exactly how I got

18              it.

19                       MR. LEHMAN:  Tell me how you got it.

20                       THE WITNESS:  The transaction was made.

21                       MR. LEHMAN:  What date?

22                       THE WITNESS:  Starting on January 8th --

23                       MR. LEHMAN:  No.  How did you get this

24              document?

25                       THE COURT:  Did you print them up as you

1            got your payments?

2                 THE WITNESS:  As I got my payments,

3            exactly, yes.

4                 MR. LEHMAN:  So you would say on January

5            8th, you printed up one, and on January 22nd,

6            you printed up another, and you put them

7            together?  You didn't print them up at a

8            later date?

9                 THE WITNESS:  No. I print them as I get

10           them and keep a file accordingly.

11                MR. LEHMAN:  Okay.

12                THE WITNESS:  By the way --

13                MR. MADSEN:  Wait a minute.  Hold on.

14           No question pending.

15                THE WITNESS:  Sorry.

16                MR. MADSEN:  I introduce this as a full

17           exhibit.

18                MR. LEHMAN:  No objection.

19                THE COURT:  Accordingly, Exhibit 17 may

20           now be marked as a full exhibit.

21  BY MR. MADSEN:

22       Q    Mr. Edelstein, does Exhibit 17 reflect all

23   payments you received from HYD USA, LLC and/or Lucas Brand

24   Equity LP for -- in 2016?

25       A    That is correct.

1       Q       Okay.  And were you paid in full up through,

2    and I'm asking you to turn to the -- one, two, three -- if

3    you turn to the marked, the April 11, 2016 postdate, do

4    you see that?

5       A       One second, please.  Yes.

6       Q       Okay.  Were you paid in full as compensation

7    for chief operating officer through March -- through April

8    11, 2016?

9       A       Yes.

10      Q       Okay.  And then, if you turn to the next page,

11   there is an entry dated April 25, 2016.  Do you see that?

12      A       Yes.

13      Q       How much was that deposit?

14      A       Seven hundred and fifty dollars.

15      Q       That was less than the $5,000 that you were

16   supposed to receive; is that correct?

17      A       That's correct.

18      Q       All right.  And --

19              MR. LEHMAN:  Your Honor, I object to the

20           extent that counsel just characterized it as

21           he was "supposed to receive."

22              MR. MADSEN:  Okay.

23   BY MR. LEHMAN:

24      Q       All right.  What was your expectation as to

25   how much money you would be receiving on April 25, 2016?

1        A        The normal $5,000.

2        Q        Did you receive the normal $5,000?

3        A        Not in that entry, no.

4        Q        What did you receive?

5        A        Seven hundred and fifty dollars.

6        Q        Did you raise any concerns with Ms. Ballou

7    about the fact that you had -- you did not receive full

8    compensation?

9        A        I raised concerns with several people.

10               MR. LEHMAN:  Your Honor, I object to the

11               leading nature of the question.  You should

12               have just said, How did you respond?  And you

13               would have said, I raised concerns.  But

14               right now, we have a situation where counsel

15               is using words, getting the witness to parrot

16               it.

17 BY MR. MADSEN:

18        Q        Did you raise any concerns --

19               MR. LEHMAN:  No.  Objection, your Honor.

20               How did you respond?

21               THE WITNESS:  I responded with phone

22               calls, multiple times, to confirm why I

23               wasn't receiving $5,000 as prescribed in my

24               employment agreement.

25

1   BY MR. MADSEN:

2          Q      And to whom did you direct those

3   communications?

4          A      Mike Lanzaro, Karen Ballou.

5          Q      And did you end up receiving the balance of

6   your -- of what should have been your -- of what you

7   maintain should have been your deposit on April 25, 2016?

8          A      I did.

9          Q      When did you receive that?

10         A      May 27, 2016.

11         Q      What amount of deposit did you receive on that

12   date?

13         A      $4,250.

14         Q      And was it explained to you what that $4,250

15   represented?

16         A      It was.

17         Q      By whom?

18         A      Michael Lanzaro.

19         Q      What did Michael Lanzaro tell you?

20         A      The balance of the $5,000 that was due

21   previously agreed to.

22         Q      Okay.  So --

23         A      Promised.

24         Q      With the receipt of $4,250 on May 27, 2016,

25   were you paid in full through April 25, 2016?

```
 1          A      Yes.

 2          Q      Okay.  And then, did you receive any other

 3     payments in 2016?

 4          A      Out of compensation?

 5          Q      Did you receive any other payments from -- as

 6     chief operating officer in 2016 after May 27, 2016?

 7          A      No, I did not.

 8                 MR. LEHMAN:  Objection.  It's vague.

 9                 He's not saying from who.  Did you receive

10                 any other payments from --

11                 MR. MADSEN:  Payments for compensation

12                 as chief operating officer.

13                 MR. LEHMAN:  No.  I understand what

14                 you're saying as what, but you're not saying

15                 from whom.  Did you receive any other

16                 payments in 2016 from HYD?

17                 MR. MADSEN:  From anyone?

18                 THE WITNESS:  Anyone?

19                 MR. MADSEN:  Yes, anyone.

20                 THE WITNESS:  No.

21     BY MR. MADSEN:

22          Q      I would like you to turn to the last page of

23     Exhibit 17.  Do you see there's a postdate there?

24          A      I do.

25          Q      Okay.  What is that date?
```

1          A      6/29/2016.

2          Q      How much money was deposited?

3          A      Five thousand dollars.

4          Q      Was that the only other payment you received

5     from anyone as compensation for your services as chief

6     operating officer for HYD for Men USA in 2016?

7          A      That is correct.

8          Q      Okay.  And what did you have an understanding

9     as to what this $5,000 payment was intended to cover?

10         A      Normal compensation.

11         Q      For what period?

12         A      For the what should have been the 22nd date,

13    the second installment of the bimonthly payment.

14         Q      I believe you testified that you were paid in

15    full through April 25, 2016; correct?

16         A      Correct.

17         Q      And then you received one more payment for

18    $5,000?

19         A      Correct.

20         Q      And when was the next pay date after April 25,

21    2016?

22         A      On 5/27.

23         Q      Well, were you paid?

24         A      Technically, I was.  The next pay period would

25    have been 5/8/2016.

```
 1          Q     So was it your understanding that the payment
 2    made to you on June 29, 2016, was payment to compensate
 3    you for the payment that you had expected on May 8, 2016?
 4          A     That is correct.
 5          Q     You continued to work for the defendants
 6    through September 12, 2016?
 7          A     That is correct.
 8          Q     And so how many -- through -- if your last
 9    payment in full was May 8, 2016, and your termination was
10    -- you were notified that you were no longer employed
11    September 12, 2016?
12                    MR. LEHMAN:  Your Honor, I object to
13                    counsel characterizing it as evidence.  We
14                    don't know when he's saying --
15                    THE COURT:  Stopped working as of
16                    September 12th.
17                    MR. MADSEN:  Yes, when you stopped
18                    working.
19                    THE WITNESS:  Mm-hmm.
20    BY MR. MADSEN:
21          Q     So how much money is owed to you?
22                    MR. LEHMAN:  Your Honor, I object.
23                    That's a legal question.  That's up to the
24                    Court to decide.  That's why we're here.
25                    THE COURT:  Why don't we say, in his
```

```
1              estimation, how much is he missing in income?
2                   THE WITNESS:  From what period of time
3              to what period of time?
4    BY MR. MADSEN:
5         Q     So you were paid through May 8, 2016; correct?
6         A     Mm-hmm.
7         Q     And you testified that you worked through
8    September 12, 2016; correct?
9         A     Mm-hmm.
10        Q     And how many pay periods does that encompass?
11        A     The total due is $45,000 in total
12   compensation.
13        Q     Thank you.
14                  MR. LEHMAN:  It's fine to say, your
15             Honor, how much do you allege in your
16             complaint?
17                  THE COURT:  He's testified as to, in his
18             opinion, how much is due him.
19   BY MR. MADSEN:
20        Q     Now, did Mr. Lucas indicate to you that he had
21   authority to determine when and how you would get paid as
22   chief operating officer?
23        A     Yeah.  Sure.  Yes.
24        Q     And did you talk to Mr. -- withdraw that.
25            You testified you spoke with Mr. Lucas about the
```

```
1    fact that you -- that there were delinquent payments?
2                    MR. LEHMAN:  Your Honor, I do object
3               that whatever he testified to, he testified
4               to.  I don't remember.  It's been three
5               hours, so I just would ask counsel not to
6               characterize previous testimony.  You can ask
7               the question.
8    BY MR. MADSEN:
9         Q    Did Mr. Lucas ever tell you that he would
10   attempt to take care of the shortage in your pay
11   compensation?
12        A    Yes, he did.
13        Q    On how many occasions?
14        A    Several, but one that is documented.
15   Verbally.
16        Q    Okay.  Thank you.  And did Ms. Ballou ever
17   indicate to you that she would -- did she ever -- did you
18   have any conversations with her regarding the delinquent
19   compensation payments?
20        A    Several.
21                    MR. LEHMAN:  Your Honor, I object to it
22               being called a "delinquent compensation."
23               That's a legal question.  If he wasn't owed
24               it, it wasn't delinquent.  That's why we're
25               in this court.
```

```
 1                    THE COURT:  If you could just rephrase,
 2           please.
 3   BY MR. MADSEN:
 4        Q     You maintain that you are entitled to
 5   compensation that you did not receive; correct?
 6        A     Correct.
 7        Q     Did you ever broach that subject with Ms.
 8   Ballou?
 9        A     I did.
10        Q     And did Ms. Ballou indicate that she had
11   authority or control over your payment?
12        A     Yes, she did.
13                    MR. MADSEN:  Okay.  Your Honor, I have
14           no further questions.  Thank you.
15                    MR. LEHMAN:  Your Honor, I would like to
16           have another break to go to the restroom, and
17           then I can start; or we can -- I don't know
18           how your lunch practice works here.  I can
19           also work through it.
20                    THE COURT:  Usually, we break at 1:00.
21           Why don't we have a late morning recess, and
22           then reconvene.
23                    (Recess:  11:56 to 12:02.)
24
25
```

                        CROSS-EXAMINATION

BY MR. LEHMAN:

     Q    You earlier heard, or used the phrase "Lucas
Brand Equity."  When was the first time you heard in your
life the phrase "Lucas Brand Equity, LP"?

