UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| Steven J. Edelstein | : |
| | : |
| Plaintiff, | :     16 Civ. 01353 (WWE) |
| | : |
| v. | : |
| | : |
| Lucas Brand Equity, LLC, | : |
| Hyd USA, LLC, and Jay Lucas, | : |
| | : |
| Defendant. | : |
| | : |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS CLAIMS AGAINST
JAY LUCAS AND LUCAS BRAND EQUITY LLC**

Defendants Lucas Brand Equity LLC ("Management Company") and Jay Lucas submit this reply memorandum in support of their motion to dismiss the claims against them for lack of subject matter jurisdiction. Plaintiff's lack of factual allegations in its complaint and Steve Edelstein's testimony under oath firmly forecloses Plaintiff from proving any injury that is fairly traceable to the Management Company or Jay Lucas. The claims against these defendants should be dismissed.

## I. PLAINTIFF'S ALLEGED INJURY CANNOT BE TRACED TO THE MANAGEMENT COMPANY

Plaintiff sued the wrong company. Edelstein sued the Management Company (LLC) rather than the private equity fund (LP). Rather than admit the error and file a motion under Rule 15 of the Federal Rules of Civil Procedure to amend the complaint to name the proper party, Plaintiff's counsel derisively begins its memorandum by stating: "Defendants' misguided motion . . . argues that Plaintiff lacks Article III standing to Defendants Lucas Brand [sic] and Jay Lucas because he has not properly alleged injury." Pl. Mem. at 1 (CM/ECF No. 55).

This argument has at least two errors. *First*, Plaintiff's counsel continues to refer generically to "Lucas Brand Equity" as he did at the hearing and subsequently in papers submitted to this Court. At some point, Plaintiff's chicanery must come to an end. There is an entity called Lucas Brand Equity LP and an entity called Lucas Brand Equity LLC. The former is a private equity fund (LP) and the latter is a management company of the fund (LLC).

The basic structure of this private equity fund is publicly stated in SEC forms (and is easily found with google). Basic textbooks explain why LLCs are used as general partners. JAMES M. SCHELL AND KRISTEIN M. KOREN, PRIVATE EQUITY FUNDS: BUSINESS STRUCTURE AND OPERATIONS § 3.01 (2016) available on Google Books (https://books.google.com/) via http://bit.ly/2qi5ryQ. It is bewildering as to why Plaintiff or his attorneys cannot admit that they

1

confused the two entities and correct the error.

*Second*, Plaintiff's counsel misstates Defendant's argument. Defendants are not arguing that Plaintiff did not allege injury. Of course, he did. Edelstein has alleged that he has not received money that he believes he is entitled to for his purported work. That is sufficient to allege an injury for purposes of standing. Defendants are arguing that Edelstein's alleged injury *is not traceable* to two of the Defendants. It should be enough to point out that Edelstein is confused about the entities and sued the wrong one.

Indeed, at the prejudgment attachment hearing, Steve Edelstein admitted and inadvertently demonstrated that he confused the companies. Edelstein's own lawyer asked him: "Do you know the difference between – were you aware that there was a difference between an LP and an LLC with respect to Lucas Brand Equity?" Tr. at 39.[1] Edelstein answered, "No." *Id.*

In fact, Edelstein was so confused that he *insisted* he was paid by the LLC only for it to be proven that the LP (*i.e.*, the private equity firm) paid him:

> Q Do you know if like these [wire transfers in Exhibit 17], they all say HYD USA, LLC, the merchant that was paying you?
>
> A Some of them do, some of them don't.
>
> Q Which ones? What do you mean, some of them do, some of them --
>
> A Some of the transactions were made by HYD USA, LLC or came out of that bank account. Others came out of Lucas Brand Equity [sic].
>
> Q In Exhibit 17, is there a single one that came from Lucas Brand Equity, LLC?
>
> A Yes, there is.
>
> Q All right. Let's find it.

---

[1] The transcript of the hearing was attached as an exhibit to Defendants' initial memorandum of law and is also available at CM/ECF 47-1 as an exhibit. The pages of the transcript are referred to as Tr. at ___. The exhibits referred to (1-17) were submitted at that hearing and also attached to Defendant's initial memorandum of law.

