IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------x
                                                                                  :
STEVEN J. EDELSTEIN                        :                    CIV. NO.  16 CV 1353 (WWE)
                                                                                :
v.                                                                    :
                                                                  :
LUCAS BRAND EQUITY, LLC,             :
HYD USA, LLC, and JAY LUCAS           :                    DATE: JUNE 2, 2017
------------------------------------------------------x

RULING ON PLAINTIFF'S APPLICATION FOR PREJUDGMENT REMEDY AND
TO DISCLOSE PROPERTY AND ASSETS

On August 9, 2016, plaintiff Steven J. Edelstein, a resident of Connecticut, commenced this action against New York defendants Lucas Brand Equity, LLC, HYD USA, LLC ["HYD"], and Jay Lucas (Dkt. #1), which Complaint was superseded by an Amended Complaint on September 27, 2016.  (Dkt. #14).  In his Amended Complaint, plaintiff alleges that defendants failed to pay plaintiff in violation of federal and state wage and hour laws. (Id.).  Specifically, plaintiff, who was employed as the Chief Operating Officer of defendants Lucas Brand Equity, LLC and HYD, alleges that defendants improperly characterized plaintiff as an independent contractor, and in doing so, failed to pay him wages in violation of the Connecticut Minimum Wage Act ["CMWA"](Count One); breached the employment contract defendants had with plaintiff (Count Two); failed to pay plaintiff in violation of the Fair Labor Standards Act ["FLSA"](Count Three); failed to pay plaintiff overtime compensation in violation of the FLSA (Count Four); and wrongfully terminated plaintiff in violation of the FLSA (Count Six).  (Id.).  Plaintiff also seeks declaratory and injunctive relief against all defendants (Count Five).  (Id.).[1]  On October 11, 2016, defendants filed their Answer and

---

[1]On December 16, 2016, plaintiff filed a Motion for Leave to Amend Complaint and to Join Party Defendant, in which he seeks to join Karen Ballou.  (Dkts. ##19-20).  That motion is pending before Senior United States District Judge Warren W. Eginton.

Affirmative Defenses. (Dkt. #16).

On December 20, 2016, plaintiff filed the pending Motion for Prejudgment Remedy and for Disclosure of Assets. (Dkt. #21).[2] One week later, the pending motion was referred from Senior United States District Judge Warren W. Eginton to this Magistrate Judge (Dkt. #22), and a telephonic scheduling conference was held on January 11, 2017. (Dkts. ##23-25).

A hearing on plaintiff's Motion for Prejudgment Remedy and Motion for Disclosure of Assets was held on February 23, 2017 (Dkt. #37; see Dkts. ##26, 35, 38, 39),[3] at which plaintiff, Steven Edelstein, testified. (Dkt. #38). On April 6, 2017, plaintiff filed his brief in support (Dkt. #47),[4] and on April 20, 2017, defendants filed their brief in opposition. (Dkt. #50). Six days later, defendant filed a letter with the Court regarding evidence related to the prejudgment remedy motion. (Dkt. #52).[5] On May 4, 2017, plaintiff filed his reply brief to address defendant's letter. (Dkt. #54).

---

[2]Attached to plaintiff's Motion is a copy of the Amended Complaint (Exh. A); a draft Order of Notice and Hearing; a draft Order; the Motion for Disclosure; and another draft Order.

[3]The following exhibits offered by plaintiff were admitted in full: copy of email, dated September 9, 2015 (Exh. 1); copy of letter, dated February 1, 2016 (Exh. 2); copy of Defendants' Responses to Plaintiff's First Set of Interrogatories (Exh. 3); copy of 2015 1099-Misc (Exh. 4); copy of email, dated September 12, 2016 (Exh. 6); copy of email, dated August 22, 2016 (Exh. 11); copy of Notice of Appearance of Lawrence Peikas (Exh. 15); copy of Amended Complaint, filed September 27, 2016 (Exh. 16); and copies of wire payments from January through May 2016 (Exh. 17).

The following exhibits offered by plaintiff were admitted for a limited purpose: copy of Complaint, dated August 9, 2016 (Exh. 5); copy of email, dated June 2, 2016 (Exh. 7); copy of email, dated July 13, 2016 (Exh. 8); copy of email, dated July 15, 2016 (Exh. 9); copy of email, dated August 2, 2016 (Exh. 10); copy of email, dated August 29, 2016 (Exh. 12); copy of email, dated August 29, 2016 (Exh. 13); and copy of email, dated September 6, 2016 (Exh. 14).

[4]Attached to plaintiff's brief in support is the transcript of the hearing (Exh. A), and the seventeen exhibits admitted in part or in full at the hearing (see note 3 supra).

[5]See note 6 infra.

For the reasons stated below, plaintiff's Motion for Prejudgment Remedy and for Disclosure of Property and Assets (Dkt. #21) is <u>granted in large part in the amount of $140,000</u>.