     A    Never.

     Q    You didn't hear it today?

     A    Just in that document today, in this hearing.

     Q    So the answer would be today you heard it?

     A    Correct.

     Q    But not never?

     A    Correct.

     Q    Do you know the difference between Lucas Brand
Equity, LLC and Lucas Brand Equity, LP?

     A    To my knowledge, there isn't a difference.

     Q    Do you know the difference?

     A    Do I know technically the difference?  Yes.
One is a limited partnership, and the other one is a
private equity investment firm.

     Q    Do you know what they do that's -- do you know
what the LP does?

     A    No.  I am not aware of that.

     Q    Do you know what the LLC does?

     A    I do.

     Q    Your testimony is that you were the chief

```
 1    operating officer of the LLC, and there's an LP out there
 2    that you know nothing about?
 3         A    Correct.  That I was a not aware of, no.
 4         Q    Do you review tax forms?
 5         A    I do.
 6         Q    So you would have seen that it says "LP" on
 7    the tax form?
 8         A    Correct.
 9         Q    So you would have seen that back then, not
10    just today; is that correct?
11         A    Well, sure; but I don't reference it as being
12    a difference of employment.
13         Q    So when you said "never" you were incorrect,
14    and when you said "today" you were --
15         A    That is correct.
16         Q    What does Lucas Brand Equity, LLC do?
17         A    They are a brand -- let me back up.  They're a
18    private equity firm or investment firm that invests in
19    health, beauty, wellness and personal care businesses,
20    emerging brands.
21         Q    It's hard for me to hear you.  Could you just
22    pull the microphone near you?
23         A    Lucas Brand Equity is an investment firm that
24    provides capital investment in health, beauty, wellness,
25    and personal care brands, primarily early-stage products.
```

1          Q       Why?

2          A       To grow the brand, I would assume, and to

3     ultimately sell it or move it to another investment fund.

4          Q       Do you need to make that assumption?

5          A       Do I need to make that assumption?

6          Q       Why did you assume just now?

7          A       Based on information that I know about the

8     company.

9          Q       Who is in their portfolio?

10                 MR. MADSEN:  Objection.  Can we have a

11            time frame?

12    BY MR. LEHMAN:

13         Q       Who was in your portfolio when you were

14    working for them?

15         A       Do you want the brands?

16         Q       According to you?  Yes.

17         A       Tara Smith, which is a health care -- hair

18    care brand, Immunecology [phonetic] which is a luxury

19    brand -- what else?  What other companies did they have?

20    Trying to think of the other ones they had at the time.

21    Youth Corridor, which was an anti-aging cosmetic product,

22    or cosmeceutical product.  There were a number of others

23    that I wasn't aware of because I wasn't involved with

24    them.

25         Q       You weren't involved with which one?  How many

1    were you involved with?

2        A    I was involved with Youth Corridor, I was

3    involved with Tara Smith; but remember, my

4    responsibilities were to HYD, not to the other entities in

5    the company.

6        Q    So as chief operating officer of Lucas Brand

7    Equity, LLC --

8        A    No, no.

9        Q    -- which is what you said you worked for --

10       A    Both companies I was paid from.  My primary

11   responsibility was HYD USA.

12       Q    What was your other responsibilities?

13       A    I also did evaluation work, research, and

14   operations for the other entities for the CFO and the CLO

15   of Lucas Brand Equity, Lucas Brand Equity at the

16   management level.

17       Q    Which other entities did you evaluate?

18       A    All different.  I did a complete cost

19   accounting, inventory reviews --

20       Q    Just answer the specific question.  That

21   wasn't -- I said which entities?  How many total?

22       A    All of them.

23       Q    All of them?  How many?

24            MR. MADSEN:  There's too many questions

25            pending, your Honor.  I would ask that

```
 1              counsel --
 2    BY MR. LEHMAN:
 3         Q      How many total?
 4         A      How many total what?
 5         Q      Entities is did you value?
 6         A      Did I who?  Did I value?
 7         Q      You said you valued the entities.
 8         A      No, no, no.  There were eight different
 9    portfolio holdings that they had at the time.
10         Q      You only remember the name of three of them?
11         A      I didn't deal with them directly in terms of
12    name.  I only dealt with them in terms of inventory.
13         Q      What was Lucas Brand Equity net profits for
14    two thousand -- while you were working, while you allege
15    you were working?
16              MR. MADSEN:  Your Honor, I --
17              THE WITNESS:  I have no idea.
18    BY MR. LEHMAN:
19         Q      You have no idea?
20         A      I wasn't privy to that information.  I'm not
21    an accountant.
22         Q      Chief operating officer --
23         A      I did not --
24              THE COURT:  One at a time, please.
25              THE WITNESS:  I did not have exposure to
```

1                    Lucas Brand Equity's financials.

2      BY MR. LEHMAN:

3           Q     You don't recall the name of the five other

4      entities?

5           A     I don't.  At this time, no.

6           Q     Do you try to present yourself as an honest

7      person in the business world?

8           A     Do I try?  I am an honest person in the

9      business world.

10          Q     Earlier you testified that you stopped working

11     for Logical Step in 2011.  Was that true?

12          A     That is correct.

13          Q     Have you ever presented to anyone that you

14     continued to work for Logical Step through November of

15     2016?

16          A     No.

17          Q     When is the last time you looked at your

18     LinkedIn page?

19          A     Doesn't matter.  LinkedIn -- it's done.  2011

20     was the last time that I worked with that company.

21          Q     Please answer my question.  When is the last

22     time you looked --

23          A     I look at my LinkedIn page everyday.

24          Q     You look everyday?

25          A     Sure, I do.

```
 1          Q     Do you know what date you put on as the last
 2     date you worked for Logical Step?
 3          A     2011.
 4          Q     It's not November, 2016?
 5          A     No.
 6          Q     So if I was to produce evidence that showed
 7     that your LinkedIn page --
 8          A     Shouldn't reflect --
 9          Q     -- November of 2016, November of 2016, you
10     would be wrong, you would be lying, or you would be
11     grossly --
12          A     From Logical Step?
13          Q     On your LinkedIn page, does it say,
14     "Experience:  Founder, Logical Step -- "
15                  MR. MADSEN:  Objection.  He's reading
16             from a document.
17                  MR. LEHMAN:  I'm not asking him about
18             the document.  I'm asking, is it on his
19             LinkedIn page?  Does it say this?  Yes or no?
20                  THE WITNESS:  Logical Step doesn't have
21             anything to do with any of this.
22                  MR. LEHMAN:  Please answer my question.
23             And in fact, it does because it was raised by
24             your counsel earlier.
25                  So here's my question:  On your
```

1              LinkedIn page, which you check everyday, does

2              it say, "Founder of Logical Step, LLC,

3              November, 2006 to November, 2016, 10 years,

4              one month."  Logical Step, LLC --

5                   THE WITNESS:  That's inaccurate.  That

6              should not be -- that's not the case.

7    BY MR. LEHMAN:

8         Q      So you tried to present yourself --

9         A      That was not the case.

10        Q      -- you are honest?

11        A      That is not the case, and it's -- 2011 is when

12   the company ceased to --

13        Q      So earlier, when you said you try to be

14   honest, and you said, "I am honest," to present yourself

15   in an honest way to the world --

16        A      Right.

17        Q      -- is this honest?  Would it be honest to say

18   that on your LinkedIn page that you worked for Logical

19   Step all the way through November of 2016?

20        A      No.  It's inaccurate.

21        Q      Or dishonest?

22        A      No.  Inaccurate.

23        Q      Why haven't you fixed it?  You look at it

24   everyday?

25        A      Well, let me qualify my reply, then.  When I

 1     look at LinkedIn, I look at LinkedIn for notifications --

 2          Q      Please answer my question.

 3                    THE COURT:  Let him finish, please.

 4                    MR. LEHMAN:  Him or me?

 5                    THE COURT:  The witness.

 6                    MR. LEHMAN:  Yes, your Honor.

 7                    THE WITNESS:  When I look at LinkedIn, I

 8                look at it for notifications.  I don't

 9                necessarily look at my profile.  I don't look

10                at the content of my profile.  Right now my

11                goal is to be finding new employment, not to

12                be looking at any LinkedIn content.  So if

13                it's inaccurate, obviously, it needs to be

14                fixed; but it is not, from my --

15                    MR. LEHMAN:  Not inaccurate?

16                    THE WITNESS:  It should not be

17                inaccurate because 2011 is the last time I

18                performed business under that corporation.

19   BY MR. LEHMAN:

20          Q      Corporation or LLC?

21          A      LLC, excuse me.

22          Q      Do you know the difference between a

23     corporation and an LLC?