2

> A Okay. Let's find it. Why don't you --
>
> Q I don't see one.
>
> A Go to 6/29/2016.
>
> Q Oh, so that was the LLC; right?
>
> A That was the LP, actually.
>
> Q So sitting there right now, you don't know of a single instance where the LLC paid you?
>
> A Q No, I don't.

Tr. at 180-81.

Edelstein works in the "direct response industry." *Id.* at 129. Direct response, or marketing, is part of the advertising industry.[2] It is not surprising that Edelstein does not understand how the private equity industry works even though Lucas Brand Equity LP is structured the same way as a clear majority of private equity firms in this country.

Edelstein's confusion, however, does not justify his counsel's refusal to now acknowledge the error. Article III of the Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992) (quoting U.S. CONST. art. III, § 2). "One essential aspect of this requirement is that any person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013). To satisfy the requirements of Article III standing, a plaintiff must "prove that he has suffered a concrete and particularized injury ***that is fairly traceable to the challenged conduct***, and is likely to be redressed by a favorable judicial decision." *Id.* (emphasis added).

---

[2] *See* Roddy Mullin, *Direct Marketing: A Step-by-step Guide to Effective Planning and Targeting* at 1-2 (2002) (defining direct marketing). Infomercials on television are one example. *See generally Direct Marketing*, Wikipedia, https://en.wikipedia.org/wiki/Direct_marketing.

Under Article III, "an 'actual controversy' " must "persist throughout all stages of litigation." *Id.* (quoting *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013)).

At most, Edelstein had an economic relationship with the fund, not the management company. Moreover, anything that the management company did was as an agent for the fund. It is hornbook law that claims against a fund cannot be asserted against the manager and visa-a-versa. *See* John Morley, *The Separation of Funds and Managers*, 123 YALE L.J. 1228, 1240. Breaching the wall that separates the legal liability of a managing company from its fund would – to put it mildly – shake the financial industry to its core.

The claims against the Management Company (Lucas Brand Equity LLC) should be dismissed.

## II.   PLAINTIFF'S ALLEGED INJURY CANNOT BE TRACED TO JAY LUCAS

Steve Edelstein's testimony under oath also forecloses any possibility that Plaintiff could trace his economic injury to Jay Lucas. Plaintiff has brought five claims alleging that Jay Lucas:

(1)   breached the employment contract that Jay Lucas had with plaintiff;

(2)   failed to pay Plaintiff in violation of the Connecticut Minimum Wage Act (CMWA);

(3)   failed to pay Plaintiff in violation of the Fair Labor Standards Act;

(4)   failed to pay plaintiff overtime compensation in violation of the FLSA; and

(5)   wrongfully terminated plaintiff in violation of the FLSA.[3]

---

[3] Plaintiff also seeks declaratory and injunctive relief against all defendants as a "count" or "claim." But a declaratory judgment is not a claim; it is a remedy. See *Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 508-09 (1959); *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950) (holding that the Declaratory Judgment Act is procedural only and does not affect the substantive rights of the parties); *Wyly v. CA, Inc.*, No. 05 Civ. 4430, 2009 WL 3128034, at * 5 (E.D.N.Y. Sept. 29, 2009) (citing numerous cases).

4

In the opposition memorandum, the only argument for why Plaintiff has standing to sue Jay Lucas (*i.e.*, his alleged injury is traceable to Jay Lucas) is the following:

> under the joint employer analysis, which Defendants' motion wholly ignored, Plaintiff's pleadings and the evidence collected thus far evidence that Defendants LBE, HYD and Jay Lucas are Plaintiff's joint employer. Defendants jointly hired, paid, supervised, and fired Plaintiff. This is sufficient to establish Defendants as Plaintiff's joint employer.

Def. Mem. at 1. Edelstein's testimony under oath ends any argument that Jay Lucas was his "joint employer."