## I. DISCUSSION

### A. FACTUAL BACKGROUND

Plaintiff was hired as the Chief Operating Officer ["COO"] of HYD for Men, a portfolio company of Lucas Brand Equity, LLC on September 1, 2015 for a salary of $120,000 plus healthcare benefits and expenses. (Exh. 1).[6]  Plaintiff was offered his position as an

---

[6]In their responses to plaintiff's First Set of Interrogatories, defendants contend that "Defendant [HYD] USA, LLC entered into a consultant agreement with The Logical Step, LLC, a company that [p]laintiff promotes as 'a Brand Management, Marketing, and Operations (Fulfillment/Logistics, Customer Care) firm . . . .'  The other defendants did not have a contractual relationship with The Logical Step, LLC." (Exh. 3, at 4-5).  However, plaintiff testified that he ran The Logical Step as a consulting business "many years ago," from 2006 through 2011 (Dkt. #47, Exh. A at 32), and when he provided services through that entity, he invoiced clients and customers from The Logical Step, LLC, and issued 1099s with The Logical Step LLC's employer identification number.  (<u>Id.</u> at 33). Plaintiff testified that the last time that he received a check for The Logical Step, LLC was in 2011.  (<u>Id.</u>).

That said, at the hearing plaintiff testified that he looks at his LinkedIn page "everyday[]" (Dkt. #47, Exh. A at 123), and although it says that he held his position as Founder of Logical Step, LLC from November 2006 to November 2016, that information is "inaccurate.  That should not be – that's not the case."  (<u>Id.</u> at 125). Additionally, in a letter to this Court, dated April 26, 2017, defendants brought to this Court's attention that attached to their Motion to Modify the Scheduling Order (Dkt. #51), filed the same date, is an email sent by plaintiff as the COO of HYD, but signed by "Steven J. Edelstein – Founder and CEO" next to the trademark for The Logical Step, LLC.  (<u>Id.</u> at Exh. A).  The email ends with the following statement:

> The information transmitted from The Logical Step, LLC is intended only for the
> person or entity to which it is addressed and may contain confidential material.
> Any review, retransmission, dissemination or other use of, or taking of any action
> in reliance upon, this information or entities other than the intended recipient is
> prohibited.  If you receive this in error, please contact TLS . . . and delete the
> material from any computer.  Thank you in advance.

(<u>Id.</u>).

Defendants have not articulated why these documents were not offered at the PJR hearing, thereby justifying the belated submission in support of defendants' argument that plaintiff was acting as an independent contractor. Accordingly, the Court will confine this decision only to testimony and exhibits offered at the hearing and the briefs related thereto.

employee of both Lucas Brand Equity, LLC and HYD for Men, LLC, which name changed to HYD USA, LLC (Exh. 2).[7]

Plaintiff's title was initially Chief Executive Officer, but later changed to COO. (Dkt. #47, Exh. A at 20).  He was responsible for entering into manufacturing agreements with third parties, for distribution of the products, for vendor relationships, and for overseeing all development and growth of the business.  (Id. at 22). Plaintiff needed to obtain approval or authority from members of Lucas Brand Equity, LLC and specifically from Karen Ballou, a senior partner and co-CEO of Lucas Brand Equity, LLC (id. at 15, 24), in order to carry out his job duties and responsibilities as the COO of HYD.  (Id. at 25).

Plaintiff testified that in his position as COO, he worked on average more than forty hours a week. (Id. at 135-36 (he did not keep time sheets but his responsibilities warranted working over forty hours a week; he considered himself a "professional")). Plaintiff was paid twice a month in installments of $5,000 on the eighth and twenty-second day of each month. (Id. at 43).  At some point, plaintiff became aware that his income was being reported as 1099-Miscellaneous income, such that taxes were not withheld from his pay.  (Id. at 46-47). Plaintiff testified that he was concerned about being paid as a "1099 employee," and he raised his concerns with Jay Lucas, the Managing Director of Lucas Brand Equity, LLC (see Exh. 1), Michael Lanzaro, who was responsible for all accounting for the business, and Karen Ballou. (Dkt. #47, Exh. A at 12, 46-48).  According to plaintiff, Lanzaro told him that he was being paid as a "1099 employee" because the accounting system "was not set up properly and they did not have a payroll service."  (Id. at 47).

---

[7]HYD USA sells primary personal care and grooming products, as well as moisturizers, conditioners, shampoos, razors, and a variety of skin care products.  (Dkt. #47, Exh. A at 21).  The numbers cited to the transcript herein correspond to the page numbers of the transcript, and not to the numbers assigned by CM/ECF.

Plaintiff testified that he received his compensation checks from both entities, Lucas Brand Equity, LLC and HYD. (Id. at 14, 35). He testified that worked for HYD for four months, earning $40,000 from September to December 2015. (Id. at 45). Plaintiff's 2015 1099-MISC reflects payment of $15,000 from Lucas Brand Equity LP, and payment of $25,000 from HYD. (Exh. 4; see also Dkt. #47, Exh. A at 43). The confirmations of wire payments paid directly to plaintiff's bank account reflect several payments from HYD between January 8, 2016 and May 27, 2016, and then from Lucas Brand Equity LP on June 29, 2016. (Exh. 17). Plaintiff explained that he received late payments in 2015, and the last payment he received was for work at the end of May 2016. (Exh. 17; see Dkt. #47, Exh. A at 52, 111, 113). Specifically, on April 25, 2016, he received $750, and over a month later, he received $4,250. (Exh. 17). On June 29, 2016, plaintiff was paid $5,000, which was the remainder of what he expected to receive in May. (Exh. 17; see Dkt. #47, Exh. A at 52, 111-13).