24          A      I do.

25          Q      What is the difference?

```
1        A     The difference is based on filings, based on

2    units -- investments being made, and LLC is a much more

3    simple method of corporation.  Typically, you have a

4    managing-member structure versus a board, etc.

5        Q     How many members of Logical Step are there?

6        A     One.

7        Q     Who set up Logical Step, LLC?

8        A     My accountant.

9        Q     Who asked your accountant to do it?

10       A     I did.

11       Q     How did you meet Jay Lucas?

12       A     Through Karen Ballou.

13       Q     How did you meet Karen Ballou?

14       A     I have absolutely no idea.  I can't remember.

15   It was a long time ago.

16       Q     Was it 10 years ago?

17       A     It was well over 10 years.

18       Q     Was it over 20?

19       A     No.

20       Q     Somewhere between 10 and 20?

21       A     Correct.

22       Q     Was it closer to 20 or closer to 10?

23       A     Closer to 10.

24       Q     Do you remember where?

25       A     No.
```

```
1         Q      Do you remember how she introduced you to Jay?
2                MR. MADSEN:  Objection.  I just -- can I
3         just inquire as to the relevance of this?
4                MR. LEHMAN:  I want to establish the
5         relationship between him and Jay and under
6         what circumstances.  It clearly --
7                THE WITNESS:  She introduced me to Jay
8         because I'm an expert in a category that they
9         needed help with.
10               MR. LEHMAN:  I didn't hear any of that.
11        I was still talking.
12               THE WITNESS:  I'm sorry.
13               MR. LEHMAN:  It would establish the
14        context in how you would interpret things.
15        If it's a personal relationship, then if Jay
16        said something, he would take it in a
17        different way than if it was just purely
18        business.
19               THE COURT:  The objection is overruled.
20               MR. MADSEN:  I object.
21               THE COURT:  I just overruled it.  No
22        need to continue.
23   BY MR. LEHMAN:
24        Q      How did you meet Jay?
25        A      Through Karen Ballou.
```

1        Q       Where?  When?

2        A       She wanted to introduce me to Jay to help them

3    to understand some aspects of their business at the time.

4        Q       Some aspect of which business?

5        A       They were in the development of getting

6    involved with the direct response industry.  They wanted

7    to understand the financials behind it.  I helped them to

8    develop a spreadsheet, to understand how to project

9    certain revenue streams within that particular mechanism.

10       Q       For which business?

11       A       It wasn't for any specific business at the

12   time.  It was general knowledge.

13       Q       General knowledge of the spreadsheet that did

14   what?

15       A       To understand how to build a direct response

16   campaign.

17       Q       What is a direct response --

18       A       Direct response typically involves utilizing

19   television to drive sales to sell product.

20       Q       Did they tell you why they came to you?

21       A       Why they came?  Because I knew Karen as a

22   friend, as a business colleague.  I was helping them out.

23   I was not being paid.  I did it as a friendly gesture.

24       Q       So you worked without being paid?

25       A       I did.

```
1          Q       As a friendly gesture?

2          A       I did.

3          Q       Do you know a company called Specific Beauty?

4          A       Of course, I do.

5          Q       What is Specific Beauty?

6          A       A company I was the president of.

7          Q       When did you become president of that company?

8          A       I don't have my resume in front of me.

9          Q       Are you doing your best to remember?

10         A       Three years ago.  I don't remember the date.

11         Q       What does Specific Beauty do?

12         A       A multicultural skin care company.

13         Q       What is multicultural skin care?  I don't know

14    what that means.

15         A       It is a product that is sold to women of a

16    variety of different ethnic backgrounds.

17         Q       How did you become president?

18         A       I was introduced to the chairman of the

19    company.  In fact, through Karen, we developed a

20    relationship; and subsequent to that relationship, I was

21    asked to be the president of that company.

22         Q       Who asked you?

23         A       The chairman of the company.

24         Q       Who was?

25         A       Specific Beauty, Ron Krongold.
```

1          Q      I can't hear you.

2          A      Ron Krongold.

3          Q      When was the first time you heard the name

4     "Specific Beauty"?

5          A      From Karen.

6          Q      When did she --

7          A      Several years ago.  I don't remember the exact

8     date.

9          Q      I mean, how many years before you became

10    president?  Six months?  A year?  Eighteen --

11         A      It was a good -- it was a good six months to a

12    year, absolutely.

13                    THE COURT:  So this is between 2011 and

14              2015?

15                    THE WITNESS:  Correct.

16    BY MR. LEHMAN:

17         Q      Can you give a date?

18         A      No, I cannot.

19         Q      I mean, not a specific date, but it's like

20    asking how tall the Empire State Building is, you know,

21    around a hundred stories, not a thousand.

22         A      If I had my CV in front of me, I could give

23    you an exact date.  I don't have it.

24         Q      If I said July, 2014, would that sound

25    somewhat accurate?

```
 1          A      I'm not going to confirm that.  I don't
 2    remember the date.
 3          Q      If I said July of 2002, would that sound
 4    inaccurate?
 5          A      That is correct.
 6          Q      If I said July, 2003, would that sound
 7    accurate?
 8          A      It was after 2013, let's put it that way.
 9          Q      Thank you.  Did Lucas Brand, LLC -- the
10    limited partnership, I'm sorry, the limited partnership,
11    did they ever ask you to value Specific Beauty?
12          A      No.
13          Q      Did you ever hear Mr. Lucas say that he wanted
14    to make an investment in Specific Beauty?
15          A      He did, but that was out of my realm of
16    involvement.  I had nothing to do with that.
17          Q      Please answer my question.
18          A      No.  The answer to your question, I'll say no.
19          Q      Did he ever pay you to value Specific Beauty?
20    I mean, did the LP ever pay you?
21          A      No.
22          Q      Did the LP ever pay you to value Specific
23    Beauty?
24          A      No.
25          Q      Did anyone in the world ever pay you to value
```

```
1    Specific Beauty?

2         A     No.

3         Q     Did you value Specific Beauty?

4         A     No.

5         Q     When you found out that you believed you were

6    misclassified, what steps did you take to rectify it?

7         A     I made the repeated phone calls and

8    conversations with Mike Lanzaro to correct the problem.

9    He did not correct the problem.

10        Q     Why Mike?

11        A     Because Mike was the accounting manager.  He

12   was responsible for setting up the accounting system,

13   setting up payroll, handling accounts payable, etc.

14        Q     When did you find out that you were

15   misclassified?

16        A     Almost immediately.

17        Q     So earlier, when you said three months, two to

18   three months --

19        A     I don't remember exactly what it was.  It was

20   within a two- to three-month period.  I understand --

21        Q     Sir, this is important.  You're testifying

22   right now, and earlier, you said two to three months.

23        A     Then we'll maintain that.

24        Q     I mean, I really do want you to give your best

25   efforts because in your complaint you say --
```

```
 1          A       I don't recall.

 2                  THE COURT:  One at the time, please.  We

 3                  have an incredibly talented court reporter,

 4                  but she can't take down two people speaking

 5                  at a time.

 6                  MR. LEHMAN:  I apologize to the court

 7                  reporter.

 8   BY MR. LEHMAN:

 9          Q       In your complaint, you allege, "Shortly after

10   commencing his employment, however, Plaintiff learned

11   that, instead of properly classifying and paying him as a

12   W-2 employee, Defendant's improperly classified," and then

13   it goes on.

14          A       Mm-hmm.

15          Q       But earlier, you said two to three months

16   after you started working.  So my question to you is, does

17   two to three months qualify as shortly after commencing

18   his employment?

19          A       I don't understand the question.  I'm sorry.

20          Q       Does two to three months --

21          A       I can't make that determination.

22          Q       You're the one who used the phrase "shortly

23   commencing," so what does it mean to you?

24          A       That it would be two to three months, then.

25          Q       Did you keep time sheets?
```

1        A       No.  I was not responsible for time sheets nor

2    was I required to keep time sheets.

3        Q       How do you know if you worked over 40 hours in

4    a week?

5        A       Because my responsibilities warranted that

6    amount of time and the amount of communication that I made

7    on a daily basis warranted that time.  Plus, as an

8    executive running a company, there are many, many

9    responsibilities that would certainly take that amount of

10   time to perform.

11       Q       So you've alleged that you were not paid for

12   all the hours over 40 hours, but you have no way of

13   figuring out how many which weeks you might have worked

14   over 40 hours?

15       A       I always worked over 40 hours.

16       Q       Do you consider being a chief operational

17   officer a professional job?

18       A       A professional job?  It's a management job.

19       Q       Have you ever used the word "professional" in

20   your life?

21       A       Well, within my resume, sure, professional

22   experience.

23       Q       How did you use it?  What did it mean to you

24   when you used the word "professional"?

25       A       That I was a professional with a specific

1    talent or experience to perform a duty.

2         Q    So do you consider chief operating officer to

3    be professional within your own definition?

4         A    I don't understand the question.

5         Q    You have a definition of a word.  I'm asking,

6    does your job fit within that definition?

7         A    I am a professional, yes, in the context of

8    running that particular discipline of an organization.

9         Q    Do you know what "docking" is?

10        A    Of course I do.

11        Q    What is docking?

12        A    Docking is when you're moving product from one

13   end to the other and making sure that you create economies

14   of scale on the operations side.

15        Q    So in your complaint, when you allege that

16   there was docking, that's what you meant?

17        A    No.  "Docking" is a technical operations term.

18   If you're referring to docking -- I don't understand the

19   context in which you're asking the question.

20        Q    I'm asking you, Do you know what docking is?

21   And you said, yes, of course, you do.

22        A    Well, I don't know if it's a legal term, then?

23        Q    I'm not the one who defined the term.  You

24   are.

25        A    I didn't draft the agreement or the document

1    that you're referring to, I assume.

2          Q     You didn't draft what?

3          A     What are you referring to, Brian?

4          Q     I'm asking you -- what did you just call me?

5          A     I'm sorry.  I'm not familiar with the

6    terminology here.  Just continue.

7          Q     Do you know what docking is?

8          A     I don't understand the context in which you're

9    asking the question.  "Docking" has different meanings for

10   different things.

11         Q     Is there any context in this world in which

12   you know what docking is?