### A. The Tests for determining "Joint Employer" in the Second Circuit and under Connecticut Law

The FLSA defines "employee" as "any individual employed by an employer," 29 U.S.C. 203(e)(1), and "employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. 203(d). The FLSA's definition of "employ" "includes to suffer or permit to work." 29 U.S.C. 203(g). The FLSA regulations explicitly state that a single worker may be "an employee to two or more employers at the same time." 29 C.F.R. 791.2(a); *see also Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998) ("The FLSA contemplates several simultaneous employers, each responsible for compliance with the Act.").

The Second Circuit has articulated two tests to determine whether an employment relationship existed for the purposes of the FLSA. The first, the formal control test, asks "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 422 (2d Cir. 2016) (internal quotation marks omitted);. The standard "does not require continuous monitoring of employees, looking over their shoulders at all times, or any

5

sort of absolute control of one's employees." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 939 (S.D.N.Y. 2013) (internal quotation marks omitted). Indeed, "[c]ontrol may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA." Id. (internal quotation marks omitted). "No one of the four factors standing alone is dispositive. . . ." *Graziadio*, 817 F.3d at 422 (internal quotation marks omitted).

Additionally, the Second Circuit has identified a number of factors relevant to determining whether a person or entity, even if lacking formal control, exercised "functional control" over an employee. *See Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 72 (2d Cir. 2003). Under this functional control test, courts look to the following non-exclusive, factors: "(1) whether the alleged employers' premises and equipment were used for the plaintiffs' work; (2) whether the subcontractors had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which [the] plaintiffs performed a discrete line job that was integral to the alleged employers' process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the alleged employers or their agents supervised [the] plaintiffs' work; and (6) whether [the] plaintiffs worked exclusively or predominantly for the alleged employers." *Olvera v. Bareburger Grp. LLC*, 73 F. Supp. 3d 201, 204 (S.D.N.Y. 2014). (alterations and internal quotation marks omitted) (quoting *Zheng*, 355 F.3d at 72).

Neither test for employment is a "rigid rule." *Barfield*, 537 F.3d at 143. Rather, these tests provide "a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." *Id.* (internal quotation marks omitted).

6

Finally, although CMWA "provides wage and overtime guarantees similar to FLSA," *Scott v. Aetna Servs.*, Inc., 210 F.R.D. 261, 263 n.2 (D. Conn. 2002), the Connecticut Supreme Court has declined to adopt the "economic reality" test for purposes of evaluating joint employer status under the CMWA, *Butler v. Hartford Technical Inst.*, 243 Conn. 454, 462 n.8 (1997). Instead, Connecticut courts consider factors such as whether the alleged employer set the hours of employment, paid wages, exercised control over day-to-day responsibilities, or ran other daily operations. *Id.* at 464-65; *Petronella ex rel. Maiorano v. Venture Partners, Ltd.*, 60 Conn. App. 205, 211-12 (2000)

### B. Edelstein's testimony forecloses finding that Jay Lucas was a "Joint Employer" of Plaintiff

There are no specific factual allegations in Plaintiff's complaint that would allow this Court to find that Jay Lucas was a plausible joint employer over Edelstein. More important, Edelstein's testimony would contradict such allegations such that the Court should now dismiss the claims. Jay Lucas never paid Edelstein (Exhibit 17). Jay Lucas never oversaw any of Edelstein's decision:

> Q Okay. Is it the case that you did or did not have to get approval from anyone at Lucas Brand Equity in order to carry out your daily activities?
>
> A In terms of tasks and operations, no.

Tr. at 25.

Edelstein did not need and never sought Jay Lucas's approval for any financial matter:

> Q. Did you also get approval from Jay Lucas with respect to any financial matters or dealings of HYD USA?
>
> A I did not.

Tr. at 25.

> Q Average week, how often would you talk on the phone with Jay Lucas?

7

>A Oh, never. It was impossible to get ahold of him.
>
>Q Average week, how often would you email Jay Lucas? A If I needed to reach him, once or twice a week, but not really that often. Q How often did he respond back? A Never. And if he did, it was via text or sporadic email.

Tr. at 154-55.

>Q Why didn't you get approval from Jay [to take a business trip]?
>
>A. Because I didn't need approval from Jay.