According to plaintiff, he pressed Karen Ballou, Michael Lanzaro, and Jay Lucas for his outstanding payments, and was assured that he would be paid what he was owed. (Dkt. #47, Exh. A at 65-66, 110-11). Specifically, he was told that monies were being generated and he would be made whole and paid what was owed. (Id. at 49-51, 116-17). Despite not receiving another payment after the June 29, 2016 deposit, plaintiff continued to work. (Id. at 65-66, 114; see Exhs. 7-14).

Plaintiff took legal action in August 2016 as a "last resort" in order to be paid for his services. (Dkt. #47, Exh. A at 56). On August 9, 2016, when he filed the initial complaint in this action (Exh. 5), he was still working, and he continued to have interactions with Ballou and Lanzaro. (See Exhs. 7-14 (reflecting plaintiff's business communications with parties)). Plaintiff brought his claims against Lucas Brand Equity, LLC, HYD and Jay Lucas. (Exh. 5).

Plaintiff learned from an email dated September 12, 2016 between Lawrence Piekes, defendants' former counsel, and William Madsen, plaintiff's counsel, that "[i]t would behoove [plaintiff] to discontinue the activities he claims to have been engaged in on HYD's behalf." (Exh. 6; see Dkt. #47, Exh. A at 56-57, 59-60, 62-64, 65). Attorney Piekes' email also contended that defendants stopped paying plaintiff in May 2016 "due to the fact that he was not providing the services he was retained to provide." (Exh. 6).

Plaintiff testified that he has been unemployed since September 12, 2016 (Dkt. #47, Exh. A at 138), but he does not consider himself terminated; in his words, he "left the company [on] September 12th." (Id. at 148-49). Plaintiff receives unemployment compensation benefits. (Id. at 105-06). Plaintiff testified that he was not paid for the period of May 9 through September 12, 2016, and based on his salary of $120,000, he is owed $45,000 for that time period. (Id. at 115).

### B. LEGAL STANDARD FOR A PREJUDGMENT REMEDY

A prejudgment remedy "is generally intended to secure the satisfaction of a judgment should plaintiff prevail." Cendant Corp. v. Shelton, No. 3:06 CV 854 (JCH), 2007 WL 1245310, at *2 (D. Conn. Apr. 30, 2007)(citation omitted). Federal Rule of Civil Procedure 64 permits a plaintiff to utilize the state prejudgment remedies available to secure a judgment that might ultimately be rendered in an action. See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County, 415 U.S. 423, 436, n.10 & 437 (1974); Dill v. Ron's Golf Car Rental, Inc., No. 12 CV 137 (JBA)(JGM), 2013 WL 275690, at *8 (D. Conn. Jan. 24, 2013). Pursuant to the Connecticut Prejudgment Remedy statute, CONN. GEN. STAT. § 52-278d(a), the standard for issuing a prejudgment remedy is probable cause, so that a prejudgment remedy is appropriate

> [i]f the court, upon consideration of the facts before it and taking into account any defenses, counterclaims or set-offs, claims of exemption and claims of adequate insurance, finds that the [movant] has shown probable cause that such a judgment will be rendered in the matter in the [movant's] favor in the amount of the prejudgment remedy sought . . . .

CONN. GEN STAT. § 52-278d(a).  In the words of United States District Judge Alvin W. Thompson:

> The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. Probable cause is a flexible common sense standard.  It does not demand that a belief be correct or more likely true than false.

Qualitative Reasoning Sys., Inc. v. Computer Scis. Corp., No. 3:98 CV 554 (AWT), 2000 WL 852127, at *10 (D. Conn. Mar. 31, 2000)(internal quotations & multiple citations omitted).

A prejudgment remedy proceeding is "only concerned with whether and to what extent the plaintiff is entitled to have property of the defendant held in the custody of the law pending adjudication of the merits of that action." Benton v. Simpson, 78 Conn. App. 746, 751-52, 829 A.2d 68, 72-73 (App. Ct. 2003)(citation & internal quotations omitted). Further, while a prejudgment remedy hearing "is not contemplated to be a full scale trial on the merits of the plaintiff's claim[,]" Roberts v. TriPlanet Partners, LLC, 950 F. Supp. 2d 418, 421 (D. Conn. 2013)(internal quotations & citation omitted), a plaintiff is "bound to furnish proof of his damage with reasonable probability, and not leave the trial court to speculation and conjecture." Mullai v. Mullai, 1 Conn. App. 93, 95, 468 A.2d 1240, 1242 (App. Ct. 1983)(per curiam).  After a hearing, the Court must "consider not only the validity of the plaintiff's claim but also the amount that is being sought." Calfee v. Usman, 224 Conn. 29, 38, 616 A.2d 250, 254 (1992)(citation & internal quotations omitted).  Additionally, the Court must "evaluate not only the plaintiff's claim but also any defenses raised by the defendant."