13         A     Docking could be docking pay --

14         Q     Is there any context -- my question --

15               THE COURT:  One at the time, please.

16               MR. LEHMAN:  He's being intentionally

17              evasive, and I'm trying to, you know, is

18              there any context in which you know what

19              "docking" means?

20               THE WITNESS:  Yes.

21   BY MR. LEHMAN:

22         Q     What context is that?

23         A     Docking pay, for instance.

24         Q     So you know what it means in that context?

25         A     I do.

1     Q     Is there any other context in which you --

2     A     In operations, there's something called

3     "docking" when you are moving inventory from one entity or

4     one environment to the other in order to create what are

5     called economies of scale.  Docking a boat, for instance.

6     Q     Yes.  I agree.

7     A     Okay.

8     Q     Did you testify earlier that you needed Ms.

9     Ballou's authority for certain things?

10     A     I needed their approval to pay expenses.

11     Historically, the bills were paid by Mike Lanzaro.

12     Q     So you needed her to do parts of your job;

13     correct?

14     A     Technically, yes.

15     Q     How would it be not technically correct?

16     A     I answer yes, then.

17     Q     So you've testified, I believe, correct me if

18     I'm wrong, that you believe that you were fired on what

19     date?  I'm just asking that question.  What date do you

20     think you were terminated?

21     A     September 12th.

22     Q     And when is the last date you thought that you

23     were fully paid?

24     A     The end of May.

25     Q     So from May to September 12, you testified

1    that you were working, but not, according to you,

2    receiving pay that you deserve?

3         A    Correct.

4         Q    How were you able to do your work if Karen

5    wasn't giving you the authority to do it?

6         A    Not a matter of authority to do it.  I did my

7    job.  I had the authority to perform the duties that I

8    had --

9         Q    You just said that --

10                  THE COURT:  Let him finish, please.

11                  THE WITNESS:  No.  What I said earlier,

12             and I will say it again, is that in order to

13             pay invoices, expenses, those monies had to

14             be approved by either Mike Lanzaro, typically

15             Karen Ballou.  Ultimately, it should have

16             been by Jay Lucas; but he was never available

17             to make those decisions.

18   BY MR. LEHMAN:

19        Q    What's your basis for saying ultimately Jay

20   Lucas --

21        A    Because when I tried to communicate --

22        Q    Let's -- I will work on not interrupting you.

23   I do apologize for that, but let me finish my sentence,

24   too.

25             What is your basis for saying that ultimately, it

1    should have been Jay?

2         A       Because it was communicated to me that Jay

3    Lucas and/or Karen Ballou were responsible to approve

4    payments, expenses that needed to be, obviously, paid.

5         Q       Who communicated that to you?

6         A       Karen Ballou.

7         Q       Just Karen Ballou?

8         A       Correct.

9         Q       Jay Lucas never did?

10        A       No, but she included Jay Lucas as part of that

11   approval process.

12        Q       When did she communicate that to you?

13        A       Very early on in the process.  That was almost

14   from day one.

15        Q       What was day one?

16        A       September 1, 2015.

17        Q       So was that communicated to you before or

18   after that day?

19        A       Before September 1st?

20        Q       September 1st.

21        A       It was communicated after because the

22   agreement and the start of the business from the document

23   standpoint, agreement standpoint, did not commence until

24   that time.  Prior to that, there was due diligence that

25   was taking place based on the agreement.

1      Q      What was the due diligence that was performed

2    by you?

3      A      I was involved in the capital raise, in

4    working on all of the documents, financial documents,

5    helping to develop all of the presentations -- everything

6    up until the agreement was signed.  And I worked as part

7    of a team to do that.  It wasn't just me.

8      Q      Okay.  So who was part of this team?

9      A      Ian Knowles, Karen to some extent, very

10   little, and Jay Lucas oversaw the process.

11     Q      Just those three people?

12     A      Certainly Adam Berk as the original founder

13   and owner of the brand.

14     Q      Which brand are you referring to?

15     A      HYD for Men, LLC.

16     Q      So he's the founder and owner of HYD?

17     A      He's the original founder and owner of HYD.

18     Q      From September 1st to --

19     A      No.  From --

20     Q      What do you mean, no?  I'm the one asking the

21   question.

22     A      Sorry.

23     Q      From the day you started working on that date,

24   who were the owners of HYD?

25     A      Lucas Brand Equity.

1       Q       Was the only owner?

2       A       Correct.

3       Q       So if I was -- by "Lucas Brand Equity," you

4    mean Lucas Brand Equity, LLC or LP?

5       A       LLC.

6       Q       And I mean, it is important, because that is

7    the defendant here, that you be specific.

8       A       Mm-hmm.

9       Q       So as chief operational officer, you would

10   know, tell me if I'm wrong, you would know if Lucas Brand

11   Equity, LLC only owned less than 15 percent of HYD?

12      A       I would know the deal structure that was put

13   into place and what they were supposed to be doing based

14   on the detail and agreement that was signed.  What they

15   decided to do post that, I would not be privy to because

16   that information was not provided to me.

17      Q       My question is, if I were to say that Lucas

18   Brand Equity, LLC only owned less than 15 percent of HYD

19   on September 1st, that would be inaccurate?

20      A       I wouldn't able to answer that question.

21      Q       But you just said that Lucas Brand Equity, LLC

22   was the only owner.

23      A       I said they were the owner according to the

24   agreement that was signed.  As far as what percentage they

25   owned, I am not privy, nor was I privy to that

 1    information.

 2         Q      So you did not say that the only owner of HYD

 3    was Lucas Brand Equity, LLC?

 4         A      That's not what I said.  I said according to

 5    my -- according to my knowledge, they are the only owner.

 6         Q      What agreement are you referring to?

 7         A      Referring to the agreement between ABJP, LLC,

 8    which was the corporate entity for HYD for Men, which is

 9    the brand, and Lucas Brand Equity.  That's it.  That's the

10    agreement.

11         Q      Lucas Brand Equity --

12         A      LLC.

13         Q      You saw this agreement?

14         A      I see it.  I have a copy of it.

15         Q      Do you have a copy of it here?

16         A      No.  I didn't think it was important.

17         Q      Have you ever shown a copy to your lawyer?

18         A      I have not.  It's not --

19              MR. MADSEN:  Please don't ask questions.

20         I'm going to object.

21              THE WITNESS:  No, I did not.  It's not

22         relevant anyway.

23    BY MR. LEHMAN:

24         Q      It's not relevant, even though you keep

25    referring to the agreement as defining what Jay's

1    responsibilities were?

2          A      I didn't -- that's not what I said.  Not what

3    I said at all.

4          Q      On the first exhibit, which was an email -- I

5    have to find it.  On the first exhibit, Jay Lucas wrote an

6    email to you.  According to you, that says, "This letter

7    is to confirm your employment as chief operating officer

8    of HYD for Men, a portfolio company of Lucas Brand Equity,

9    LLC."  At that time, did you note that he didn't mention

10   anything about Lucas Brand Equity, LLC?

11         A      I don't understand the question.

12         Q      At that time, did you note that he did not

13   mention anything about Lucas Brand Equity, LLC?

14         A      Absolutely not.

15         Q      You did not note that?

16         A      No.

17         Q      Was your understanding that you were going to

18   be chief operational officer of both companies?

19         A      My understanding was I was going to be CEO of

20   HYD for Men at the time.

21         Q      So your understanding was that you were going

22   to be CEO of HYD for Men --

23         A      During --

24         Q      Wait, wait, wait.  This says "chief

25   operational officer."

1        A        Because the title got changed thereafter.  The

2   original intention was for me to be the CEO of the

3   company.  When I started with the company on September

4   1st, it was decided that I would be chief operating

5   officer of Lucas Brand Equity and HYD for Men, primary

6   responsibilities to operate the HYD for Men business,

7   which, like I said earlier, changed its name to HYD USA,

8   LLC.

9        Q        So you're saying that your understanding on

10  September 1, 2015, or even September 9, 2015, was that you

11  were going to be chief operating officer of both HYD, the

12  LLC, and Lucas Brand Equity, the private equity firm, LLC.

13  That was your understanding?

14       A        My understanding was I was the chief operating

15  officer of HYD as a portfolio company, as a brand.

16       Q        Were ever a chief operating --

17       A        No.  I was not a chief operating officer for

18  Lucas Brand Equity, LLC, but I was paid by that company.

19                     MR. LEHMAN:  Can I see the second

20             exhibit, please?

21                     THE CLERK:  Sure.

22  BY MR. LEHMAN:

23       Q        So in the second exhibit where, according to

24  this exhibit by Michael Lanzaro, says, "To Whom It May

25  Concern:  Steven J. Edelstein, has been chief operating

1    officer for Lucas Brand Equity," typed in, "HYD USA since

2    September 1, 2015."  Is that accurate or inaccurate?

3            A       That is accurate.

4            Q       How is that accurate if you just testified

5    that you were only chief operational officer of HYD USA,

6    LLC?

7            A       In terms of responsibilities, I was chief

8    operating officer.  As far as payment and what I was

9    employed as, that is what I am.  That letter clearly

10   indicates that.

11           Q       What is your definition of "employed as" in

12   that context?

13           A       In terms of payment, in terms of how I was

14   paid by the corporation.

15           Q       And how were you paid?

16           A       I was paid by both Lucas Brand Equity and HYD

17   USA, LLC.

18           Q       Lucas Brand Equity, LLC or LP?

19           A       LLC.

20           Q       If you want, we'll call it "LP" and private

21   equity.  That's fine with me.  How do you know that's the

22   same thing?

23           A       I don't know that.

24           Q       So why did you just say it was the same thing?

25           A       Because as far as I'm concerned, the payments

1    came out of the same bank account.