Tr. at 161. Finally, Plaintiff worked whatever hours he wanted in his home as either the Chief Executive Officer or Chief Operating Officer of Hyd. Tr. at 135 (Edelstein describing himself as "an executive running a company).

The assertion that Jay Lucas was Edelstein's "joint employer" given Edelstein's testimony is preposterous. Jay Lucas did not suffer or permit Edelstein to work for Hyd. Indeed, Jay Lucas rarely had any contact with Edelstein once he started working at Hyd.

The wage and labor claims against Jay Lucas should be dismissed.

**C.   The joint employer doctrine does not apply to contract claims**

Edelstein's breach of contract claim against Jay Lucas fails for two reasons. First, Edelstein's testimony establishes that there is no contract. The sole document on which Edelstein's counsel relies is Exhibit 1, an email from Jay Lucas to Edelstein. This email is not only hearsay (an out-of-court statement submitted for the truth of its contents), but also fails to comport with the best evidence rule, which requires that the original document must be admitted into evidence. *See* Fed. R. Evid. 1002–1004; Conn. Code Evid., § 10.1.

When trying to prove a material fact by offering the contents of a document (in this case, an email), a party must produce the original. *See* Fed. R. Evid. 1002; Conn. Code Evid., § 10-1. The purpose behind the rule is to ensure that the trier of fact has the actual language contained in a document whenever that language (the content of the document) is at issue.

As a corollary to the requirement to produce the original document, the rule also prohibits a witness from testifying from memory as to the language contained in a document. This can be stated "the document speaks for itself," and, therefore, the witness's recollection is not the best evidence. Production of the original document, rather than allowing testimony on the document's contents, helps reduce the risk of inaccurate recollection of the document's language and guards against fraud or selective memory. *See*, e.g., Colin C. Tait & Hon. Eliot D. Prescott, TAIT'S HANDBOOK OF CONNECTICUT EVIDENCE, § 10.1 (4th ed. 2008). Witness testimony about the language of the document is prohibited. Michael R. Fontham, TRIAL TECHNIQUE & EVIDENCE, 407 (2d ed. 2002).

Putting to one side Edelstein's egregious attempt to fabricate a contract that he kept at home and purportedly showed his lawyer, Tr. at 172, Edelstein finally conceded when questioned that no other contract existed. *See* Tr. a 174 (Court: "Well, why don't we just have this question: Is there a written contract, employment contract, outside of Exhibit 1? That's my question. MR. MADSEN: No. THE COURT: We'll let the witness answer. THE WITNESS: No. I don't know -- this is -- you're referring to this? . . . THE COURT: Is there a written employment contract outside of Exhibit 1? THE WITNESS: No.").

Second, even assuming that Edelstein produced a contract, the joint employer doctrine is used to interpret the word "employer" under the FLSA. It does not override basic rules of contract formation or privity under Connecticut law. In order for Edelstein to enter into a

9

contract he needs to show that there was privity of contract with Jay Lucas. Edelstein's testimony forecloses that possibility since (1) Exhibit 1 is not a contract, (2) no other contract exists, and (3) Edelstein never accepted the hypothetical offer. Saying that Jay Lucas entered into a contract with Edelstein would mean that Mike Lanzaro also entered into a contract when he confirmed Edelstein's employment with Hyd (Exhibit 2), which is nonsensical.

The breach of contract claim against Jay Lucas must be dismissed because any alleged breach of contract is not fairly traceable to him.

### IV. CONCLUSION

Plaintiff's sworn testimony at the prejudgment hearing demonstrates that any alleged injury he suffered as an executive of Hyd cannot be fairly traceable to the Management Company or Jay Lucas. Therefore, Plaintiff cannot satisfy his burden to establish that he has standing to sue them. The claims against these defendants should be dismissed.

Dated: May 16, 2017

/s/ *Brian Lehman*
Brian Lehman
Lehman LG LLC
244 5th Avenue,
Suite B258
New York, NY 10001
brian@lehmanlawgroup.com

*Counsel for Defendants*

### CERTIFICATION OF SERVICE

    I hereby certify that on May 16, 2017, I electronically filed the foregoing with the Clerk of the Court for the District of Connecticut by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Brian Lehman*
Brian Lehman