7

Balzer v. Millward, Civ. No. 3:10 CV 1740(SRU)(HBF), 2011 WL 1547211, at *1 (D. Conn. Apr. 21, 2011), quoting Haxhi v. Moss, 25 Conn. App. 16, 20, 591 A.2d 1275, 1277 (1991)(citation omitted).  See also Corey v. Hawes, No. 14 CV 1266 (JAM)(JGM), 2015 WL 5472507, at *7-8 (D. Conn. Sept. 17, 2015)(multiple citations omitted).

### C. PROBABLE CAUSE

Plaintiff's application for prejudgment relief turns upon whether plaintiff has shown "probable cause" that a judgment will enter in his favor.  CONN. GEN. STAT. § 52-278(d)(a)(1). "Probable cause" has been defined by the Connecticut courts as "'a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it.'" Walpole Woodworkers, Inc. v. Atlas Fencing, Inc., 218 F. Supp. 2d 247, 249 (D. Conn. 2002), quoting Three S. Development Co. v. Santore, 193 Conn. 174, 175, 474 A.2d 795 (1984)(citation omitted).  The standard of "probable cause" is less demanding than the "preponderance of the evidence" or the "likelihood of success" standards.  Cendant Corp., 2007 WL 1245310 at *3 (citation omitted).  Plaintiff need not "prove its case by a preponderance of the evidence, but must show that there is probable cause to sustain the validity of its claim." Walpole Woodworkers, 218 F. Supp. 2d at 249 (citation omitted).  "In ordering a prejudgment remedy or attachment, the court must only find that 'there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater . . . will be rendered in the matter in favor of the plaintiff.'" Metal Mgmt., Inc. v. Schiavone, 514 F. Supp. 2d 227, 237 (D. Conn. 2007), quoting CONN. GEN. STAT. § 52-278d(a)(1).

In his post-hearing brief, plaintiff contends that he has established probable cause

8

with respect to his claim for a violation of the Connecticut Minimum Wage Act (Count One); breach of his employment contract (Count Two); and wrongful termination in violation of the FLSA (Count Six). (Dkt. #14).

### 1. COUNT ONE: VIOLATION OF THE CONNECTICUT MINIMUM WAGE ACT

Plaintiff contends that he has established probable cause with respect to defendants' failure to pay wages under CONN. GEN. STAT. § 31-72. The Connecticut Minimum Wage Act ["CMWA"], CONN. GEN. STAT. § 31-58 et seq., "provides wage and overtime guarantees similar to the FLSA[.]" Scott v. Aetna Servs., Inc., 210 F.R.D. 261, 263 n.2 (D. Conn. 2002).

A party may bring a civil action under CONN. GEN. STAT. § 31-72 "[w]hen an employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k . . . ." An employee shall recover

> (1) twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, or (2) if the employer establishes that the employer had a good faith belief that the underpayment of wages was in compliance with the law, the full amount of such wages and compensation, with costs and such reasonable attorney's fees as may be allowed by the court.

CONN. GEN. STAT. § 31-72. An "employee" is defined as "any individual employed or permitted to work by an employer[,]" but does not include "an individual employed in a bona fide executive, administrative or professional capacity as defined in the regulations of the Labor Commissioner . . . ." CONN. GEN. STAT. § 31-58(e). An "employer" is defined as "any owner or any person, partnership, corporation, [or] limited liability company . . . acting directly as, or on behalf of, or in the interest of an employer in relation to employees . . . ." CONN. GEN. STAT. § 31-58(d). The term "employer" as used in CONN. GEN. STAT. § 31-72 "encompasses an individual who possesses the ultimate authority and control within a

corporate employer to set the hours of employment and pay wages and therefore is the specific or exclusive cause of improperly failing to do so." Butler v. Hartford Tech. Inst., Inc., 243 Conn. 454, 462, 704 A.2d 222, 227 (1997)(footnote omitted).  The CMWA "parallels the FLSA's breadth with nearly identical definitions of 'employee' and 'employer.'" Velasquez v. US 1 Farm Mkt, Inc., 3:13 CV 634 (GWC), 2016 WL 2588160, at *10 (D. Conn. May 3, 2016); see CONN. GEN. STAT. §§ 31-58(d), (e).

Defendant Jay Lucas, acting on behalf of HYD for Men, which is a "portfolio company of Lucas Brand Equity, LLC[]" hired plaintiff (Exh. 1), set his compensation (id.), explained to plaintiff why he was not receiving his full pay (Dkt. #47, Exh. A at 50), and, according to plaintiff, promised to make him whole.  (Id.).  Plaintiff has established that there is probable cause to believe that Lucas had ultimate authority over plaintiff, and acted "on behalf of, or in the interest of, [plaintiff's] employer[.]"  CONN. GEN. STAT. § 31-58(d).[8]

Plaintiff contends that there is no evidence that he was not an "employee" under the CMWA, and, although he was paid as a "1099 employee[,]"[9] when he complained about being paid in this manner, defendants' accountant, Michael Lanzaro, explained to plaintiff that "the accounting system that was being put in place was not set up properly, and they

---

[8]See Morales v. Gourmet Heaven, Inc., 3:14 CV 1333 (VLB), 2016 WL 6996976, at *6 (D. Conn. Nov. 19, 2016)(rather than applying the "economic reality" test applicable to the FLSA, when determining individual liability for an "employer" under CMWA, the Connecticut Supreme Court asks whether the individual "possesses the ultimate authority and control within a corporate employer to set the hours of employment and pay wages and therefore is the specific or exclusive cause of improperly failing to do so[]")(citation omitted).