2        Q    Does your concern determine whether or not

3    they're the same thing?

4        A    My concern?

5        Q    I asked you why you thought they were the same

6    thing.  You said because, "As far as I'm concerned," blah,

7    blah, blah.

8              MR. MADSEN:  Objection.  He didn't say

9         blah, blah, blah.

10             MR. LEHMAN:  Yada, yada, yada.

11             THE WITNESS:  My concern is only

12        relative to where the payments are coming

13        from so I adequately get paid.

14   BY MR. LEHMAN:

15       Q    So were you chief operating officer of Lucas

16   Brand Equity, LLC?

17             MR. MADSEN:  Objection.

18             MR. LEHMAN:  Can you tell us what your

19        objection is?

20             MR. MADSEN:  It's been asked and

21        answered.

22             THE COURT:  Overruled.  I'll let him

23        answer one more time.

24             THE WITNESS:  I'm sorry?

25

1  BY MR. LEHMAN:

2       Q    Were you chief operating officer of Lucas

3  Brand Equity, LLC?

4       A    I was not.

5       Q    Did you ever receive an email that said,

6  "Steve," or something similar, "at Lucas Brand Equity --

7       A    No.

8       Q    -- LLC"?

9       A    No.

10      Q    Did you ever use a logo at the bottom of your

11 email that said, "Lucas Brand Equity, LLC"?

12      A    No.

13      Q    What was the logo that you used at the bottom

14 of your email?

15      A    HYD.

16      Q    What was the email that you used when working

17 from September 1, 2015, to the date you were fired?

18      A    HYD.

19      Q    Is your email still working?

20      A    No.

21      Q    When was it turned off?

22      A    A long time ago.  I don't even know.  Months.

23      Q    What was the date you thought you were fired?

24      A    I'm sorry?

25      Q    What was the date you thought you were fired?

1        A       I wasn't terminated, but I left the company

2    September 12th.

3        Q       Was your email working on that day?

4        A       I'm sure it was.

5        Q       After September 12th, did you ever try to

6    access your email?

7        A       I don't think I did, actually.  No.  I stopped

8    all activity.

9        Q       So you had already printed out all these

10   emails prior to that date?

11       A       Yeah, but I had them in a file, of course.  I

12   always keep a human resource file for myself and make sure

13   that I keep track of all my files and all my

14   communications.

15       Q       Do you remember earlier testifying that every

16   time you got a bank statement, for Exhibit No. 17, you

17   printed it out on that date?

18       A       I printed it out on that date, and then what I

19   do is, I do a cumulative for my file, so I have everything

20   in one file.  Correct.

21       Q       So the date you got paid, say, January 22nd --

22       A       I didn't do it all time.

23       Q       -- 2016, on that date, you looked at it, I got

24   paid, I print it out.

25       A       I looked on the computer, to be honest with

1    you, and I sometimes print it out, and most of the time, I

2    do print it and make sure I put it in a file, a hard copy.

3         Q        Do you remember testifying that you printed it

4    out on each date you received it?

5         A        I did.

6         Q        Were you trying to be accurate at that time?

7         A        Was I trying to be accurate?

8         Q        Yeah.

9         A        Yes.

10        Q        In the bottom right-hand corner of Exhibit

11   17 --

12        A        Yeah.

13        Q        -- it says, "1, hyphen, 1," and then it's cut

14   off.  He can look at it, if he can have Exhibit 17.  Given

15   that the date of the transaction was on January 8, 2016;

16   but every piece of paper is exactly the same?

17        A        Yes.

18        Q        Does that refresh your recollection that you

19   in fact printed out the whole packet on January 11th or

20   some date after January 8th?

21        A        Oh, God, yeah.  I print these out all the

22   time.

23        Q        Do you know how the stamp at the bottom would

24   be exactly the same if you were printing them out on

25   different dates.

1    A    This was just printed recently.  This was all

2    printed recently.  It was printed for a particular

3    purpose.

4    Q    So earlier, when you said that --

5    A    You asked me -- I said I did.  You didn't ask

6    me if I printed it out for this particular purpose.

7    Q    I asked you what I asked you.  And what you

8    said was that this exhibit came from printing it out on

9    each date, you put it into a folder, and that's how we got

10   this exhibit.  In fact --

11   A    Well, then I --

12   Q    -- it was a very big moment where I said --

13   A    I'm sorry.

14   Q    -- it was a very big moment where I said, "How

15   did you get this document?"  And you explicitly said, "I

16   printed it out on each date."  And I'm asking you, if you

17   printed it out on different dates, do you know how it has

18   the same time stamp on every page?

19   A    Yes, because this was printed recently.  This

20   was just printed for this particular purpose.

21   Q    So this exhibit wasn't printed on each date,

22   the way you testified earlier?

23   A    This particular one was not.  That is correct.

24   Q    As of September 9, 2015, what percentage of

25   HYD USA, LLC was owned by Adam Berk?

1        A       I have no idea.

2        Q       You were chief operating officer of HYD?

3        A       I'm just going to say I have no idea.

4        Q       If you have no idea about that, how do you

5    know that Lucas Brand Equity, LLC owns anything?

6        A       Because that's who I reported to.

7        Q       How do you know that they own anything?  You

8    may have reported to someone, but how do you know they own

9    it?

10       A       Because I saw the agreement.

11       Q       Between?

12       A       Between ABJP, LLC, HYD for Men, and Lucas

13   Brand Equity, LLC.

14       Q       What's Jay Lucas' role at Lucas Brand Equity

15   LLC?

16       A       He's co-CEO, I believe.

17       Q       You don't know?

18       A       He runs the company.  He's the chairman,

19   co-CEO of the company.

20       Q       What does it mean to run a company such as

21   Lucas Brand Equity, LLC?  What does it mean --

22       A       He oversees the investment responsibilities of

23   those particular portfolio brands.

24       Q       Are there other owners of Lucas Brand Equity,

25   LLC?

1       A       Not that I know of, no.

2       Q       How is Ms. Ballou a partner if she's not an

3   owner?

4       A       Ask her.

5       Q       So your testimony is she's a partner?

6       A       That's what she's telling me.  That's what

7   she's telling people.  That's what she has listed in

8   various documents.  I'm just citing what I've seen and

9   what I've heard.

10      Q       When did you see it?

11      A       Several, many times.  I don't pay attention to

12  Karen Ballou in terms of what her title is.  Certainly not

13  anymore.

14      Q       Name one instance where you saw that?

15      A       Oh, my God.  Every document, every email she

16  sent that she has a signature on.

17      Q       So let's look at one that you say she sent

18  here.

19      A       If there's a signature on it, it's probably

20  going to reflect that.

21      Q       Okay.  Exhibit 12, I'm just looking --

22      A       There may not be a signature.

23      Q       You just said it would.

24      A       I said, if there was a signature, which I

25  can't -- I cannot tell you that she has a signature all

1    the time --

2         Q    Sir, you're the one who said she was a partner

3    on every single document, or many times.  I asked you to

4    give me one instance.  You said, "Look at her emails."

5         A    Go back to her LinkedIn page.  It says it

6    right there.

7         Q    So you remember her LinkedIn page?

8         A    Yeah, only because she is constantly going on

9    mine.  I see it pop up in my notifications.

10        Q    I'm not asking you why you remember.

11        A    I'm telling you, I remember what it said for

12   her title.

13        Q    But you don't remember your LinkedIn page?

14        A    It's not a matter of remembering a LinkedIn

15   page.  What I'm saying to you is that I don't -- I don't

16   consistently go to my content of my LinkedIn page.

17        Q    Why did you start Logical Step?

18        A    Because I wanted to run my own business.

19        Q    What was that business that you were running?

20        A    A management consulting firm.

21        Q    What would you consult on?

22        A    All different things -- operation tasks, brand

23   tasks, financial matters, helping companies to grow their

24   business.  I was a consultant, pure and simple.

25        Q    Average week, how often would you talk on the

1    phone with Jay Lucas?

2         A     Oh, never.  It was impossible to get ahold of

3    him.

4         Q     Average week, how often would you email Jay

5    Lucas?

6         A     If I needed to reach him, once or twice a

7    week, but not really that often.

8         Q     How often did he respond back?

9         A     Never.  And if he did, it was via text or

10   sporadic email.

11        Q     Did you save all those texts?

12        A     I have some.  Well, the texts I can't say

13   because they delete.  I have voicemails from him, and I

14   certainly have emails.

15        Q     You say you saved his voicemails?

16        A     Yeah.

17        Q     You testified that you were looking for work?

18        A     I am.

19        Q     How many places have you applied to?

20        A     Oh, dozens.  I would say 10, 20, something

21   like that.  I have a lot of referrals, a lot of people in

22   my network that I talk to.

23        Q     Can you name two places you applied?

24        A     Of course.  One company called Speed Commerce,

25   and another company called Jorbay [phonetic]; I've also

1    spoken with L'Oreal, and let's see.  Who else have I

2    spoken with?  Estee Lauder -- a number of companies.

3        Q       Has anyone told you why they're not hiring

4    you?

5        A       Nobody's told me that they're -- no, nobody's

6    told me why they're not hiring.

7        Q       Could you look at Exhibit 6, please?  When did

8    you first see this email?

9        A       I guess the day it was sent, shortly after

10   that.

11       Q       Who sent it to you?

12       A       It was forwarded by my attorney.

13       Q       Who was?

14       A       Mr. Madsen.

15       Q       What in this email from Mr. Peikes, your

16   attorney, made you stop working?

17       A       Quote, unquote, "would therefore behoove Mr.

18   Edelstein to discontinue activities he claims to be

19   engaging in on HYD's behalf."

20       Q       At that point, you said, That means I'm not

21   going to work for them anymore?