[9] "Payers use Form 1099-MISC" to report payments made in the course of business to a person who is not an employee. See https://www.irs.gov/help-resources/tools-faqs/faqs-for-individuals/frequently-asked-tax-questions-answers/small-business-self-employed-other-business/form-1099-misc-independent-contractors/form-1099-misc-independent-contractors (Last visited May 16, 2017).

did not have a payroll service." (Dkt. #47, at 10; Dkt. #47, Exh. A at 47).[10]  Defendants counter, however, that the position of a chief operating officer, or a chief financial officer, is exempt as it is "one of the highest levels of executives at a company[.]" (Dkt. #50, at 4).[11]

Under the CMWA, individuals employed "in a bona fide executive, administrative or professional capacity" are excepted from the overtime pay and forty-hour workweek provisions.  The governing Regulations provide that an

> "employee employed in a bona fide executive capacity" means any employee (1) whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and (2) who customarily and regularly directs the work of two or more other employees therein; and (3) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and (4) who customarily and regularly exercise[s] discretionary powers; and (5) who does not devote more than twenty percent, or, in the case of an employee of a retail or service establishment who does not devote as much as forty

---

[10]Additionally, as stated above, plaintiff applied for and was granted unemployment compensation benefits.

[11]The Regulations from the Department of Labor applicable to the Fair Labor Standards Act that were in effect at the time plaintiff was employed exempts employees "*with total annual compensation of at least $100,000 . . . if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee . . . .*" 29 C.F.R. § 541.601(a)(effective until December 1, 2016).  As the Regulations explain, "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties."  29 C.F.R. § 541.601(c).

Plaintiff was hired to perform the job of COO at an annual salary of $120,000.  (Exh. 1).  Thus, the compensation element of the "highly-compensated employee" exemption is satisfied under the FLSA.  Additionally, to satisfy this exemption under the FLSA, defendant would have to demonstrate that plaintiff "customarily and regularly perform[ed] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee[.]"  29 C.F.R. § 541.601(a)(2).

In this case, however, plaintiff is seeking a prejudgment remedy on his wage claim under the CMWA, not on his wage claim under the FLSA.  In his brief in support of his Motion for Prejudgment Remedy, plaintiff specifically seeks a remedy limited to his CMWA claim, his FLSA retaliation claim, and his breach of contract claim; he does not seek a prejudgment remedy for his wage claim under the FLSA.

> percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in subdivisions (1) to (4), inclusive, of this section ... and (6) who is compensated for his services on a salary basis at a rate of not less than four hundred dollars per week. . . .

REGS. CONN. STATE AGENCIES § 31-60-14.  Similarly, an

> "employee employed in a bona fide professional capacity" means any employee (1) whose primary duty consists of the performance of: (A) work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual or physical processes or (B) work that is original and creative in character in a recognized field of artistic endeavor, . . . or (C) teaching, tutoring, instructing or lecturing in the activity of imparting knowledge while employed . . .; and (2) whose work requires the consistent exercise of discretion and judgment in its performance; and (3) whose work is predominantly intellectual and varied in character . . .; and (4) who does not devote more than twenty per cent of his hours worked in the workweek to activities which are not an essential part of and necessarily incident to the work described in subdivisions (1) to (3), inclusive, of this section; and (5) who is compensated for his services on a salary or fee basis at a rate of not less than four hundred dollars per week . . . .

REGS. CONN. STATE AGENCIES § 31-60-16.  "The burden rests on the employer to establish that the employee comes within the statutory exemption." Butler, 243 Conn. at 466, citing Shell Oil Co. v. Ricciuti, 147 Conn. 277, 283, 160 A.2d 257, 260 (1960).  In this case, defendants have not satisfied that burden.[12]

At the hearing, plaintiff testified that as the COO, he "did evaluation work, research, and operations for the other entities [in Lucas Brand Equity's portfolio] for the CFO and the CLO of Lucas Brand Equity, Lucas Brand Equity at the management level." (Dkt. #47, Exh. A at 121). Additionally, plaintiff performed "cost accounting [and] inventory reviews[.]" (Id.).

---

[12] Defendants' three and a half page brief in opposition (Dkt. #50) fails to specifically address the legal arguments made by plaintiff; defendants have not argued which exemption applies, if any; and defendants do not address the Counts at issue in the underlying motion.