22       A       Correct.

23       Q       When was the first time you contacted

24   counsel --

25       A       Back --

```
 1          Q       -- about suing?

 2          A       I don't remember the exact date sometime in

 3   August.

 4          Q       You didn't contact anyone before August?

 5          A       No, not that I recall.

 6          Q       Have you ever described your wife as being an

 7   expert in workplace rights?

 8          A       In who?

 9          Q       Workplace rights.

10          A       Workplace rights?

11          Q       Have you ever described your wife as being an

12   expert in workplace rights?

13          A       She works in that area.

14          Q       Is she an expert in workplace rights?

15          A       I don't know.  You probably heard me say that,

16   though, because I just said it today.  I just said it

17   today.  Would I describe her -- I guess she would be.

18   Yes.  She is a compliance person.

19          Q       So you have described her as an expert --

20          A       I just did today.

21          Q       What did you mean by "expert"?

22          A       She is well versed in employment services

23   relative to compliance, she is well versed in employment

24   situations with people that are re-entering the workforce,

25   she understands grants, and she understands political
```

```
 1    process.
 2         Q     When did you first tell your wife that you
 3    were no longer receiving any money from HYD or Lucas Brand
 4    Equity, LLC or from anyone involved in this litigation?
 5         A     In May of 2016.
 6         Q     What was her reaction?
 7         A     What was her reaction?
 8              MR. MADSEN:  Objection.  I, you know,
 9              I'm not sure what this has to do with
10              anything.
11              THE COURT:  Besides marital privilege.
12              MR. MADSEN:  Yeah.  I'll claim the
13              marital privilege.
14              MR. LEHMAN:  I mean, the relevancy would
15              be that the wife was giving advice on how to
16              set up a lawsuit as an expert in workplace
17              rights.  That would be the relevance.
18              THE WITNESS:  No.  She did not.
19    BY MR. LEHMAN:
20         Q     On September 1, 2015 -- let me go to September
21    9, 2015.  Did you think you were making $120,000 a year?
22         A     Did I think I was making?  No.  I knew I was
23    making.  That was under my -- what my employment agreement
24    entailed.
25         Q     How often did you talk to Adam Berk?  How do
```

1   you spell his last name, by the way?

2        A     B-e-r-k.

3        Q     How often did you talk to him on average in a

4   week?

5        A     Oh, God, almost everyday.

6        Q     What would you talk about?

7        A     The business.  He was very involved he was

8   hired as a transitionary consultant, if you will, as part

9   of the growth of the business, part of the transition of

10  the business.  He has historical knowledge of the

11  business.

12       Q     Why would he take the time to talk to you?

13       A     Because he's the one who got me involved in

14  the business in the first place.

15       Q     Why does he care?  I've gotten people involved

16  in business, and I don't keep talking to them --

17       A     I can't answer that question.  You would have

18  to ask him.

19       Q     He never told you why he was talking to you?

20       A     He talks to me based on relevant information

21  that pertains to the brand.  As far as his rationale or

22  reasoning behind him talking to me, you'd have to ask him.

23       Q     Can you give me two examples of relevant

24  information that he talked to you about?

25       A     Sure.  Talked about packaging; we talked about

1      the vendors handling the manufacturing; we talked about

2      the retailers that we were engaged with, who they were;

3      who the buyers were, what the profile of the buyer was;

4      what kinds of inventory that is being sold.  We were

5      coming out of the razor program, we were intimate with

6      that.  The list goes on.

7            Q      What is the razor program?

8            A      We were developing a razor, a disposable razor

9      product to sell at retail.

10           Q      Did that ever happen?

11           A      No.

12           Q      Did you ever make a presentation to CVS?

13           A      I certainly did.

14           Q      Did you send the wrong presentation to CVS?

15           A      No, not that I recall.

16           Q      Did the presentation that you sent to CVS lack

17     punctuation, as you remember it?

18           A      No, not that I remember.  In fact, it was very

19     well received.

20           Q      So if it was described as disorganized and

21     aesthetically uncoordinated, that would be inaccurate, in

22     your opinion?

23           A      Inaccurate and never communicated to me.

24           Q      That was just one question.

25           A      It was inaccurate.  Correct.

```
1          Q      Did you ever travel to California to meet with
2     Starcrest?
3          A      I certainly did.
4          Q      When did you do that?
5          A      Oh, God.
6          Q      What?
7          A      I don't remember.  February maybe?  I can't
8     remember the date.
9          Q      Again, the Empire State thing.  You don't have
10    to have the exact date.
11         A      Early 2016, maybe late 2015.
12         Q      Did you get approval from anyone to take that
13    trip?
14         A      Absolutely.
15         Q      Who did you get approval from?
16         A      Ian Knowles.
17         Q      Anyone else?
18         A      No.
19         Q      Why didn't you get approval from Jay?
20         A      Because I didn't need approval from Jay.  Ian
21    was the one responsible for time, for approving those
22    things.
23         Q      Why didn't you get approval from Ms. Ballou?
24         A      I didn't need to get approval from Ms. Ballou.
25         Q      How much was the cost of that trip?
```

```
 1        A     I don't know.  Not expensive.  I will tell
 2   you, it wasn't expensive.  It was airfare and rental car,
 3   which is very inexpensive.  I saved the company money by
 4   staying with a friend of mine instead of staying at a
 5   hotel.
 6        Q     Who did you stay with?
 7        A     Curtis Kleinman.  He lives in the Pacific
 8   Palisades.
 9        Q     Did you ever take a trip to Florida?
10        A     Several.
11        Q     Were those approved?
12              MR. MADSEN:  Objection.  Can we have a
13              time frame?
14              MR. LEHMAN:  I mean, I thought that we
15              had -- what time frame did you think I meant
16              when I asked that question?  He was able to
17              answer it.
18              THE WITNESS:  Well, there wasn't a time
19              frame --
20              MR. MADSEN:  You asked has he ever been
21              to Florida without qualifying that it was
22              business-related.
23              MR. LEHMAN:  Agreed.  Agreed.  He
24              answered it, so now I'm asking him -- when I
25              asked the question, you answered it.  If you
```

```
 1                    don't understand something that I'm asking,

 2                    say "I don't understand."

 3                         THE WITNESS:  Mm-hmm.

 4     BY MR. LEHMAN:

 5          Q     What time frame did you think I meant when I

 6     asked that question?

 7          A     I didn't.

 8          Q     You said yes.

 9          A     I did not think -- no.  You didn't ask me the

10     time frame.  You said, "Did you travel to Florida?"  I

11     said yes.

12          Q     Okay.  And what time frame did you think I

13     meant?

14          A     I didn't think you meant a time frame because

15     you didn't ask.

16                         THE COURT:  Why don't we narrow it down.

17                         MR. LEHMAN:  I'll narrow it down.

18     BY MR. LEHMAN:

19          Q     While working, while you say you were working

20     for HYD from September 1st to, we'll just cut it off at

21     the date you last received money, how many months ago was

22     that?  Like eight?  What is that?  One, two, three, five

23     eight?  Eight months?

24          A     Seven, eight months.

25          Q     Yeah.  During those eight months, did you ever
```

```
1    travel to Florida?

2         A     Yes.

3                   MR. MADSEN:  For business or pleasure?

4                   MR. LEHMAN:  I'll get to that.

5                   THE WITNESS:  For business.

6    BY MR. LEHMAN:

7         Q     For HYD's business?

8         A     Correct.

9         Q     Did you get approval?

10        A     I did.

11        Q     From whom?

12        A     From several people -- Ian Knowles, for one.

13   Prior to that, Karen Ballou.

14        Q     Anyone else?

15        A     No.  I didn't need anybody else's approval.

16        Q     Was this approval verbal?

17        A     Always.

18        Q     Or was it in an email?

19        A     Always.

20        Q     Always what?

21        A     Verbal.

22        Q     Never in an email?

23        A     No.

24        Q     You never wrote to them and said, Can I have

25   permission to go to Florida?
```

1        A       No.

2        Q       How often on average were you talking with

3    Karen on a week, during this eight-month period?

4        A       When I could get in touch with her, two or

5    three times a week.

6        Q       How often did you not get in touch with her?

7        A       Constantly.

8        Q       Can you guesstimate?

9        A       Probably 70 percent of the time.

10        Q       So three times, 70 percent.  So you would call

11    her --

12        A       I would call her repeatedly.

13        Q       I'm just figuring out how many times you had

14    called her.  You said you called her 15 times --

15        A       Ten times for --

16        Q       Ten times?

17        A       I don't know.

18        Q       So twice a day, Monday through Friday?

19        A       If I needed her for anything or I'd send her

20    an email or I would text her -- the normal modes of

21    communication in business.

22        Q       I'm just trying to figure out how many times

23    you communicated with her.  After May, did you continue to

24    make it 10 times a week?

25        A       Phone calls?

```
 1           Q      Any sort of communication.

 2           A      Everybody called everybody.

 3           Q      No.  I'm asking you --

 4           A      Yes.

 5           Q      Ms. Ballou --

 6           A      Yes.

 7           Q      You said prior to that --

 8           A      Yes.

 9           Q      Just let me finish.  Prior to that, you said

10    10 times a week, three times she responded.  After you

11    stopped getting paid, how many times did you contact Ms.

12    Ballou on average in a week from May to September?

13           A      Five to seven times.

14           Q      How many times on average did she respond?

15           A      Once.

16           Q      Did she ever tell you why she was going from

17    three times to one time?

18           A      No.

19           Q      Did you ever try to address it?

20           A      Always.

21           Q      How would you try to address it?  What would

22    you say to her?

23           A      Never got a response.

24           Q      I am saying, what would you say to her?

25           A      I would say, "Why are you not responding to
```

1    me?  I needs to discuss certain things."  I would go into

2    detail in some cases, I wouldn't go into detail in other

3    cases, depending on how I left the voicemail.