Plaintiff similarly testified that he was not required to keep time sheets and his "responsibilities warranted" working over forty hour a week due to the "amount of time and the amount of communication that [he] made on a daily basis[.]" (Id. at 135). Plaintiff also testified that he considered his job as a "management job." (Id.). He testified that he worked "as part of a team[]" that marketed HYD's goods; and he was responsible for the manufacturing and distribution of products, for the vendor relationships, for "overseeing all of the development and growth of the business to some extent[,]" and for "resurrecting, growing, and enhancing retail relationships." (Id. at 22). Plaintiff explained that it was Jay Lucas who had the responsibility for overseeing the performance of HYD (id.), and that plaintiff needed approval from Karen Ballou for purchasing and for carrying out his job duties and responsibilities as COO. (Id. at 25; see also id. at 26-27).

Thus, at this stage of the case, in light of the foregoing, and given the breadth of the definition of "employee" as set forth in the CMWA, and given defendants' failure to satisfy their burden of showing that plaintiff falls within an exemption to the CMWA, plaintiff has established probable cause that he will succeed on his claim under the CMWA. See Saunders v. Firtel, 293 Conn. 515, 526-27, 978 A.2d 487, 494-95 (2009)(rejecting contention that as an officer and fifty percent interest holder, who was "running the company," plaintiff was employed in "bona fide executive, administrative or professional capacity," and therefore excluded from the definition of an employee in § 31-58); see also Bennett v. Shaheer, No. CIV 126030297S, 2013 WL 2383604, at *5-6 (Conn. Super. Ct. May 13, 2013)(finding a legally sufficient cause of action by alleging failure to pay commissions under 31-72 to a forty-nine percent holder of the company).

## 2. COUNT TWO: BREACH OF CONTRACT

To state a claim for breach of contract, a party must show "the formation of an agreement, performance of one party, breach of the agreement by the other party and damages." Sullivan v. Thorndike, 104 Conn. App. 297, 303, 934 A.2d 827, 833 (2007) (citations & internal quotations omitted), certif. denied, 285 Conn. 907, 908 (2008).  On September 5, 2015, plaintiff received a letter from Jay Lucas, as the Managing Director of Lucas Brand Equity, LLC, confirming plaintiff's employment as COO of HYD, "a portfolio company of Lucas Brand Equity, LLC[,]" at a compensation of "$120,000 per year, plus health care benefits and related items provided by the company." (Exh. 1).  Additionally, on February 1, 2016, Michael Lanzaro provided a verification of employment letter in his capacity as the "Accountant for Lucas Brand Equity - Hyd USA[,]" in which he stated that plaintiff has been COO for "Lucas Brand Equity - HYD USA since September 1, 2015[,]" and that he is compensated for an "average of 40 hours per week" at a salary of $120,000 per year, which was to be paid in bi-monthly installments.  (Exh. 2).  The foregoing communications to plaintiff confirm the parties' understanding that plaintiff was hired as the COO for a salary of $120,000, he performed such job upon the commencement of his employment on September 1, 2015, and continued to perform his duties even after his compensation was discontinued in May 2016, until he was informed by defendants' counsel that he was no longer employed by defendants.

Although defendants' former counsel stated that plaintiff stopped being paid because "he was not providing the services he was retained to provide[]" (Exh. 6), this information was never communicated to plaintiff, despite the fact that he regularly copied his superiors on his work-related emails, and was in contact with Karen Ballou regularly in June, July and

14

August 2016.  (See Exhs. 7-14).  Additionally, although defendants argue that "[i]n mid-April 2016, [HYD] ran out of money and laid [plaintiff] off[,]" defendants also acknowledge that they never communicated to plaintiff that he was, in fact, laid off.  (Dkt. #50, at 2).  Rather, defendants contend that plaintiff, who had been working for more than three months unpaid, just should have known he was laid off as "[e]very reasonable person would know that they had been laid off due to lack of funding when he or she stopped receiving a check."  (Id.). Yet, plaintiff repeatedly testified that Jay Lucas assured him that he would be paid once they generated revenue.  (Dkt. #47, Exh. A at 50, 52-53).  Additionally, in September 2016, in addition to claiming that it would "behoove" plaintiff to stop working for defendants because "HYD was . . . lacking funds due to the absence of revenue[,]"  defendants, through their former counsel, also stated that plaintiff was not paid due to a lack of "sales activity or production development." (Exh. 6).  Yet defendants also claim that plaintiff "clearly decided to work for sweat equity" after "he was laid off from his job due to lack of funds[,]" and "[f]or this wrap-up work, [plaintiff] was compensated by" Lucas Brand Equity LP, the entity "that had made an investment in the company[.]" (Dkt. #50, at 3-4; see Exh. 17 (confirmations of wire payments paid by HYD USA LLC from January 8, 2016 to May 27, 2016, and then from Lucas Brand Equity LP on June 29, 2016.)).  Defendants' explanation about the change in payor in 2016, however, is inconsistent with the payment history from 2015.