4        Q    Did you only do this verbally or did you do it

5    in emails?

6        A    I did, I did, I did.  There were occasions

7    when I would send her an email, like some you've seen in

8    some of these exhibits, that express a concern and does

9    certain things.

10        Q    Nothing in these exhibits I know of says why

11    are you not meeting --

12        A    -- particular meeting --

13            THE COURT:  One at a time, please.

14  BY MR. LEHMAN:

15        Q    My specific question is, did you ever write an

16    email that asks Ms. Ballou in sum or substance, Why are

17    you only responding once a week when before, you responded

18    on average three?

19        A    No, of course not.  I did not, no.

20        Q    But you would ask her that?

21        A    I would, and I did.

22        Q    Did you intentionally keep it off email?

23        A    No.  Just the mode of communication was always

24    phone.

25        Q    Did you ever do it in texting?

```
 1        A     I might have, but I don't remember.  We'll
 2   leave it at phone calls.
 3                  MR. LEHMAN:  I think the situation right
 4              now, your Honor, is that I can probably push
 5              through, and we'll be done in -- I'll limit
 6              myself to no more than 1:15.  If counsel
 7              wants to do that, then we can be done now and
 8              not have to break and come back.
 9                  MR. MADSEN:  Well, are you going to be
10              requesting oral argument or concluding
11              arguments?
12                  THE COURT:  I will give you the option
13              of whether you want to do post-hearing
14              briefing or oral argument, whichever you
15              prefer.
16                  MR. LEHMAN:  If it matters for you to,
17              just planning on right now, I would just like
18              the briefs.  I don't want an oral argument
19              here.  I'm happy to stick around as long as
20              you want to go back and forth.  That's fine.
21              Whatever you would like.
22                  MR. MADSEN:  Well, if we're going to
23              brief, then we're going to brief.
24                  THE COURT:  So why don't we continue.
25                  MR. LEHMAN:  Okay.  So no more than
```

```
 1                     1:15.
 2     BY MR. LEHMAN:
 3          Q       Have you ever worked for anyone for free?
 4          A       When you say "worked," did I provide services
 5     for free?
 6          Q       Yes.  Have you ever provided services for
 7     free.
 8          A       Yes.  I certainly did, sure.
 9          Q       Who is the most recent person you provided
10     service for free to?
11          A       Well, since I haven't been working since May,
12     probably before Lucas.  It's been a while.  I don't
13     remember.  I don't remember.  It wasn't services for free;
14     it was more people asking me questions.  People call me up
15     saying, Give me some advice.  But I don't work, if you
16     call it work for free, no.  I'll answer the question that
17     way.  No.
18          Q       Have you ever worked for sweat equity?
19          A       I did for Jay Lucas.
20          Q       When?
21          A       Almost a year prior to HYD and Lucas acquiring
22     HYD.  I didn't get paid the entire time through the due
23     diligence process.  So yes.  Did I work on sweat equity?
24     Absolutely.
25          Q       When you say "sweat equity," what do you think
```

1    it means?

2         A     Meaning working for free based on some

3    opportunity potentially forthcoming.  In other words,

4    you're helping out a cause; you're helping out a piece of

5    business with the hopes that it turns into something on a

6    consistent financial basis.

7         Q     Do you know what "equity" is?

8         A     Do I know what equity is?

9         Q     You don't have to repeat my question.

10         A     Yes, I do know what equity is?

11         Q     What is sweat equity?

12         A     It is when you are working on behalf of not

13    being compensated in any way or form.

14         Q     Are you compensated with equity?  Is that why

15    it's called sweat equity?

16         A     No.

17         Q     It's not called sweat equity, if you work and

18    you get equity?

19         A     No.  You don't get anything.  You may get

20    something as part of that extension of work, but there's

21    no given; there's no guarantee.

22         Q     So your understanding of the phrase "sweat

23    equity" is you work, you're not guaranteed any equity in

24    the company, it's just part of this big project; but

25    there's no agreement to give you a percentage of ownership

1     back in the company you're working in?

2          A      Yes.

3          Q      Do you think the other people -- yes or no on

4     those.  Do you think that other people hold that same

5     definition?

6                      MR. MADSEN:  Objection.

7                      THE WITNESS:  Depends on the

8                  circumstance.

9     BY MR. LEHMAN:

10         Q      What circumstance would make someone --

11         A      If a discussion had taken place about an

12    agreement to do further work based on some type of either

13    equity agreement or compensation, then sweat equity could

14    apply.  If you are not making an investment, if you're not

15    making an investment in the business, then technically,

16    that is construed or defined as sweat equity.

17         Q      Who is it technically defined that way by?

18         A      Me.  The way I interpret it.

19         Q      Did you draft your complaint?

20         A      No.

21         Q      Did you draft your first amended complaint?

22         A      No.

23         Q      Did you review it?

24         A      Did I review it?  I read through it, yeah; but

25    I'm not an attorney.

```
 1          Q      Did you read through it carefully?

 2          A      I read through it as well as I understand from

 3     a non-legal perspective, yes.

 4          Q      Your second claim is breach of contract,

 5     actually, Count 2 on Exhibit 16.

 6          A      Yeah.

 7          Q      Do you have the contract with you today?

 8          A      No.

 9          Q      Do you have a contract anywhere in this world?

10          A      Right here.  Yes, at home, in my office.

11          Q      You have it at home?

12          A      Yes, I do.

13          Q      Have you ever showed it to your attorney?

14          A      I didn't draft this.

15          Q      I'm not asking you that.  I'm asking you --

16          A      Have I ever shown it to my attorney?

17          Q      -- you just said it was at home to your

18     attorney.  This is a PJA hearing.

19          A      Yes, he has seen it.

20          Q      It's meant to show if there's probable cause

21     whether or not there was a breach of contract or one of

22     the other --

23          A      To answer your question, of course, he has.

24          Q      So your answer changed depending on what my

25     explanation of what this hearing was?
```

```
 1        A      No.  It's a question that doesn't make any
 2    sense, personally, but I don't understand the question.
 3                    THE COURT:  Is there a written contract
 4               beyond Exhibit 1?  That's my question.
 5                    MR. LEHMAN:  He said so.  He said there
 6               was a contract at his house that --
 7                    THE WITNESS:  This is it.  This is the
 8               document.
 9    BY MR. LEHMAN:
10        Q      You didn't earlier say you have a contract at
11    your house that you did not bring here today?
12        A      You asked me --
13        Q      I just would ask that that --
14        A      I just would asked it be reread.  I would ask
15    it be reread.  Whatever he said he said.
16                    MR. MADSEN:  I just need to make an
17               objection.  When the witness was testifying
18               about a contract that was at his house --
19                    MR. LEHMAN:  You're not supposed to be
20               testifying right now.  This is not --
21                    THE COURT:  Why don't we have the court
22               reporter read back to us, please.
23
24                    (The requested material was read back.)
25
```

```
 1
 2                    MR. LEHMAN:  So outside of this, when is
 3              the last time you entered into a contract
 4              with someone.
 5                    MR. MADSEN:  Can you let the record
 6              reflect what exhibit you're referring to when
 7              you say "outside of this"?
 8   BY MR. LEHMAN:
 9         Q    When is the last time signed a contract other
10    than the one you had in your house?
11         A    I'm confused.  I don't --
12         Q    When is the last time you signed a contract --
13         A    What contract are you referring to?
14         Q    When is the last time you signed any
15    contract--
16                    THE COURT:  Well, why don't we just have
17              this question:  Is there a written contract,
18              employment contract, outside of Exhibit 1?
19              That's my question.
20                    MR. MADSEN:  No.
21                    THE COURT:  We'll let the witness
22              answer.
23                    THE WITNESS:  No.  I don't know -- this
24              is -- you're referring to this?
25                    MR. LEHMAN:  Your Honor, I do object to
```

```
 1                    him testifying and just telling the witness

 2                    what to say.

 3                         THE WITNESS:  No, no, no.  You asked me

 4                    a question.  If you're referring to this as a

 5                    contract --

 6                         THE COURT:  No.  This is pointing to

 7                    Exhibit 16.

 8                         MR. LEHMAN:  He knows exactly what he is

 9                    saying.

10                         THE WITNESS:  No, I don't know.

11                         MR. LEHMAN:  It's clearly reflected in

12                    what the testimony was reread, and now he's

13                    changing it because his lawyer --

14                         THE COURT:  Is there a written

15                    employment contract outside of Exhibit 1?

16                         THE WITNESS:  No.

17   BY MR. LEHMAN:

18        Q    Okay.  So on Exhibit 1, did you ever write an

19   email back saying, I agree?

20        A    No.  It was a verbal agreement.

21        Q    Please answer my question.  Can you please

22   answer my question?

23        A    Forgive me.  I'm very confused right now by

24   what you're talking about.  Explain to me what document

25   you're referring to.
```

```
 1          Q     Exhibit 1.

 2          A     Let me take a look at it before I answer the

 3    question.

 4                MR. LEHMAN:  Your Honor, it might go

 5                past 1:15.  That's only because --

 6                THE COURT:  That's fine.

 7                MR. LEHMAN:  That's only because he's

 8                seemingly confused.

 9                THE WITNESS:  No.  Nothing was written

10                back to Jay Lucas based on this document that

11                I'm reading.  If this is a contract that

12                you're referring to, this is -- no.  There

13                was never -- it was a verbal agreement.

14    BY MR. LEHMAN:

15          Q     Is there anything else in this world that you

16    would consider to be the contract other than Exhibit 1?

17          A     No.  But the only thing I thought you were

18    referring to was this document, which is Exhibit 16.

19          Q     No, no, no.

20          A     Good.  So we're on the same page.

21          Q     Exhibit 1.  Exhibit 1.  There's nothing --

22    Exhibit 1 is the only document --

23          A     I understand that.

24          Q     -- in this world that you believe to be the

25    contract between you and HYD Brand, LLC?
```

```
 1          A       And Lucas Brand Equity.

 2          Q       And Lucas Brand Equity --

 3          A       Correct.

 4          Q       -- according to you.  And you never respond

 5    back with, "I agree," in an email?

 6          A       No.  We verbally discussed it.

 7          Q       Do you know what "at-will employment" is?

 8          A       Yes, but that's not --

 9          Q       I'm just asking you, do you know what at-will

10    employment is?  What is at-will employment?

11          A       That either I can terminate or they can

12    terminate the employment at any given time for generally

13    any reason.

14          Q       Have you ever fired anyone who was working for

15    you at will?

16          A       No.

17          Q       Have you ever been fired at will?

18          A       Yeah, I'm sure I have.

19          Q       When were you last fired at will?

20          A       It was years ago.

21          Q       When were you last fired at will?

22          A       Fired?  My God.

23          Q       When was the first time you were fired at

24    will?

25          A       When I worked in high school.
```

```
1                    MR. MADSEN:  I just object to this line

2              of questioning.  I don't see the relevance.

3                    THE WITNESS:  It was a part-time job I

4              had.

5                    MR. LEHMAN:  We have a case here where

6              he may have been fired at will.  He's

7              testified that he knows what "at will" means.

8              I'm exploring how he would know what that

9              means, what it means to him.

10                   THE COURT:  Why don't we limit it to his

11             professional life and not any part-time jobs

12             he had during high school.

13                   MR. LEHMAN:  That's why it was asked --

14                   THE WITNESS:  So the answer is no.

15                   MR. LEHMAN:  -- when was the last time,

16             not the first time.  He wasn't able to answer

17             that question, so what was the last --

18                   THE WITNESS:  The answer is no.

19                   MR. LEHMAN:  No what?

20                   THE WITNESS:  I was not fired or let go

21             on an at-will basis.

22   BY MR. LEHMAN:

23        Q     Ever?

24        A     No.  If we are not including part-time jobs

25   that I had in high school, a part-time job I had in high
```