Plaintiff's termination could not have been signified by a change in payor. Lucas Brand Equity LP not only paid plaintiff at the end of April 2016, but Lucas Brand Equity LP also paid plaintiff for a month and a half of work in 2015.  Plaintiff's 2015 1099-MISC reflects payments in 2015 from both Lucas Brand Equity LP and HYD  (Exh. 4 (2015-MISC: $15,000 from Lucas

15

Brand Equity LP; $25,000 from HYD); see also Dkt. #47, Exh. A at 43), all occurring while, as plaintiff testified, he was working for HYD.  (Dkt. #47, Exh. A at 45-46 (plaintiff testified that he worked for HYD USA for four months, earning $40,000 from September to December 2015; he did not realize that his pay, as reported on the 2015 MISC, was coming from two different payors)).

Accordingly, in light of the low probable cause standard, the Court concludes that plaintiff has met his minimal burden necessary to sustain the validity of a breach of contract claim.  Accordingly, plaintiff is entitled to a prejudgment remedy against defendants HYD, Jay Lucas, and Lucas Brand Equity, LLC,[13] jointly and severally, in the amount of $90,000, reflecting "twice the amount" of plaintiff's unpaid wages from June through September 2016.[14]  See CONN. GEN. STAT. § 31-72.

### 3. COUNT SIX: WRONGFUL TERMINATION IN VIOLATION OF FLSA

The FLSA provides that it is "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [FLSA]." 29 U.S.C. § 215(a)(3). "FLSA retaliation claims are subject to the three-step burden-shifting framework established

---

[13]Plaintiff, however, testified that he was employed only as the COO of HYD; he was never the COO for Lucas Brand Equity, LLC. (Dkt. #47, Exh. A at 145-48).  Plaintiff also testified that he was paid by Lucas Brand Equity, LLC, and he named Lucas Brand Equity, LLC as a defendant.  (Id. at 145).  Yet, the copies of the wire transfers admitted at the hearing reflect payment by HYD and by Lucas Brand Equity LP.  (See Exh. 17).  Additionally, plaintiff's 1099-MISC issued in 2015 reflect payment from HYD and from Lucas Brand Equity LP.  (See Exh. 4).  In addition, the employment agreement was signed by Jay Lucas, as Managing Director of Lucas Brand Equity, LLC, and plaintiff's employment was with HYD, "a portfolio company of Lucas Brand Equity, LLC." (Exh. 1). Pending before Judge Eginton is defendants Lucas Brand Equity, LLC and Jay Lucas' motion to dismiss for lack of subject matter jurisdiction (Dkt. #49), in which they assert that there is no legal injury that can be traced to them, and, as a result, plaintiff lacks standing to sue them.

[14]Defendants Lucas Brand Equity, LLC and Jay Lucas have moved for dismissal for lack of subject matter jurisdiction (Dkt. #49), in which they assert that there is no legal injury that can be traced to them, and, as a result, plaintiff lacks standing to sue them.  See note 13 supra.

by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)." <u>Mullins v. City of New York</u>, 626 F.3d 47, 53 (2d Cir. 2010)(citation omitted).  To establish a prima facie case of retaliation under the FLSA, plaintiff must show: "(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." <u>Id.</u> (citations omitted).

Plaintiff established that he continued to perform work for HYD after he stopped being paid in May 2016 (<u>see</u> Exhs. 7-14), and that on August 9, 2016, plaintiff filed this lawsuit, in which he seeks to recover unpaid compensation from defendants.  (Exh. 5 & Dkt. #47, Exh. A at 54-56).  The filing of his FLSA lawsuit constitutes protected activity.  Thereafter, about one month later, Attorney Lawrence Piekes, who was retained by defendants to represent them in this litigation, sent an email, dated September 12, 2016, to plaintiff's counsel stating: "It would . . . behoove Mr. Edelstein to discontinue the activities he claims to have been engaging in on HYD's behalf."  (Exh. 6).  The timing of the email from Attorney Piekes suffices to establish a causal connection between the filing of plaintiff's action and the employment action taken by defendants as "a causal connection between an adverse action and a plaintiff's protected activity may be established" by showing that the protected activity was closely followed in time by the adverse action.  <u>Mullins</u>, 626 F.3d at 53 (citation & internal quotations omitted).  However, in order to be covered under the anti-retaliation provision of the FLSA, plaintiff must establish that he is an "employee" as defined under the FLSA, and must not fall within an exemption under the Act.

As discussed above, <u>see</u> note 11 <u>supra</u>, the Regulations from the Department of Labor applicable to the Fair Labor Standards Act that were in effect at the time plaintiff was

employed by defendants, provide that: "An employee with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of [the FLSA] if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee . . . ." 29 C.F.R. § 541.601 (effective until December 1, 2016).[15]  As the Regulations explain, "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties."  29 C.F.R. § 541.601(c).

Plaintiff was hired to perform the job of COO at an annual salary of $120,000.  (Exh. 1).  Thus, the compensation element of the "highly-compensated employee" exemption is satisfied under the FLSA.  Additionally, to satisfy this exemption under the FLSA, defendant would have to demonstrate that plaintiff "customarily and regularly perform[ed] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee[.]"  29 C.F.R. § 541.601(a)(2).  As discussed in Section I.C.1. supra, defendants have not satisfied their burden.  Accordingly, a prejudgment remedy shall enter on plaintiff's claim in Count Six.