1    school 30-something years ago, then I would say the answer

2    is no.

3         Q     Did you ever dissolve Logical Step, LLC?

4         A     It's supposed to be dissolved.

5         Q     Did you ever dissolve Logical Step, LLC?

6         A     Yes.  The intention was to dissolve it.

7    Correct.

8         Q     So I really -- don't insert the word.  Did you

9    ever dissolve Logical Step, LLC?

10        A     It is still active, according to the State of

11   Connecticut; but the paperwork and the filings were taken

12   place many years ago to dissolve the corporation.

13        Q     Who filed those?

14        A     My accountant.

15        Q     Who is your accountant?

16        A     Jeanette J. Ayers.

17        Q     Do you pay a yearly tax on your LLC?

18        A     Not anymore.  I did.  We had filings, yeah.

19        Q     So in 2015, you didn't pay a tax --

20        A     No.  I didn't have a tax on that since 2011.

21        Q     Do you know of any -- did you bring in your

22   2016?

23        A     No.  I haven't received it yet.

24        Q     Today is the first day you noticed it says

25   "Lucas Brand Equity, LP"?

```
1        A      Yes.  I would just say yes.  I don't recall.
2    I looked at it, but --
3        Q      Did Lucas Brand Equity, LP hire you to go
4    scout out Specific Beauty?
5        A      No.
6                THE COURT:  For the record, defendant's
7            counsel has Exhibit 4 in his hand.
8                MR. LEHMAN:  Thank you, your Honor.
9    BY MR. LEHMAN:
10       Q      Do you have the online banking transactions
11   from 2015?
12       A      Do we have them with us?  I don't know.
13       Q      Do you have them here today?
14       A      No.  Not with me here, no.
15       Q      Do you know if like these, they all say HYD
16   USA, LLC, the merchant that was paying you?
17       A      Some of them do, some of them don't.
18       Q      Which ones?  What do you mean, some of them
19   do, some of them --
20       A      Some of the transactions were made by HYD USA,
21   LLC or came out of that bank account.  Others came out of
22   Lucas Brand Equity.
23       Q      In Exhibit 17, is there a single one that came
24   from Lucas Brand Equity, LLC?
25       A      Yes, there is.
```

```
 1          Q      All right.  Let's find it.

 2          A      Okay.  Let's find it.  Why don't you --

 3          Q      I don't see one.

 4          A      Go to 6/29/2016.

 5          Q      Oh, so that was the LLC; right?

 6          A      That was the LP, actually.

 7          Q      So sitting there right now, you don't know of

 8   a single instance where the LLC paid you?

 9          A      No, I don't.

10          Q      Why don't you sue Adam Berk?

11                 MR. MADSEN:  Objection.

12                 THE WITNESS:  Why would I sue Adam Berk?

13                 Adam Berk has nothing to do with the

14                 business.

15   BY MR. LEHMAN:

16          Q      He was talking to you everyday --

17          A      It doesn't matter.  You didn't listen to what

18   I said.  The agreement of the company, based on

19   investment, was made by Lucas Brand Equity to acquire Adam

20   Berk's company.  He had no responsibility after September

21   1st for the financial welfare or payments of anything

22   within the organization.

23          Q      You think that's what Mr. Berk -- is it Berk?

24          A      Berk.

25          Q      With a "k"?
```

```
 1          A      With a "k".
 2          Q      You believe that's what he would say under
 3    oath?
 4                  MR. MADSEN:  Objection.
 5                  MR. LEHMAN:  He can testify as to what
 6              he believes.
 7                  THE COURT:  Testify to his
 8              understanding.
 9    BY MR. LEHMAN:
10          Q      Is that your understanding?
11          A      That's my understanding.  Correct.
12                  MR. LEHMAN:  I don't have any other
13              questions, your Honor.
14                  MR. MADSEN:  Nothing further.
15                  THE COURT:  Thank you, sir.  You may be
16              seated.
17                  THE WITNESS:  Thank you.
18                  THE COURT:  Does the courtroom clerk now
19              have all the exhibits?
20                  THE CLERK:  Yes, your Honor.
21                  THE COURT:  Thank you.  At the end of
22              every evidentiary hearing, I go over my notes
23              to reflect -- with respect to the exhibits,
24              that the notes of the court reporter, the
25              courtroom clerk, and all counsel are
```

```
1              consistent.  My notes reflect the following:
2              1, 2, 3, and 4 came in full; 5 came in full
3              but for a limited purpose; 6 came in full,
4              Exhibits 7, 8, 9, and 10 came in full but for
5              a limited purpose; Exhibit 11 came in full;
6              Exhibit 12, 13, 14 came in full but for a
7              limited purpose; and Exhibits 15, 16, and 17
8              all came in full.  Are your notes consistent?
9                   MR. MADSEN:  Yes, your Honor.
10                  THE CLERK:  Yes.
11                  MR. LEHMAN:  Yes, your Honor.
12                  THE COURT:  Thank you.
13                  MR. LEHMAN:  May I ask a question, your
14             Honor?
15                  THE COURT:  Certainly.
16                  MR. LEHMAN:  Would counsel like to set a
17             briefing schedule?  I'm happy to do it
18             however he would like.
19                  THE COURT:  The first question I have
20             is, do you wish to have access to a
21             transcript before filing a brief?
22                  MR. MADSEN:  I do.
23                  MR. LEHMAN:  Yes, your Honor.
24                  THE COURT:  So let me inquire, what is
25             the court reporter's expectation as to when a
```

1          transcript would be available?

2

3               (Off-the-record discussion.)

4

5               MR. LEHMAN:  It's their motion, so I

6          defer to them.

7               THE COURT:  That would take us until

8          March 9th.  So how much time thereafter do

9          you wish to file briefs?  Do you wish to do

10         them concurrent or --

11              MR. MADSEN:  I would prefer concurrent.

12              MR. LEHMAN:  Your Honor, I would prefer,

13         since they have the burden of showing

14         probable cause based on this evidence that

15         they file a brief, we'll respond, I'll

16         respond quickly, I'll do it as quickly as

17         possible, and then they reply back.

18              THE COURT:  How much time would

19         plaintiff's counsel like to have?

20              MR. MADSEN:  Three weeks from the

21         receipt?

22              MR. LEHMAN:  To hurry it up, I'll do

23         two.

24              THE COURT:  That would be March 30th for

25         plaintiff.

```
1              MR. LEHMAN:  I mean, I'm just doing that
2         as a courtesy, but obviously, I would want
3         three.  If he's anxious, I'll do two.  It's
4         up to him.
5              MR. MADSEN:  Two weeks, you said?
6              MR. LEHMAN:  Yup.  That's fine.
7              THE COURT:  Reply brief for the
8         defendants.  And then April 27th for a reply
9         brief for the plaintiff.  If you wish, we can
10        put this on the CM/ECF to memorialize the
11        dates.
12             Anything else that we need to address?
13             MR. MADSEN:  Not for the plaintiff.
14             THE COURT:  The Court obviously will
15        reserve decision.  Have a very safe trip back
16        to your office.  Court stands in recess.
17
18             (Adjourned:  1:13 p.m.)
19
20
21
22
23
24
25
```

CERTIFICATE


I hereby certify that the foregoing 185 pages are a
complete and accurate computer-aided transcription of
my original stenotype notes taken of the proceeding,
which was held in re:  Steven J. Edelstein v.
Lucas Brand Equity, LLC, et al, held before the
Honorable Joan G. Margolis, USDC Judge, U.S.
District, 141 Church Street, New Haven, Connecticut on
February 23, 2017.



_____/s/ KT_____

Kirsten Telhiard, LSR #391