D. DAMAGES

The damages that plaintiff claims "need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate." Savalle v. Kobyluck, No. 3:00 CV 675 (WWE)(HBF), 2001 WL 1913746, at *2 (D. Conn. Sept. 21, 2001)(citations & internal quotations omitted).  Plaintiff seeks a prejudgment remedy in the amount of $320,000.

In this case, plaintiff has "furnish[ed] proof of his damage with reasonable

---

[15]The amendment to this Regulation reads: "As of December 1, 2016, and until a new amount is published in the Federal Register by the Secretary and becomes effective, such an employee must receive total annual compensation of at least $134,004."

18

probability." Mullai, 468 A.2d at 1242.  Accordingly, probable cause exists for the entry of a prejudgment remedy in the amount of $90,000 against defendants, reflecting "twice the amount" of plaintiff's unpaid wages from June through September 2016, and an additional $50,000 against defendants, reflecting five months of unpaid wages, for the FLSA retaliation claim, for a total of $140,000.[16]

### E. DISCLOSURE OF ASSETS

In addition to his motion for prejudgment remedy, plaintiff moved for the disclosure of defendants' assets, so that he may seek an order of attachment under CONN. GEN. STAT. § 52-278n.  Section 52-278n provides that a "court may, on motion of a party, order an appearing defendant to disclose property in which he has an interest or debts owing him sufficient to satisfy a prejudgment remedy."

As stated above, plaintiff has established probable cause to support a prejudgment remedy in the amount of $140,000 against defendants.  It is unclear whether defendants have any assets within Connecticut to satisfy the prejudgment remedy.  Accordingly, plaintiff's Motion for Disclosure of Assets is granted.  On or before **June 26, 2017**, defendants shall disclose to plaintiff the money or property in which they have an interest, or debts owing to them, sufficient to provide security in the amount of $140,000.

### II. CONCLUSION

For the reasons stated above, plaintiff's Motion for Prejudgment Remedy and for

---

[16] Plaintiff also seeks an award of attorneys' fees as part of its prejudgment remedy. (Dkt. #47, at 12). While the Court has found probable cause to believe that wages were withheld, there is disagreement and plausible questions about whether plaintiff falls within an exemption in the CMWA and the FLSA. Additionally, plaintiff has offered no evidence to substantiate his claim for attorneys' fees. See Roberts, 950 F. Supp. 2d at 425 & n.7. Accordingly, the Court declines, at this juncture, to grant plaintiff's motion for prejudgment remedy for attorneys' fees.

Disclosure of Assets (Dkt. #21) is <u>granted in large part, in the amount of $140,000.</u>[17]

This is not a Recommended Ruling, but a ruling on a non-dispositive motion,[18] the standard of review of which is specified in 28 U.S.C. § 636; FED. R. CIV. P. 6(a) & 72; and Rule 72.2 of the Local Rules for United States Magistrate Judges. As such, it is an order of the Court unless reversed or modified by the District Judge upon timely made objection.

<u>See</u> 28 U.S.C. § 636(b)(**written objection to ruling must be filed within fourteen calendar days after service of same**); FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Impala v. United States Dept. of Justice</u>, ____ F. App'x ___, 2016 WL 6787933 (2d Cir. Nov. 15, 2016)(summary order)(failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); <u>cf. Small v. Sec'y, H&HS</u>, 892 F.2d 15, 16 (2d Cir. 1989)(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).

Dated at New Haven, Connecticut, this 2nd day of June, 2017.

                                                                  /s/ Joan G. Margolis, USMJ_____
                                                               Joan Glazer Margolis
                                                               United States Magistrate Judge

---

[17] If either counsel believes that a settlement conference before this Magistrate Judge would be productive, he should contact Chambers promptly.

[18] It has long been the rule in this district that a PJR application is a non-dispositive motion, and upon referral to a Magistrate Judge, does not require a recommended ruling. <u>Aetna Life Ins. Co. v. Tooth Savers Dental Serv.</u>, No. 96 CV 102453 (GLG), 1997 WL 102453, at *1 (D. Conn. Feb. 5, 1997). <u>See also Doe v. Bruno</u>, 17 CV 217 (JAM)(JGM), 2017 WL 1424298, at *4, n.3 (D. Conn. Apr. 20, 2017); <u>Lafarge Bldg. Materials, Inc. v. A. Aiudi & Sons, LLC</u>, 15 CV 1203 (JBA)(JGM), 2015 WL 6551796, at *8, n.19 (D. Conn. Oct. 29, 2015); <u>Corey</u>, 2015 WL 5472507, at *11, n.29; <u>Balzer</u>, 2011 WL 1547211, at *5, n.7; <u>CapitalSource Fin. LLC v. Autorino</u>, 09 CV 2148 (RNC)(DFM), 2011 WL 1195857, at *1, n.1 (D. Conn. Mar. 11, 2011); <u>United of Omaha Life Ins. Co. v. Conn. Student Loan Found'n</u>, 718 F. Supp. 2d 277, 286 (D. Conn. 2010).